**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| THE DUGABOY INVESTMENT TRUST and JAMES D. DONDERO,<br><br>Plaintiffs,<br>v.<br><br>MARK E. PATRICK, individually and as trustee of DAAM REAL ESTATE TRUST; DAAM REAL ESTATE TRUST; PAUL MURPHY; SHAWN RAVER; VALUESCOPE INC. n/k/a MARSHALL & STEVENS DALLAS-FORT WORTH; SHIELDS LEGAL GROUP, P.C.; CDMCFAD, LLC; DFW CHARITABLE FOUNDATION; ATLAS IDF, GP, LLC; RAND ADVISORS, LLC; RAND PE FUND MANAGEMENT, LLC; HUNTER MOUNTAIN INVESTMENT TRUST; CHARITABLE DAF GP, LLC; CLO HOLDCO, LTD.; CLO HOLDCO, LLC; and CDH GP, LTD.,<br><br>Defendants,<br><br>-and-<br><br>ATLAS IDF, L.P.; CHARITABLE DAF FUND, L.P.; RAND PE FUND I, L.P.; BEACON MOUNTAIN, LLC; and CHARITABLE DAF HOLDCO, LTD.,<br><br>Nominal Defendants. | Case No. ______________<br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

1. Plaintiffs The Dugaboy Investment Trust, and James D. Dondero bring this action against Defendants Mark E. Patrick, individually and as trustee of DAAM Real Estate Trust; the DAAM Real Estate Trust; Paul Murphy; Shawn Raver; ValueScope Inc. n/k/a Marshall & Stevens Dallas-Fort Worth; Shields Legal Group, P.C.; CDMCFAD, LLC; DFW Charitable Foundation; Rand Advisors, LLC; Rand PE Fund Management, LLC; Atlas IDF, GP, LLC; Hunter Mountain

Investment Trust; Charitable DAF GP, LLC; CLO Holdco, Ltd.; CLO Holdco, LLC; and CDH GP, Ltd.; and Nominal Defendants Atlas IDF, LP; Charitable DAF Fund, L.P.; Rand PE Fund I, L.P.; Beacon Mountain, LLC; and Charitable DAF Holdco, Ltd. Plaintiffs allege the following based on documents, testimony, and proceedings in related matters, and on information and belief where facts are peculiarly within Defendants' knowledge or control.

## NATURE OF THE ACTION

2. This case is about fraud, theft, and a breathtaking breach of trust. Mark Patrick assembled a corrupt enterprise of accountants, advisors, and puppet directors to steal hundreds of millions of dollars in assets from four established charities. He did so both to take control of those assets and to pay himself tens of millions of dollars—and then tens of millions more to his co-conspirator directors and advisors to paper this massive transfer of wealth from charities to himself.

3. The nature of the victims of this theft and fraud make the misconduct all the more grotesque. The charitable structures from which Mr. Patrick stole were, prior to his misconduct, helping the least advantaged and most suffering. From injured veterans to economically disadvantaged high school students, the charities had been positively changing lives for years. Mr. Patrick's misconduct put an abrupt stop to that. Funds that were aiding the helpless were converted into luxury ranches and eight-figure bank accounts for Mr. Patrick.

4. The charitable structures in question were created by the generosity of James Dondero and Mark Okada. Messrs. Dondero and Okada worked hard to create one of the Nation's most successful investment businesses and were pioneers in establishing the modern hedge fund industry. And they used the product of that hard work to establish a charitable legacy. To do so, Mr. Dondero established what was called "the Charitable DAF," and Messrs. Dondero and Okada established another structure related to it that was centered on the Hunter Mountain Investment Trust. These structures allowed a gift of promising assets to new corporate structures that were

committed to work for the benefit of (depending on the structure) as many as four established charities and their "supporting organizations," a special type of entity created under the Internal Revenue Code. Messrs. Dondero and Okada would then sit on the board of these supporting organizations and, working with leaders of the charities, would have a significant say on the good causes to which the fruits of their gift would be directed.

5. By committing the fraud that is detailed below, Mr. Patrick absconded with one of those two donors' most important possessions: The ability to have a say about the good works to which the fruits of their gift would be put. Worse, he took those resources away from any charitable end and put them into the pockets of himself and his co-conspirators.

6. For years before Mr. Patrick got involved, this charitable endeavor was a massive success. With the input of Mr. Dondero, the assets of the Charitable DAF changed the lives of people across the country. They funded transformative initiatives for veterans wounded or affected by the wars in Iraq and Afghanistan. The Secretary of Defense called Mr. Dondero's charitable initiative one of the single most consequential private interventions in salving the trauma of war during the last two decades. They stood up a high school providing free, faith-based college preparatory educations to the disadvantaged, coupled with internships throughout the business community. The Charitable DAF's assets contributed to becoming an anchor donor for the Bush Presidential Center, a stable ballast of public affairs thought in politically polarized times for our country.

7. The assets of the Charitable DAF grew substantially. What started as a gift of tens of millions grew to hundreds of millions. By the early 2020s, the Charitable DAF was poised to make a considerable difference in the lives of people across the country.

8. The parallel Hunter Mountain structure was also poised to do great good for the

needy across the country. One of the investment funds that Messrs. Dondero and Okada had founded—Highland Capital Management, L.P.—became a leader in managing collateralized debt and loan obligations, a form of corporate debt instruments. Messrs. Dondero and Okada wanted Highland Capital Management, L.P., to provide a charitable legacy for both of their families. So they transferred their equity stakes in Highland Capital Management to the Hunter Mountain Investment Trust, in exchange for a handful of future obligations that did not come close to the value of that equity. Like the Charitable DAF, the Hunter Mountain structure was organized to benefit an established charity—the Dallas Foundation—and entities underneath the Dallas Foundation that permitted Messrs. Dondero and Okada to have a say in the ultimate use of the charitable assets.

9. Then Mark Patrick happened. The prior trustee for the Charitable DAF and the administrator for entities in the Hunter Mountain structure separately decided to step aside to pursue other endeavors, and Mark Patrick volunteered to take those positions over, claiming he understood the organizations' mission and values. Mr. Patrick was involved in setting up these structures for Messrs. Dondero and Okada when he was a tax lawyer helping their investment funds.

10. What Mark Patrick really saw was an opportunity for graft and to enrich himself at the expense of the least fortunate—the charitable beneficiaries of Messrs. Dondero and Okada's giving. In 2024, Mr. Patrick launched a conspiracy to stuff tens of millions of those charitable assets into his own pocket, as well as the pockets of the enterprise he built to pull off his breathtaking fraud.

11. To do this, Mr. Patrick needed help. He assembled a roster of unscrupulous directors for the various entities that would have to make decisions, professionals who would

advise him on how to execute the fraud and who would make up a patina of justification for his misconduct, and accountants who would concoct bogus valuations for transactions that would consummate the theft. His co-conspirators churned out reams of paper in secret to effect his fraud. Bald-faced lies were conceived and communicated to the charities to delay their inquiries that might have uncovered the misconduct earlier. High-minded excuses for Mr. Patrick's behavior were readied for when he got caught.

12. The whole point of all this activity was *to pay Mark Patrick a princely sum*. Mr. Patrick decided that—for what effectively amounted to a part-time job if he weren't scheming to steal so many of the assets—the charitable structures should pay him *more than 18 million dollars* over just a few quarters in 2024 and 2025. Of course, Mr. Patrick knew that was not appropriate, so he caused the charitable structures to pay his co-conspirator director Paul Murphy more than four million for "approving" his compensation. And he converted tens of millions more in charitable assets into stomach-turning buy offs for professionals who would put aside any notion of ethics to help him paper the transactions that would help with the fraud.

13. In doing so, he stood up a corrupt enterprise with a malign purpose: To divert assets from charities into his pocket.

14. With the bounty he had extracted from the charitable assets, he bought himself a four-hundred-acre ranch in Boone County, Missouri, a compound from which he would direct the next steps in his scam.

15. Mr. Patrick was acutely aware that Messrs. Dondero and Okada, and the established charities their gifts were intended to benefit, would not stand for this eye-popping money grab. So, he had been planning and—in 2024, began to execute—divorcing those charities from the charitable structure and replacing them with a made-up, sham "charity" that was headquartered in

one of his houses and that he controlled. This new entity was called the DFW Charitable Foundation.

16. The DFW Charitable Foundation does not have an office. It does not have professional charitable staff. The plan from the beginning was to take all the Charitable DAF's assets and drop them into this sham charity. Then, Mr. Patrick would control all the assets and, he hoped, would answer to no one and would owe duties to no one but himself. Only then could he argue that what he paid himself and his co-conspirators was no one's business.

17. He asked lawyers at co-defendant the Shields Law Group, P.C., to map out how he could take all the charitable assets from the established charities and causes that Messrs. Dondero and Okada had worked so hard to benefit. The Shields Law Group prepared a "Work Plan," which was essentially a guide for Mr. Patrick to execute his planned theft.

18. And Mr. Patrick took that plan and got to work. He instructed law firms to begin standing up new corporate entities that would be "hard to track or trace," lest the charities or the donors to the charitable structures detect Mr. Patrick's misconduct before it was completed. This led to the creation of an alphabet soup of non-descript corporate entities that would be difficult, if not impossible, to find. Mr. Patrick caused the creation of defendant CDH GP, Ltd., a Cayman Islands entity that would become the new general partner of the Charitable DAF structure and direct the theft of assets from the established charities. He also directed his lawyers to stand up defendant CDMFAD LLC, a new entity to which he would transfer the limited partnership shares in the entity that held the Charitable DAF's assets.

19. He then began diluting the established charities' ownership in the assets of the Charitable DAF, issuing new shares to his sham charity, DFW Charitable Foundation. Ultimately, he went opinion-shopping for an accountant who would bend reality to determine that the

established charities did not really own more than $270 million in assets, but less than one percent of that. After one legitimate firm after another turned him down, co-defendant ValueScope Inc. agreed to issue an "opinion" that the $270 million in assets owned by the established charities were really worth only $1.6 million. In March 2025, with this fraudulent opinion in hand, he "redeemed" the established charities out of his new corporate entities for $1.6 million, leaving his concocted DFW Charitable Foundation with more than $270 million in assets.

20. Key to all of this was telling absolutely none of the victims. He never told the established charities or the donors about any of this so-called restructuring activity. Worse, he sent his agents—including co-defendant Paul Murphy and his deceased lawyer Doug Mancino—out to lie to the charities and lull them into inaction, lest they start asking questions during the last quarter of 2024 and the first of 2025 while he was carrying out his fraud. In October 2024, when Mr. Patrick left his role as a tax lawyer for Mr. Dondero's enterprise, Mr. Patrick assured the charities that nothing in the structure of the Charitable DAF would change and the charities' more than $270 million in assets continued to be in safe hands. He then deployed Messrs. Murphy and Mancino to claim that the Charitable DAF—while Mr. Patrick was restructuring it—had all sorts of safeguards against fraud and misconduct. They went so far as to assemble a galling PowerPoint presentation touting what they claimed was some kind of state-of-the-art compliance structure for the Charitable DAF designed to stop exactly the kind of pilfering in which Mr. Patrick was already engaged. They promised forthcoming financial transparency into how the charities' assets were being cared for, falsely representing that the Charitable DAF was working on audited financial statements that would be released imminently. All of these lies were meant to encourage contentment and give Mr. Patrick time to complete his fraud. And all of these lies were orchestrated by Mr. Patrick.

21. In parallel, Mr. Patrick was raiding the Hunter Mountain structure. In a sham

undisclosed transaction, he sold the Hunter Mountain Investment Trust—and with it almost all the equity interest in Highland Capital Management, L.P.—from the structure that was meant to benefit the Dallas Foundation to the Charitable DAF. He made sure this additional asset would arrive at the Charitable DAF in time for Mr. Patrick and DFW Charitable Foundation to steal it and the more than $270 million in assets that were already there. Most remarkable, Mr. Patrick was pulling these shenanigans with respect to Hunter Mountain Investment Trust in his role as a registered investment advisor regulated by the United States Securities and Exchange Commission. The Investment Advisors Act, as one would expect, forbids a person registered with the SEC to be trusted with managing assets on behalf of a fund's beneficiaries from selling fund assets to other entities he controls with no disclosure to anyone. But Mr. Patrick's fraud was never going to let the solemn duties assigned to him by federal law get in the way of his heist.

22. In the end, Mr. Patrick's enterprise of perfidy is precisely what the Racketeer Influenced and Corrupt Organizations Act was designed to combat.

23. Fortunately, that law and many others give this Court the power to right this wrong. In the first instance, this Court should pause these defendant corporate entities as they are and appoint a receiver to govern their affairs so that Mr. Patrick may take no further steps through use of his corrupt enterprise to advance his grotesquely perfidious scheme. And then the Court should begin the process of returning the stolen assets to the charities so that they can continue distributing to the less fortunate among us who so desperately need them.

24. Plaintiffs assert civil RICO claims based on Defendants' use of interstate wires, mail, and related acts to carry out and conceal their scheme. Plaintiffs also assert common-law claims for fraud, conversion, breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, civil conspiracy, unjust enrichment, and equitable tracing

and constructive-trust remedies concerning property in Missouri.

**THE PARTIES**

*Plaintiffs*

25. Plaintiff The Dugaboy Investment Trust is a Delaware statutory trust with its principal place of business in Dallas, Texas. It was created through both the transfer and donation of numerous assets by Mr. Dondero and the companies of which he was an owner. Mr. Dondero is the sole beneficiary of the trust during his lifetime, and certain heirs become beneficiaries of the trust after his death. The Dugaboy Investment Trust directly or indirectly holds property, contractual, governance, note, investment, or claim rights affected by Defendants' conduct.

26. Plaintiff James D. Dondero is a Texas resident. He co-founded Highland Capital Management, L.P., formerly served as Highland Capital Management's Chief Executive Officer, and is the president of NexPoint Advisors, L.P. Mr. Dondero and entities that he controlled granted assets to The Dugaboy Investment Trust. Mr. Dondero also has direct contractual, property, governance, advisory, and expectancy rights affected by Defendants' conduct, including rights associated with the Hunter Mountain Investment Trust and charitable structures described herein.

*Defendants*

27. Defendant Mark E. Patrick is a Texas-licensed attorney and former tax counsel for Plaintiffs and other Highland Capital Management, L.P.-related entities. Mr. Patrick later obtained managerial, fiduciary, and advisory authority over and with respect to the Charitable DAF and Hunter Mountain Investment Trust structures. Mr. Patrick is alleged to have designed, directed, and personally benefitted from the restructuring and diversion of assets alleged below. Mr. Patrick is sued individually and as trustee of DAAM Real Estate Trust.

28. On information and belief, Mr. Patrick is a trustee of Defendant, the DAAM Real Estate Trust, which holds real property located at 4909 Minor Hill Road, Ashland, Missouri 65010

(the "Ashland Property"). On information and belief, Mr. Patrick conducts the business of DAAM Real Estate Trust from the Ashland Property. On information and belief, the Ashland Property is Mr. Patrick's primary residence or a residence where he spends a substantial amount of time. Mr. Patrick and his wife, Darees, purchased that property on or about November 4, 2024, and conveyed it to DAAM Real Estate Trust, with Mark E. Patrick and Darees T. Patrick as trustees, on or about November 20, 2024. Ex. 1, Ashland Property Nov. 4, 2024, Trustee Deed; Ex. 2, Ashland Property Nov 20, 2024, Warranty Deed. He is (a) the Sole Manager of Defendant CDMCFAD, LLC, (b) a Director of Defendant DFW Charitable Foundation, (c) the Sole Manager of Defendant Rand Advisors, LLC, (d) the Sole Manager and President of Rand PE Fund Management, LLC, (e) the Sole Manager and President of Defendant Atlas IDF GP, LLC., (f) the control person, by virtue of his control of its general partner and investment advisor, of Defendant Atlas IDF, L.P., (g) the control person, by virtue of his control of its general partner and investment advisor, of Defendant Rand PE Fund I, L.P.; (h) on information and belief, the Sole Manager of Defendant Beacon Mountain, LLC, (i) the Administrator of Defendant Hunter Mountain Investment Trust, (j) the control person, by virtue of his ownership of its general partner, of Charitable DAF Fund, L.P., (k) a Director of Defendant CLO Holdco, Ltd., (l) on information and belief, the sole manager of Defendant CLO Holdco, LLC, and (m) the sole owner and President of Defendant CDH GP, Ltd.

29. Defendant Paul Murphy is a resident of the Cayman Islands. He is a licensed attorney with Stanbrook Prudhoe and is admitted to practice in the Cayman Islands and in England and Wales. Mr. Murphy serves with Mr. Patrick as a director of Charitable DAF Holdco, Ltd., and participated in the offshore administration and implementation of the challenged restructuring, valuation, redemption, and liquidation conduct described below.

30. Defendant Shawn Raver is a Texas resident. On information and belief, Mr. Raver

previously served as legal counsel for Highland Capital Management, L.P. until 2021 and currently serves as Chief Operating Officer at DFW Charitable Foundation and, during the relevant period, served as Chief Operating Officer of Charitable DAF Holdco, Ltd. Mr. Raver participated in the administration, accounting, legal, and operational steps by which Mr. Patrick and others implemented the challenged restructuring and to have served in control or officer roles at CDMCFAD, LLC, and/or DFW Charitable Foundation.

31. Defendant Marshall & Stevens, Inc. is a Delaware corporation with a principal place of business at 800 West Sixth Street, Suite 950, Los Angeles, California, 90017. In late Summer 2024, Marshall & Stevens, Inc., purchased ValueScope Inc. On information and belief, before its acquisition, ValueScope Inc.'s principal place of business was at 950 E. State Highway 114, Suite 120, Southlake, Texas, 76092, and Marshall & Stevens, Inc. maintained the Southlake, Texas office after the acquisition. In 2025, ValueScope Inc. supplied Mr. Patrick with a valuation that ValueScope Inc. knew would be used by Mr. Patrick to redeem for $1.6 million assets that ValueScope Inc. had previously appraised for approximately $270 million.

32. Defendant Shields Legal Group, P.C. is a Texas professional corporation and law firm with its principal place of business at 16400 Dallas Parkway, Suite 300, Dallas, Texas, 75248. On information and belief, Shields Legal did more than provide neutral legal advice: it prepared and implemented the work plan, entity-formation documents, restructuring steps, and concealment-oriented devices that instructed Mr. Patrick about how to secretly remove assets and rights from the existing charitable structure without notice to affected stakeholders.

33. Defendant CDMCFAD, LLC, is a Delaware limited liability company. The registered address of CDMCFAD, LLC, is 6716 Glenhurst Drive, Dallas, Texas, 75254. CDMCFAD, LLC, was inserted into the Charitable DAF structure as an intermediary between the

existing participating shareholders and the underlying assets, and functioned as an instrumentality through which Defendants asserted control over charitable assets and rights and stole them from Mr. Dondero and the established charities and supporting organizations. On information and belief, as the sole manager of CDMCFAD, LLC, Mr. Patrick conducts the business of CDMCFAD, LLC, from his ranch in Ashland, Missouri.

34. Defendant DFW Charitable Foundation is a Delaware not-for-profit entity and 501(c)(3) organization. The registered address of the DFW Charitable Foundation is 6716 Glenhurst Drive, Dallas, Texas, 75254. On information and belief, Mr. Patrick, as the Director of DFW Charitable Foundation, conducts the business of DFW Charitable Foundation at his ranch in Ashland, Missouri. DFW Charitable Foundation was created and controlled by Mr. Patrick and became the recipient of majority participation-share rights and later 100% of the value diverted from the existing supported charities. DFW Charitable Foundation is alleged to have functioned as an instrumentality and repository of the challenged transfers.

35. Defendant Rand Advisors, LLC is a Delaware limited liability company. The registered address of Rand Advisors, LLC is 6716 Glenhurst Drive, Dallas, Texas, 75254. Mr. Patrick is the sole manager of Rand Advisors, LLC, and conducts the business of Rand Advisors, LLC, from his ranch in Ashland, Missouri. Rand Advisors, LLC is a registered investment advisor group who provided advice to Rand PE Fund I, L.P., including when it sold its membership interest in Beacon Mountain, LLC, into the Charitable DAF structure.

36. Defendant Rand PE Fund Management, LLC is a Delaware limited liability company. The registered address of Rand PE Fund Management, LLC is 2101 Cedar Springs Road, Suite 1200, Dallas, Texas, 75201. Mr. Patrick is the manager of Rand PE Fund Management, LLC and conducts its business from his ranch in Ashland, Missouri. Rand PE Fund

Management, LLC, is the general partner of Rand PE Fund I, L.P.

37. Defendant Atlas IDF GP, LLC is a Delaware limited liability company. The registered address of Atlas IDF GP, LLC. is 2101 Cedar Springs Road, Suite 1200, Dallas, Texas, 75201. Mr. Patrick is the manager of Atlas IDF GP, LLC, and conducts its business from his ranch in Ashland, Missouri. Atlas IDF GP, LLC is the general partner of Atlas IDF, L.P.

38. Nominal Defendant Atlas IDF, LP is a Delaware "series" limited partnership. The registered address of Atlas IDF, L.P., is 2101 Cedar Springs Road, Suite 1200, Dallas, Texas, 75201. Atlas IDF GP, LLC, manages and makes decisions for Atlas IDF, L.P., and Mr. Patrick has used his authority over Atlas IDF GP, LLC, to engage in misconduct with respect to Atlas IDF, L.P. Atlas IDF, L.P., is a majority-owner of Rand PE Fund I, L.P.

39. Nominal Defendant Rand PE Fund I, L.P., is a Delaware limited partnership. The registered address of Rand PE Fund I, L.P., is 2101 Cedar Springs Road, Suite 1200, Dallas, Texas, 75201. , Rand PE Fund Management, LLC, is the general partner Rand PE Fund I, L.P. Through his control of Defendant Rand PE Fund Management, LLC, Mr. Patrick corruptly managed the business of Nominal Defendant Rand PE Fund I, L.P. Rand PE Fund I, L.P., owned Hunter Mountain Investment Trust until it sold its membership interest in Beacon Mountain, LLC, which owned Hunter Mountain Investment Trust, into the Charitable DAF structure.

40. Nominal Defendant Beacon Mountain, LLC, is a Delaware limited liability company. The registered address of Beacon Mountain, LLC, is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801. Mr. Patrick is the sole manager of Beacon Mountain, LLC, and conducts the business of Beacon Mountain, LLC from his ranch in Ashland, Missouri. Beacon Mountain, LLC owns Hunter Mountain Investment Trust and indirectly holds 99.5% of Highland Capital Management, L.P.'s outstanding limited

partnership interests.

41. Defendant Hunter Mountain Investment Trust is a Delaware statutory trust. The registered address of the Hunter Mountain Investment Trust 87 Railroad Pl., Apt. 203, Saratoga Springs, New York, 12866-2144. Mr. Patrick holds himself out as the Administrator of Hunter Mountain Investment Trust. In purporting to act as its Administrator, Mr. Patrick conducts the business of Hunter Mountain Investment Trust from his ranch in Ashland, Missouri. Hunter Mountain Investment Trust was created when substantial ownership stakes in Highland Capital Management, L.P., were transferred to Hunter Mountain Investment Trust. Through those transfers, Hunter Mountain Investment Trust directly owns 99.5% of the outstanding limited partnership interests in Highland Capital Management, L.P. Hunter Mountain Investment Trust was owned by Beacon Mountain, LLC. When Rand PE Fund I, L.P., sold its membership interest in Beacon Mountain, LLC into the Charitable DAF structure, Charitable DAF entity CLO Holdco, LLC, became the owner of Beacon Mountain, LLC, the Hunter Mountain Investment Trust, and its stake in the equity of Highland Capital Management, L.P.

42. Nominal Defendant Charitable DAF HoldCo, Ltd. is a Cayman Islands exempted company with a principal place of business at Campbells Corporate Services Limited, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands. Charitable DAF HoldCo, Ltd. made distributions to the supporting organizations for donation to charity. The supporting organizations' ownership in Charitable DAF HoldCo, Ltd. was diluted when Mark Patrick added his own charity, DFW Charitable Foundation, to the charitable structure. Mark Patrick then redeemed Charitable DAF HoldCo, Ltd.'s assets.

43. Nominal Defendant Charitable DAF Fund, L.P. is a Cayman Islands exempted limited partnership with a registered place of business in George Town, Grand Cayman, Cayman

Islands. On information and belief, Charitable DAF Fund, L.P.'s address for service is Walkers Corporate Services Limited, Walker Houst, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands, and may also be served with process at Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801. At various times relevant to this complaint, Charitable DAF GP, LLC, and then (through a false and fraudulent restructuring) CDH GP, Ltd., controlled and made decisions for Charitable DAF Fund, L.P. Mr. Patrick is the sole manager of both Charitable DAF GP, LLC and CDH GP, Ltd., and conducted the business of those entities, and therefore Charitable DAF Fund, L.P., from his ranch in Ashland, Missouri.

44. Nominal Defendant Charitable DAF GP, LLC is a Delaware limited liability company and has listed The Corporation Trust Company Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801 as its address for service. At various times relevant to this complaint, Charitable DAF GP, LLC controlled and made decisions for Charitable DAF Fund, L.P. Mr. Patrick is the sole manager of Charitable DAF GP, LLC and conducts its business from his ranch in Ashland, Missouri.

45. Defendant CLO Holdco, Ltd., is a Cayman Islands exempted company, located at Floor 4, Willow House, Cricket Square, Grand Cayman, KY-9010, Cayman Islands. Mr. Patrick is the sole control person of CLO Holdco, Ltd., and conducts its business from his ranch in Ashland, Missouri. CLO Holdco, Ltd. is the owner of CLO Holdco, LLC. Charitable DAF Fund, L.P. directly or indirectly owns all of the entities in the charitable structure.

46. Defendant CLO Holdco, LLC is a Delaware limited liability company and has listed The Corporation Trust Company Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801 as its address for service. Mr. Patrick is the sole manager of CLO Holdco, LLC,

and conducts its business from his ranch in Ashland, Missouri. CLO Holdco, LLC purchased the membership interests in Beacon Mountain, LLC, from Rand PE Fund I, L.P.

47. Defendant CDH GP, Ltd. is a Cayman Islands exempted company with limited liability and has listed Campbells Corporate Services Limited, Floor 4 Willow House, Cricket Square, Grand Cayman, KY-9010, Cayman Islands as its address for service. On information and belief, CDH GP, Ltd. may be served with process through Mr. Patrick, the sole owner and President of CDH GP, Ltd. On information and belief, Mr. Patrick, as the sole owner and President of CDH GP, Ltd., and conducts its business from his ranch in Ashland, Missouri. At Mr. Patrick's direction, Defendant Shields Legal Group, P.C. inserted CDH GP, Ltd. as the general partner of the Charitable DAF Fund, L.P., which gave CDH GP, Ltd. control over Charitable DAF Fund, L.P.'s assets.

## **JURISDICTION AND VENUE**

48. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968.

49. This Court has supplemental jurisdiction over Plaintiffs' common-law and equitable claims under 28 U.S.C. § 1367(a) because those claims arise from the same case or controversy as the federal RICO claims.

50. The Court has personal jurisdiction over Mr. Patrick pursuant to 18 U.S.C. § 1965(a), because this case is brought under the Racketeering Influenced Corrupt Organizations Act and Mr. Patrick "resides, is found, has an agent, or transacts his affairs" in the Western District of Missouri. *Id.* The Court has personal jurisdiction over Mr. Patrick under Missouri's long-arm statute, RSMo. § 506.500, and the Due Process Clause of the Fifth Amendment to the United States Constitution because Mr. Patrick purposefully directed and conduct tortious, fraudulent, and illegal

conduct from his ranch headquarters in Missouri. Mr. Patrick also directed tortious and fraudulent conduct at Missouri and at a Missouri charitable organization, acquired and held Missouri real property through DAAM Real Estate Trust, and, on information and belief, used to purchase and/or maintain that property proceeds from the misconduct at issue in this complaint.

51. The Court has personal jurisdiction over the remaining Defendants under RICO's nationwide-service provisions, including 18 U.S.C. § 1965(b), because at least one Defendant is subject to jurisdiction in this District, all Defendants are and have been made to be by Mr. Patrick members or participants in the same RICO enterprise or conspiracy, and the ends of justice require that all participants in the nationwide and international scheme be brought before one court. Each Defendant also has sufficient national contacts with the United States.

52. The Court also has personal jurisdiction over the Defendants other than Mr. Patrick under Missouri law, the long arm statute of which extends personal jurisdiction to the limits of the Due Process Clause of the Fourteenth Amendment to the Constitution, because Defendants collaborated or conspired with Mr. Patrick when he was present at his ranch in Missouri, knowingly directed conduct at a Missouri-based supported charity, and because they used interstate wires, domestic professional services, Delaware and Texas entities, and United States bankruptcy proceedings to carry out and conceal the conduct alleged below.

53. Mr. Patrick and the other Defendants directed their misconduct, in part, at the Greater Kansas City Foundation. The Greater Kansas City Foundation is a charitable entity located in this District at 1055 Broadway Boulevard, Kansas City, Missouri.

54. Venue is proper in this District under 18 U.S.C. § 1965(a) and (b) because Mr. Patrick resides, is found, has property interests, or transacts affairs in this District, and because the interests of justice require a single action against all RICO participants. Venue is also proper under

28 U.S.C. § 1391(b)(2) because a substantial part of the events, omissions, injuries, and property at issue were conducted in and/or are connected to this District, including at or related to Mr. Patrick's ranch in Ashland, Missouri, and with respect to a charitable entity located in this District.

## FACTUAL ALLEGATIONS

*A. The charitable structures were created to preserve and grow assets for charity.*

55. In 1993, Messrs. Dondero and Mark Okada co-founded Highland Capital Management, L.P. They built Highland Capital Management, L.P. into one of the world's leading hedge funds.

56. Mr. Dondero also sought to establish a substantial charitable legacy. His charitable giving included educational initiatives for disadvantaged students, veterans' programs, and major civic and public-service projects.

57. For this purpose, Dondero established several charitable structures. The structures at issue were designed to preserve and grow assets for charitable purposes, not to enrich the individuals later entrusted with administrative control.

58. In 2011, Mr. Patrick, then serving as tax counsel for The Dugaboy Investment Trust, Dondero, and other Highland Capital Management, L.P.-related entities, advised on the creation of a tax-advantaged charitable structure referred to here as the "Charitable DAF," structured with the various DAF entities identified herein. Mr. Patrick helped design the structure and coordinated legal and tax professionals involved in its formation.

59. The Charitable DAF structure centered on Charitable DAF Holdco, Ltd., a Cayman Islands exempted company. Participation shares in Charitable DAF Holdco, Ltd. were held by supporting organizations established under Section 509(a)(3) of the Internal Revenue Code. The supporting organizations existed to support designated public charities, including the Greater Kansas City Community Foundation, The Dallas Foundation, and the Santa Barbara Foundation.

Prior to the actions of Mr. Patrick and his co-conspirators, the three supporting organizations owned more than 98% of the economic interest in Charitable DAF Fund, L.P. through their ownership of the participation shares in Charitable DAF Holdco, Ltd. Management shares in Charitable DAF Holdco, Ltd. were held by the administrator of the fund.

60. Charitable DAF Holdco, Ltd. in turn held a 100 percent ownership stake in Charitable DAF Fund, L.P. The general partner of Charitable DAF Fund, L.P. was an entity called Charitable DAF GP, LLC. Charitable DAF Fund, L.P. then held 100 percent interest in CLO Holdco, Ltd., which sat as a holding company over all the assets owned by the structure.

61. From the inception of the Charitable DAF structure, Mr. Dondero sat on the boards of each supporting organization holding participation shares in Charitable DAF Holdco, Ltd., giving him a substantial voice with respect to the charitable causes the Charitable DAF's assets would be used.

62. The participation shares conferred economic rights, including rights to participate in profits, assets, winding-up, repayment of capital, and related liquidation rights as stated in the governing documents. The supported charities and their supporting organizations therefore had direct and identifiable rights and interests in the charitable structure and its assets.

63. From its inception until the misconduct and fraud identified herein, the Charitable DAF funded substantial charitable work. It distributed more than $55 million to charitable causes, and, by approximately the first quarter of 2024, it held or controlled more than $270 million in assets available for further charitable use.

64. One of the charities the Charitable DAF was meant to support was the Greater Kansas City Community Foundation, which focuses on education, housing, family stability, and support for socio-economically disadvantaged individuals. Mr. Dondero and the Foundation

worked together to identify the best uses for the charitable funds, resulting in almost $5 million in donations to noble causes through the Highland Kansas City Foundation, Inc., and the Greater Kansas City Community Foundation.

65. Before Mr. Patrick's fraud and misconduct, the DAF structure was organized as reflected in the chart below:




*Figure 1. DAF structure before the challenged restructuring.*

<u>*B. Mr. Dondero and his partner established a second charitable structure, centered on The Hunter Mountain Investment Trust.*</u>

66. In December 2015, Mr. Dondero and Mr. Okada created a separate charitable and investment structure centered on the Hunter Mountain Investment Trust. Hunter Mountain Investment Trust was governed by the December 17, 2015, Hunter Mountain Investment Trust Agreement (the "Trust Agreement").

67. Messrs. Dondero and Okada founded the Hunter Mountain Investment Trust in order to receive a substantial part of the ownership stake held by them and their family trusts in Highland Capital Management, L.P., effectively as a donation as the transfers were in return for future obligations worth much less that what the equity stake was worth. Through these transfers, Hunter Mountain Investment Trust became the owner of 99.5% of the outstanding limited partnership interests in Highland Capital Management, L.P.

68. The point of Messrs. Dondero and Okada's transfer to Hunter Mountain Investment Trust was charitable. To carry out this charitable purpose, Messrs. Dondero and Okada ensured that the beneficiary of these substantial net assets would be charitable organizations, namely The Empower Dallas Foundation, The Okada Foundation, and The Dallas Foundation.

69. Mr. Dondero sits on the board of Empower Dallas. Mr. Okada sits on the board of The Okada Foundation. These positions gave Messrs. Dondero and Okada a substantial say on the ultimately charitable ends to which the equity position in Hunter Mountain Investment Trust would be put to use.

70. Empower Dallas and The Okada Foundation, through an annuity policy at the independent Crown Global Insurance Company, are the beneficial owners of a 100 percent limited partnership interest in Atlas IDF, L.P. Atlas IDF GP, LLC. serves as the general partner of Atlas IDF, L.P., and Atlas IDF, L.P. in turn owns a 96 percent interest in Rand PE Fund I, L.P. Dondero-controlled Dolomiti, LLC and Okada-controlled Hakusan, LLC, originally owned the remainder before Mr. Patrick, through Rand PE Fund I, L.P.'s general partner, purported to redeem their interests.[1] Rand PE Fund I, L.P., is controlled by Rand PE Fund Management, LLC. Mr. Patrick controls this structure through his role as a U.S. Securities and Exchange Commission registered

---

[1] That unlawful redemption is the subject of the currently pending litigation in the New York Supreme Court of New York County: *Crown Global Life Insurance Ltd. vs. Patrick*, Docket No. 654453/2026 (N.Y. Sup Ct. Jul 29, 2026).

investment advisor and the investment advisor relationship between the funds and Rand Advisors LLC.

71. Rand PE Fund I, L.P., was the sole owner of Beacon Mountain, LLC, which is the sole beneficiary of the Hunter Mountain Investment Trust.

72. The structure was designed to have administrators who were separate from Messrs. Dondero and Okada. But several safeguards were put in place to ensure that various administrators in this structure would be under fiduciary duties to act in the best interests of the charitable entities that were supposed to benefit from the structure and in a manner consistent with the intent of the donors.

73. One such safeguard was the Hunter Mountain Trust Agreement. It provided that the administrator would be automatically removed upon any "Trigger Event." A Trigger Event included the administrator engaging in breach of fiduciary duty, dishonesty, fraud, willful misconduct, bad faith, or theft "in any capacity." The Trust Agreement further provided that upon a Trigger Event the administrator would be removed immediately without further action by the Delaware trustee or any other party.

74. Another safeguard is the ownership structure above the Hunter Mountain Investment Trust, which places the trust under the care of the Rand PE Fund I, L.P., for which in turn decisions are made by its registered investment advisor Rand Advisors. As a registered investment advisor, Rand Advisors was bound under the Investment Advisers Act of 1940, and regulations promulgated thereunder, to make decisions solely in the best interest of its investors and to keep informed the beneficial owners, which included the charitable entities and entities owned by Messrs. Dondero and Okada.

75. The initial Hunter Mountain Investment Trust structure was organized as reflected

in the chart below:




*Figure 2. Hunter Mountain Investment Trust / Rand structure before the challenged restructuring.*

*C. When their original leaders stepped back for other pursuits, Mr. Patrick was appointed to key roles of trust in the two charitable structures.*

76. When he created the Charitable DAF structure, Mr. Dondero appointed Grant Scott to the position of trust of running it. The holder of that position is responsible for the governance and management functions of the Charitable DAF entities to carry out their sole purpose of benefiting the supporting organizations and the charities Mr. Dondero selected from them to benefit.

77. When the Hunter Mountain Investment Trust structure was created, Messrs. Dondero and Okada nominated John Honis as its steward. In April 2021, Grant Scott stepped down from his roles in the DAF structure and transferred responsibilities to Mr. Patrick. In August 2022,

John Honis stepped down from his roles in the Hunter Mountain Investment Trust structure and transferred responsibilities to Mr. Patrick. Simultaneously, Mr. Patrick also became manager or controller of entities in the Hunter Mountain Investment Trust structure, including Atlas IDF, L.P., Rand PE Fund I, L.P., and Beacon Mountain, LLC.

78. Once in control of either or both structures, Mr. Patrick owed fiduciary, contractual, statutory, and common-law duties to act loyally, disclose conflicts, preserve trust and charitable assets, avoid self-dealing, and administer the structures for their intended charitable and contractual purposes.

79. As an Independent Director for Charitable DAF Holdco, Ltd., Mr. Murphy owed similar duties to the extent of his directorial, advisory, and operational roles.

*D. Mr. Patrick and the Shields Law Group developed a secret and deceptively concealed plan to steal the Charitable DAF's assets.*

80. The fundamental wrong that this case seeks to redress is Mr. Patrick's brazen theft of the Charitable DAF's assets. His plotting to do so began in late 2023. In the end, Mr. Patrick's plot stripped hundreds of millions of dollars of assets from established charities and deprive stakeholders like Messrs. Dondero and Okada from a say on the charitable causes towards which the assets would be directed.

81. On November 9, 2023, Defendant Shields Law Group, at Mr. Patrick's request, provided him a work plan to take the Charitable DAF's assets from the established charities Mr. Dondero selected, in a manner that would not provide them notice and would weaken their ability to object before the transfers occurred. In particular, the work plan included research on particular questions posed by Mr. Patrick, including whether the transfers of assets away from charity for his own benefit were valid and enforceable under Cayman law, whether consideration was even required to effectuate these transfers, and whether either Dondero or the charitable organizations

themselves possessed standing to challenge Mr. Patrick's transfers if they disagreed. Ex. 3, Shields Legal Work Plan at 8–9; §§ I.a.5., asking Shields Legal to "[a]nalyze whether holders of the participation shares in org chart have legal standing to challenge the validity of these transfers. . . ?" and I.a.6. asking Shields Legal to "[a]nalyze whether Donor [Mr. Dondero] has legal standing to challenge the validity of these transfers. . . ." Further questions included determining whether Dondero or the charitable beneficiaries had any collateral authority to challenge Mr. Patrick's scheme, seeking to make the whole scheme "bulletproof." *See id.* at 10–12 and §§ II.f. (asking "What control rights does the donor James Dondero have. . . ?"; II.i. "Can the controlling person dilute [Participation Shares]. . . ?"; II.j. "Can the controlling person redeem [Participation Shares]. . . ?"; II.l. "Could Charitable DAF Holdco, Ltd. liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares worthless?"; and III.a. "What can be done at this point to make these share transfers bulletproof?").

82. The purpose of the work plan was to: (i) separate the existing supported charities and their supporting organizations from ownership and economic rights in the underlying assets; (ii) transfer control of those assets to entities Mr. Patrick controlled or influenced; and (iii) conceal the restructuring long enough to prevent timely objections by those whose rights were impaired.

83. One of the first steps for this plan was to create a new control entity for the Charitable DAF structure—what in the structure was called the general partner—and then substitute it for the existing one. That new general partner would then secretly order the theft of the assets from the charities.

84. On February 5, 2024, Mr. Patrick sent an email from his personal email account (despite having business accounts) to Shields Law Group attorneys Brandon R. Schaller and Bart Higgins and to Mr. Raver. In that email, Mr. Patrick specified that the new general partner entity

should be “hard to find or track, or trace,” should make it difficult to “find owners,” should have a “generic name,” and should provide “strong litigation protection.” Ex. 4, Feb. 5, 2024, email from Mr. Patrick to Messrs. Schaller, Higgins, and Raver.

85. That email is direct evidence of fraudulent intent and concealment. A fiduciary acting loyally for charitable beneficiaries does not ask for an entity to be hard to trace. The instruction makes sense only if the restructuring’s success depended on keeping affected charities and donors from discovering who controlled the new entity and what assets or rights had been moved.

86. On February 27, 2024, Mr. Patrick and Shields Law Group caused the creation of CDH GP, Ltd., a Cayman Islands entity with Mr. Patrick as owner and with Mr. Patrick and Mr. Murphy as directors. This jumble of letters was exactly the type of non-descript entity that would be “hard to track or trace,” just as Mr. Patrick had ordered.

87. On March 7, 2024, Mr. Patrick caused CDH GP, Ltd. to replace Charitable DAF GP, LLC as general partner of Charitable DAF Fund, L.P. This transfer gave Mr. Patrick and Mr. Murphy the ability to control Charitable DAF Fund, L.P. without the restrictions and transparency afforded by having a Delaware general partner.

88. Mr. Patrick did not give notice of this restructuring to the supporting organizations, the supported charities, or other stakeholders whose rights were impaired, including Messrs. Dondero and Okada. Nor did he seek consent from the affected charities or disclose his conflicts of interest.

89. Mr. Patrick and Shields Legal then created CDMCFAD, LLC, another generically named entity that would be “hard to track or trace” inserted between Charitable DAF Holdco, Ltd. and the underlying assets. CDMCFAD, LLC functioned as a barrier between the existing

participation-shareholders and the assets they had rights to receive, inspect, or protect.

90. The name CDMCFAD, LLC was consistent with Mr. Patrick's February 5, 2024, instruction that entity names be hard to trace and generic. At his May 7, 2026, deposition, Mr. Patrick testified that even he did not know what CDMCFAD, LLC stood for, despite directing or approving its formation.

91. Mr. Patrick established CDMCFAD, LLC as a clearinghouse for his theft. Mr. Patrick would eventually use this entity to dispossess the established charities of ownership in—and Mr. Dondero of a say in the disposition of—more than a quarter billion dollars in charitable assets and the equity stake in Highland Capital Management.

92. In a Charitable DAF Holdco, Ltd. board resolution in support of the restructuring dated December 18, 2024, Messrs. Patrick and Murphy provided false justifications for the restructuring, including that it purportedly was to protect the tax-exempt status of the participation shareholders and "broaden the charitable scope" of the Charitable DAF. In fact, the purpose was to cashier the participation shareholders for pennies on the dollar and narrow the charitable scope of the Charitable DAF to a single purported charity run from the basement of one of Mr. Patrick's homes.

93. Mr. Patrick and Mr. Murphy started stealing the Charitable DAF's assets. Under the guise of "compensation," Messrs. Patrick and Murphy decided to pay themselves in excess of $18 million from the third quarter of 2024 through 2025. By contrast, directors and administrators for the Charitable DAF structures, including Messrs. Patrick and Murphy, had been paid tens of thousands of dollars per year previously for the part-time job that running these entities constituted.

94. At the same time, Messrs. Patrick and Murphy began paying their co-conspirator advisor and law firms dramatic sums during the same period for assisting them in the theft detailed

herein. Between 2024 and 2025, Mr. Patrick paid these firms tens of millions of dollars, a tally that continues to accelerate into 2026.

*F. Mr. Patrick creates a sham charity for stealing hundreds of millions of dollars in charitable assets.*

95. On December 9, 2024, Mr. Patrick formed DFW Charitable Foundation as a Delaware not-for-profit entity. DFW Charitable Foundation used a name that appeared charitable and geographically familiar (and confusingly similar to the legitimate Dallas Foundation), but it was not one of the existing supported charities. Mr. Patrick made himself DFW Charitable Foundation's registered director, sole member, and president.

96. Mr. Patrick listed the registered address of the charity as a home of his in Dallas, Texas, and, on information and belief, operated it from his residences in Missouri and Dallas.

97. The sole purpose of DFW Charitable Foundation was to serve as a receptacle for stolen assets. DFW Charitable Foundation had no assets of its own. Prior to receiving the stolen assets, DFW Charitable Foundation did not do an ounce of charitable work.

98. After receiving the stolen charitable assets as detailed below, Mr. Patrick caused DFW Charitable Foundation to engage in only the barest of window dressing of charitable work, donating less than $1 million of the more than quarter of a billion dollars in charitable assets stolen between early 2025 and the present time.

99. Having surreptitiously created his sham charity, Mr. Patrick began to secretly insert it into the Charitable DAF structure in February 2025. On or about February 7, 2025, Mr. Patrick ordered Charitable DAF Holdco, Ltd. to issue 318 participation shares to DFW Charitable Foundation. That transaction gave DFW Charitable Foundation a 51% majority position in Charitable DAF Holdco, Ltd. and thereby diluted the ownership stake of the existing charities that were the shareholders.

100. On information and belief, one of the reasons Mr. Patrick issued these participation shares was to hinder the ability of the shareholding charities to take legal actions that would reveal his later complete theft of the charitable assets.

101. Mr. Patrick did not disclose the DFW Charitable Foundation issuance to the existing supported charities, their supporting organizations, or the Charitable DAF's donor before it occurred. He did not disclose that he controlled DFW Charitable Foundation or that DFW Charitable Foundation now held a majority position in ownership of the charitable assets.

*G. Defendants conspired to steal the remainder of the charitable assets through a fraudulent valuation and a secret transaction.*

102. In March 2025, Mr. Patrick completed his theft of Charitable DAF Fund, L.P.'s assets from the established supported charities and supporting charitable organizations and of Mr. Dondero's ability to have a say in the charitable ends that his historic gift would support. Mr. Patrick stole more than $270 million in assets that had long been held under the Charitable DAF structure and 99.5 percent of the equity stake in Highland Capital Management, L.P., through a March 27, 2025, transaction.

103. At the heart of this scam was Mr. Patrick's conspiracy with Defendant sub-entity ValueScope, Inc. Historically, ValueScope, Inc. had performed periodic valuations for Charitable DAF Fund, L.P. In reports for calendar years 2020 through 2024, ValueScope Inc. valued the participation shares of the established supporting charitable organizations on a net-asset-value basis using generally consistent methodologies. As of September 30, 2024, ValueScope, Inc.'s analysis reflected that the established supporting charitable organizations' participation shares were worth approximately $270 million. Ex. 5, ValueScope, Inc.'s Valuation Analysis of 100 Participation Shares of Charitable DAF Holdco, Ltd as of Sept. 30, 2024, and Ex. 6, ValueScope, Inc.'s Valuation Analysis of Certain Participation Shares of Charitable DAF Holdco, Ltd as of

March 25, 2025.

104. Mr. Patrick structured his theft of the charitable assets as a secret transaction based on a fraudulent valuation. Without disclosure to any of the shareholders, he went valuation opinion shopping for a firm that would say that $270 million in assets—largely held in treasuries and other assets with a fixed market value—could somehow be worth peanuts.

105. Accounting firm after accounting firm told him "No." In January and February 2025, Mr. Patrick sought a valuation from PricewaterhouseCoopers ("PwC"). Mr. Patrick asked PwC to value the shares of Charitable DAF Holdco, Ltd. and, after CDMCFAD, LLC had been inserted into the structure, to value CDMCFAD, LLC's interests. To further the scheme's intent of removing assets from the DAF Structure for little or no value in return, Mr. Patrick pressed for a methodology that would result in at least a 95% + discount. PwC did not agree. On February 11, 2025 PwC stated in substance that there was no basis to discount the valuation. Ex. 7, February 11, 2025, email from J. Lawlor to G. Sykes.

106. After PwC would not support the discount Mr. Patrick wanted, Mr. Patrick engaged FTI Consulting in London to achieve a similar reduced valuation in furtherance of the scheme, but FTI refused to provide an opinion that would support cashing out the charities for pennies on the dollar.

107. Mr. Patrick then turned back to ValueScope Inc., On March 26, 2025, ValueScope, Inc. supplied the valuation Mr. Patrick needed for the scheme. Despite its prior valuation of the established supporting organizations' participation shares at approximately $270 million, ValueScope, Inc. valued the existing participation-share rights at approximately $1.6 million--a reduction of roughly 99.4%. And that was after a significant asset—the equity stake in Highland Capital Management—had been added to the Charitable DAF structure.

108. The ValueScope, Inc. valuation was fraudulent and for the purpose of stealing the charitable assets. It identified approximately $270 million in underlying equity value but treated the rights to that value as if they could be redeemed for approximately $1.6 million. It did not and could not adequately explain the disappearance of the remaining approximately $268 million in value. The 2025 ValueScope Inc. valuation was not disclosed to the established charities and supporting organizations. It was only found once Cayman authorities began looking into Mr. Patrick's activities.

109. On information and belief, Defendants caused the ValueScope, Inc. valuation to be transmitted via interstate wire communication, including from Mr. Patrick's ranch in Ashland, Missouri.

110. On the basis of that fraudulent valuation procured by Mr. Patrick, Defendants caused a March 27, 2025 transaction in which CDMCFAD, LLC, "redeemed" the entire limited liability company interest in CDMCFAD, LLC, that was held by Charitable DAF Holdco, Ltd., for $1,637,192. Ex. 8, Redemption and Amendment No. 2 Agreement at 2. That left DFW Charitable Foundation as the sole owner in CDMCFAD, LLC, and therefore the whole Charitable DAF structure. There was nothing "redeeming" about this transaction; it was robbery. The transaction stole hundreds of millions of dollars in charitable assets and placed them in a sham entity controlled by Mr. Patrick.

111. On information and belief, Mr. Patrick directed the above-referenced transaction, including the moving of funds, e-mails, and telephone calls, through interstate wires, including from his ranch in Ashland, Missouri.

*H. Defendants concealed the restructuring from the affected charities and stakeholders.*

112. Throughout the scheme to convert the assets of established charities, Mr. Patrick—and by extension his service providers and co-directors—due to his position in the Charitable DAF

structure that had been organized in service of the charities and their supporting organizations and to carry out the donor's wishes to benefit them, had a duty to act in their best interest, to not impair the advisory privileges of the Charitable DAF's donors (including Mr. Dondero and The Dugaboy Investment Trust), and to inform the charities of transactions that materially affected their participation shares, but intentionally withheld material information from the affected supported charities and stakeholders. Defendants did not disclose the formation and insertion of CDH GP, Ltd., CDMCFAD, LLC, or DFW Charitable Foundation before those entities were used to impair existing rights. They did not disclose Mr. Patrick's conflicts, compensation, or control over DFW Charitable Foundation. They did not disclose that the transaction was used to steal approximately $270 million in value for approximately $1.6 million. They did not disclose that Messers. Murphy, Raver, and Patrick, through his myriad positions of control and with help from ValueScope Inc. and Shields Legal Group, P.C., caused CDMCFAD, LLC, DFW Charitable Foundation, CDH GP, Ltd., Rand Advisors, Rand PE Fund Management, LLC, Atlas IDF GP, LLC., Atlas IDF, L.P., Rand PE Fund I, L.P., Beacon Mountain, LLC, Hunter Mountain Investment Trust, Charitable DAF HoldCo, Ltd., Charitable DAF Fund, L.P., Charitable DAF GP, LLC, CLO Holdco, Ltd., CLO Holdco, LLC, and CDH GP, Ltd., through a series of conflicted and impermissible transactions, to take the assets in the Charitable DAF Fund, L.P.—a lifeline to numerous charitable causes and organizations, and sweep those assets into their own pockets.

113. Mr. Patrick testified that he personally made the decision *not* to inform charitable entities. By withholding this information, Mr. Patrick and his co-defendants deprived Plaintiffs and the affected charities of the opportunity to stop the theft, through exercising their rights to object, seek injunctive relief, protect documents, prevent transfers, or take governance action before the assets and rights in which they had interests were moved.

*I. Mr. Patrick stole the equity stake in Highland Capital Management, L.P. through the same theft of the assets of the Charitable DAF.*

114. Stealing the $270 million of assets long held in the Charitable DAF was not enough for Mr. Patrick. So, while he was preparing his theft of the Charitable DAF's assets, he took steps to move Hunter Mountain Investment Trust—and its asset, the equity stake in Highland Capital Management, L.P.—to an entity in the Charitable DAF structure. Therefore, when he completed stealing Charitable DAF Fund, L.P.'s assets, those assets would now include Hunter Mountain Investment Trust.

115. On or about February 12, 2025, Mr. Patrick caused Rand PE Fund I, L.P., which he managed through the Rand PE Fund Management, LLC, to transfer its interest in Beacon Mountain, LLC—which owned Hunter Mountain Investment Trust and therefore indirectly held 99.5% of Highland Capital Management, L.P.'s outstanding limited partnership interests—to CLO Holdco, LLC, a newly formed subsidiary of CLO Holdco, Ltd. CLO Holdco, Ltd. in turn is wholly owned by Charitable DAF Fund, L.P.

116. The transfer was structured as a "sale" for approximately $1,000,000. As detailed below, just weeks later Hunter Mountain Investment Trust agreed to obtain at least $28 million in cash and medium-term payments, plus a liquidated claim in the Highland bankruptcy worth more than $300 million.

117. Because Mr. Patrick had control of both the Charitable DAF and the Hunter Mountain Investment Trust structure, Mr. Patrick was selling Hunter Mountain Investment Trust and the Highland Capital Management, L.P. equity stake from an entity he controlled to an entity he controlled. By acting on both sides of the transaction, Mr. Patrick improperly effected the sale of the Hunter Mountain Investment Trust / Highland Capital Management, L.P. equity asset from Rand PE Fund I, L.P. through Rand Advisors.

118. Mr. Patrick effectively agreed with himself on price, terms, and authority for this transaction. He did not obtain prior consent from any beneficial owners or from other affected stakeholders.

119. Under the Investment Advisers Act of 1940, Mr. Patrick was barred from selling an asset to another entity that he controlled or had a stake in, without obtaining the affirmative consent of all direct or indirect investors or owners in Rand PE Fund I, L.P. Mr. Patrick did not do so.

120. The Investment Advisers Act of 1940 placed an affirmative obligation to disclose the intended sale to his investors before undertaking it. He withheld that information despite this obligation to disclose.

121. The purpose of the Hunter Mountain "sale" was to divorce an established charity from the Highland Capital equity asset and the donors from a say in how that asset it put to good use. Mr. Patrick wanted to move Hunter Mountain to the Charitable DAF structure because he intended to and knew he was going to steal all the Charitable DAF assets and put them into his new sham charity in just a few short weeks. As detailed above, in March 2025, he did precisely that.

122. Mr. Patrick effected the sale transaction through use of interstate wires.

*J. The Defendants issue fraudulent lulling statements to conceal the scheme.*

123. While Mr. Patrick was undertaking the transactions that would steal the Charitable DAF assets from the charities and from Mr. Dondero's input as to their ultimate use, Mr. Patrick and his co-conspirators were issuing false statements intended to lull the charities from taking action to investigate his misconduct. Specifically:

a. On October 10, 2024, Mr. Patrick told the charities' representatives that (in the wake of his departure from the Skyview entity that assisted Mr. Dondero's other

ventures) the structure of the Charitable DAF would remain exactly the same. Mr. Patrick knew that statement to be false when made because he had already begun establishing entities and making preparations for the restructuring and transactions that would steal more than a quarter of a billion in assets from the charities. Mr. Patrick used interstate wires to make this false statement, including through use of telephone wires and video-conferencing technology.

b. On November 20, 2024, Mr. Patrick's co-conspirators Paul Murphy and Douglas Mancino shared over a video-teleconference to the charities' representatives in a PowerPoint presentation that included numerous knowingly false statements (*id.*), to include:

> (1) That Charitable DAF was preparing comprehensive and audited financial statements that would show that the assets of the Charitable DAF were in safe hands for the charities and would dispel any concerns about excessive expenses.
>
> (2) That Charitable DAF assets were being responsibly stewarded for the benefit of the charities.

c. On information and belief, Messrs. Mancino and Murphy made these statements at Mr. Patrick's direction.

d. These statements were knowingly false when made. Mr. Patrick was not arranging for audited financial statements and had no intention of providing the charities with accurate financial information. Nor was Mr. Patrick responsibly stewarding the assets for the charities' benefit. Instead, when the statements were made, Mr. Patrick and his co-conspirators were already planning and executing transactions that would permanently steal the Charitable DAF's assets from the charities. These false statements were knowingly designed to persuade the Plaintiffs not to further inquiry and to lull them into inaction.

e. Each of these statements involved the use of interstate wires to make them.

124. Mr. Patrick secretly stole all of the Charitable DAF structure's assets from the charities through a transaction on March 27, 2025. Six days later, on April 2, 2025, Mr. Patrick caused Charitable DAF Holdco, Ltd. to enter voluntary liquidation in the Cayman Islands. He did not first notify the affected supported charities of either move or give them an opportunity to seek protective relief.

125. On or about April 23, 2025, when the charitable organizations became concerned that Mr. Patrick had not delivered the promised audited financial statements, they attempted to call for liquidation.

126. On May 6, 2025, the Cayman Islands court appointed Margot MacInnis and Sandipan Bhowmik as joint official liquidators of Charitable DAF Holdco.

*K. The RICO enterprise, predicate acts, and direct injuries.*

127. Defendants formed and participated in an association-in-fact enterprise within the meaning of RICO. The enterprise consisted of Messrs. Patrick, Murphy, and Raver, the deceased lawyer Douglas Mancino, Shields Legal, ValueScope Inc., the following entities acting pursuant to Mr. Patrick's positions of authority: CDMCFAD, LLC, DFW Charitable Foundation, CDH GP, Ltd., Rand Advisors, Rand PE Fund Management, LLC, Atlas IDF GP, LLC., Atlas IDF, L.P., Rand PE Fund I, L.P., Beacon Mountain, LLC, Hunter Mountain Investment Trust, Charitable DAF HoldCo Ltd., Charitable DAF GP, LLC, Charitable DAF Fund, L.P., CLO Holdco, Ltd., CLO Holdco, LLC, and CDH GP, Ltd., and other persons or entities known and unknown. The enterprise had a common purpose: to illicitly and corruptly obtain and maintain control over and otherwise steal charitable and investment assets, conceal that control and/or theft from affected charities and stakeholders, and distribute fees, control, releases, or other benefits to enterprise participants.

128. The enterprise had relationships among its participants: Mr. Patrick directed the overall scheme; Mr. Murphy assisted with Cayman and director-level implementation; Mr. Raver assisted with administrative, accounting, legal, and operational steps; Shields Legal designed and documented the restructuring; ValueScope Inc. supplied the fraudulent valuation used to effectuate the redemption; CDMCFAD, LLC and DFW Charitable Foundation functioned as entities through which assets moved, and also were used to exit the charities from their interest in the DAF structure assets in favor of DFW Charitable Foundation; and Mr. Patrick improperly directed CDMCFAD, LLC, DFW Charitable Foundation, CDH GP, Ltd., Rand Advisors, Rand PE Fund Management, LLC, Atlas IDF GP, LLC., Atlas IDF, L.P., Rand PE Fund I, L.P., Beacon Mountain, LLC, Hunter Mountain Investment Trust, Charitable DAF Fund, L.P., CLO Holdco, Ltd., CLO Holdco, LLC, and CDH GP, Ltd. to move money assets between entities for the scheme's benefit.

129. The enterprise was directed in substantial part from Mr. Patrick's de facto headquarters and ranch in the Western District of Missouri. From that location, Mr. Patrick conducted the corrupt enterprise, issuing instructions to its component parts using interstate wires and/or mails.

130. The enterprise had longevity sufficient to pursue its purpose. It operated from at least November 2023 through March 2025 and the consummation of the theft and through today.

131. The enterprise affected interstate and foreign commerce by using United States and Cayman entities, Delaware filings, Missouri and Texas property as bases of operations for the charities, interstate emails, wire transfers, professional services, valuation services, and United States bankruptcy proceedings.

132. Defendants used interstate wires and, where applicable, mails to transmit false or misleading communications, entity documents, resolutions, invoices, valuation materials, transfer

instructions, liquidation papers, bankruptcy filings, settlement documents, and notices. Those communications were not innocent background communications; they were the means by which the scheme was designed, documented, concealed, and executed.

133. The following non-exhaustive list identifies representative predicate acts and communications presently known to Plaintiffs. Plaintiffs reserve the right to add further predicate acts after discovery, including additional emails, wire transfers, invoices, valuation drafts, engagement letters, formation documents, liquidation communications, and bankruptcy filings within Defendants' possession:

a. On or about November 9, 2023, and thereafter, Mr. Patrick and Shields Legal used interstate emails and legal work-plan communications to request and supply a plan to move charitable assets away from the existing supported charities while concealing the restructuring from persons with rights to object. Those communications furthered the scheme by giving Mr. Patrick a roadmap to place assets under entities he controlled.

b. On February 5, 2024, Mr. Patrick sent an interstate email from his personal email account to Shields Legal and Mr. Raver directing that the new general partner entity that would replace Charitable DAF GP, LLC be "hard to find or track, or trace[,] [o]r find owners[,]" have a generic name, and provide "strong litigation protection." That email shows Mr. Patrick's fraudulent intent and furthered the scheme by directing the concealment from Plaintiffs and the supporting charities of the ownership and control of a critical entity defendants used to execute their fraudulent restructuring of the DAF.

c. On or about March 7, 2024, Mr. Patrick, while purporting to act on behalf

of Charitable DAF GP, along with Mr. Raver, Shields Legal, and CDH GP, caused to be electronically transmitted and signed a written consent transferring the entire general partner interest in Charitable DAF GP, LLC to CDH GP, the newly formed entity that had been created, pursuant to Mr. Patrick's direction, to be concealed from Plaintiffs and the supporting charities. The transfer was executed without notice to the supporting charities and was designed, as part of defendants' scheme, to shield their fraudulent restructuring of the DAF from challenges by Plaintiffs and the supporting charities. On information and belief, the transmission was via interstate wire communications.

d. In and after August 2024, including on or about September 13, 2024, October 1, 2024, December 12, 2024, December 16, 2024, March 27, 2025, and May 12, 2025, Messrs. Patrick, Murphy, and Raver transmitted and/or mailed resolutions, director services agreements, electronic accounting records, invoices, approvals, and wire-transfer instructions authorizing and paying excessive fees and compensation to Messrs. Patrick and Murphy while omitting that such fees and compensation were being extracted from charitable assets while distributions to supported charities were withheld or impaired. Those transmissions or mailings furthered the scheme by diverting charitable value to enterprise participants and concealing the magnitude of self-compensation. On information and belief, the transmissions were via interstate wire communications.

e. On October 10, 2024, Mark Patrick, through the use of interstate wire communications, spoke with Julie Diaz, CEO of the Highland Dallas Foundation, Inc., and Debbie Wilkerson, CEO of the Highland Kansas City Foundation, Inc.,

assuring them he would not change the structure of the DAF. These statements were false when made, the falsity was known to Mr. Patrick at the time, and the statements were designed to lull the charities into inaction while he embarked on his scheme. These conversations took place telephonically.

f. On October 14, 2024, and at Mr. Patrick's direction, Mr. Patrick's former attorney Douglas Mancino spoke with Tammy Sims Johnson of the Highland Santa Barbara Foundation, Inc., assuring her that Mr. Patrick would not change the structure of the DAF. These statements were false when made, the falsity was known to Mr. Patrick at the time, and the statements were designed to lull the charities into inaction while he embarked on his scheme. These conversations took place telephonically. As of October 14, 2024, the three supporting organizations still had their over 98% economic interest in the Charitable DAF Fund, L.P.

g. On or about November 4, 2024, Mr. Patrick knowingly engaged in a monetary transaction—the purchase of his ranch in Ashland, Missouri—which transaction, on information and belief, had a value greater than $10,000 and was purchased with unlawfully obtained funds. Specifically, on information and belief, the purchase involved proceeds of wire and mail fraud offenses in the form of the excessive compensation defendants issued to Mr. Patrick as part of the scheme.

h. On November 20, 2024, Messrs. Raver and Patrick presented a PowerPoint slide deck prepared by Defendant ValueScope Inc. to the charitable entities. This PowerPoint made statements assuring the charitable entities that audited financial statements were in preparation and forthcoming, and that Messrs. Patrick and Raver were acting as careful stewards of the assets held by the DAF. These statements

were false when made, their falsity was known to Messrs. Patrick and Raver and ValueScope Inc. when made, and were designed to lull the charities into inaction while the scheme prepared to transfer the DAF and Hunter Mountain Investment Trust assets for Mr. Patrick's benefit. These conversations took place via teleconference, and, on information belief, involved interstate wire communications.

i. On or about December 18, 2024, Messrs. Patrick and Murphy, while purporting to act on behalf of Charitable DAF HoldCo, Ltd., along with Shields Legal and CDMCFAD, LLC, caused to be electronically transmitted and signed a resolution transferring to CDMCFAD, LLC, 100% of Charitable DAF HoldCo, Ltd.'s interest in the Charitable DAF Fund based on the false premise that the transfer was designed to protect the tax-exempt status of the participation shareholders and to expand the charitable reach of the Charitable DAF. In fact, the transfer was designed, as part of defendants' scheme, to begin stealing the Charitable DAF's assets from the established charities and supporting organizations and Mr. Dondero's right to have a say on how the charitable assets would be deployed and to obscure the funds Mr. Patrick stole in the form eight-figures of compensation. On information and belief, the transmission was via interstate wire communications.

j. On or about February 7, 2025, Messrs. Patrick and Murphy, while purporting to act on behalf of DAF HoldCo, Ltd., along with Shields Legal, CDMCFAD, LLC, CDH GP, Ltd., DFW Charitable Foundation, and other Defendants, caused to be electronically transmitted and signed a resolution

authorizing the issuance of participation shares to DFW Charitable Foundation, a newly formed nonprofit with Mr. Patrick as a sole member, based on the false premise that the share-issuance was designed to protect the tax-exempt status of the participation shareholders and to expand the charitable reach of the DAF. In fact, the issuance was designed to begin stealing the Charitable DAF's assets from the established charities and supporting organizations and Mr. Dondero's right to have a say on how the charitable assets would be deployed and to obscure the funds Mr. Patrick stole in the form eight-figures of compensation. On information and belief, the transmission was via interstate wire communications.

k. On February 12, 2025, Mr. Patrick through Rand Advisors LLC and Rand Fund Management LLC caused Rand PE Fund I, L.P. to sell its interest in Beacon Mountain, LLC, which in turn owned Hunter Mountain Investment Trust. Mr. Patrick caused the interest to be sold to the Charitable DAF structure and its subsidiary entity CLO Holdco, LLC, an entity over which Mr. Patrick had authority, for purposes, among other things, of having it in the Charitable DAF structure for his planned theft of all the Charitable DAF's assets in March 2025. Mr. Patrick further served as manager of Rand Advisors, a registered investment advisor which provided investment advisory services to Rand PE Fund I, L.P. Mr. Patrick secured consent to the transaction, in which he stood on both sides, only from entities over which he had apparent authority. Mr. Patrick failed to secure consent from parties from whom he was required to secure consent, namely Crown Global Insurance Company and two other entities which owned a minority stake in Rand PE Fund I, LLC. On information and belief, Mr. Patrick used interstate wire

transfers to effectuate the transaction.

l. On or about March 26, 2025, Messrs. Patrick and Murphy and ValueScope caused to be electronically transmitted a valuation of DAF HoldCo, which fraudulently undervalued DAF HoldCo's participation shares to the amount of approximately $1.6 million, despite valuing the assets in the DAF Fund at approximately $270 million. The valuation supplied the critical instrument used in the scheme to steal existing participation-share rights at a fraction of value. On information and belief, the transmission was via interstate wire communications.

m. On or about March 27, 2025, Mr. Patrick, along with and on behalf of CDMCFAD, caused to be electronically transmitted and signed a redemption agreement approving CDMCFAD's redemption of DAF HoldCo for the amount of approximately $1.6 million, which agreement falsely described the redemption amount as the "Fair Market Value" of DAF HoldCo, knowing that the redemption amount was not the fair market value of DAF Holdco and was based on a fraudulent valuation of the participating shareholders' interest in DAF HoldCo. On information and belief, the transmission was via interstate wire communications. On or about the sale date, Mr. Patrick caused funds to be moved to further this theft, using interstate wire transfers to do so.

n. On or about April 2, 2025, Messrs. Patrick and Murphy, while purporting to act on behalf of Charitable DAF HoldCo, Ltd., caused to be electronically transmitted and signed a resolution authorizing the issuance of dividends to the participating shareholders in the amount of the redemption (approximately $1.6 million), knowing that the redemption amount was based on a fraudulent valuation

that severely undervalued the participating shareholders' interest in the DAF Fund. On information and belief, the transmission was via interstate wire communications.

o. On June 23, and June 25, 2025, Mr. Patrick gave testimony related to a settlement agreement involving Hunter Mountain Investment Trust in a Chapter 11 bankruptcy proceeding. Therein, Mr. Patrick made multiple false statements, misrepresentations, and omissions, in support of the settlement agreement. The statements, misrepresentations, and omissions were false when made, and the falsity was known to Mr. Patrick at the time. The statements were designed to convince the bankruptcy court to approve the settlement and to advance the defendants' scheme by ratifying Mr. Patrick's theft of the Hunter Mountain Investment Trust and its assets. The settlement was ultimately approved by the bankruptcy court.

134. The predicate acts are related because they had the same or similar purposes, participants, victims, methods, and results. They were designed to conceal Mr. Patrick's control and conflicts, move charitable and investment rights to Mr. Patrick-controlled entities, and redeem or impair existing rights.

135. The predicate acts establish closed-ended continuity because they occurred repeatedly over a substantial period from at least November 2023 through July 2025. They also establish open-ended continuity because Defendants continue to hold or control assets, claims, releases, entities, information, and proceeds obtained through the scheme and continue to resist efforts to unwind or disclose their conduct.

136. Defendants' conduct directly and proximately injured Plaintiffs' advisory

privileges over the DAF. Plaintiffs do not seek to recover for a generalized injury to charity or for derivative injury alone. Plaintiffs seek recovery for their own direct injuries, including the loss or impairment of note and contractual rights, governance and consent rights, advisory rights, claims and causes of action, and traceable property value that Defendants transferred, discounted, released, or concealed. Plaintiffs also seek the return of the stolen funds to a charitable structure that is properly secured against Mr. Patrick and that would serve the original charities and supporting organizations from which Mr. Patrick stole the Charitable DAF's assets and would permit Plaintiffs the same advisory rights of which Mr. Patrick's misconduct deprived them.

137. The Plaintiffs were directly and proximately injured because Defendants impaired their property, contractual, note, governance, advisory, and claim rights in the DAF, Hunter Mountain Investment Trust, Highland Capital Management, L.P., and related structures. In particular, Plaintiffs Dondero and The Dugaboy Investment Trust suffered harm directly from Defendants' enterprise: Messers. Murphy, Raver, and Patrick, through his myriad positions of control and with the aid of ValueScope Inc. and Shields Legal Group, P.C., caused CDMCFAD, LLC, DFW Charitable Foundation, CDH GP, Ltd., Rand Advisors, Rand PE Fund Management, LLC, Atlas IDF GP, LLC., Atlas IDF, L.P., Rand PE Fund I, L.P., Beacon Mountain, LLC, Hunter Mountain Investment Trust, Charitable DAF HoldCo, Ltd., Charitable DAF GP, LLC, Charitable DAF Fund, L.P., CLO Holdco, Ltd., CLO Holdco, LLC, and CDH GP, Ltd. to perform a series of conflicted and impermissible transactions to sweep the assets rightfully belonging to the established charities and supporting organizations into their own pocket, thereby depriving Plaintiffs Dondero and The Dugaboy Investment Trust of their advisory privileges on the disposition of Charitable DAF assets.

138. Because Mr. Patrick and DAAM Real Estate Trust hold Missouri real property

allegedly acquired, maintained, improved, or enhanced with proceeds or benefits of the scheme and that was used as a headquarters for conducting the scheme and the corrupt enterprise, Plaintiffs also seek equitable tracing, constructive trust, equitable lien, accounting, disgorgement, and related relief against the Ashland Property and any other traceable proceeds.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF RICO, 18 U.S.C. § 1962(c)
### (Against All Defendants and Nominal Defendants)

139. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth in this Count.

140. Each Defendant and Nominal Defendant is a "person" within the meaning of 18 U.S.C. § 1961(3) because each is capable of holding a legal or beneficial interest in property. Each Defendant and Nominal Defendant is legally distinct from the association-in-fact enterprise alleged above.

141. At all relevant times, the association-in-fact enterprise described above was an "enterprise" within the meaning of 18 U.S.C. § 1961(4). It had a common purpose, relationships among participants, and longevity sufficient to permit the participants to pursue the enterprise's purpose. It was separate from, and existed beyond, any single predicate act.

142. Each Defendant was employed by, associated with, or participated in the enterprise. Mr. Patrick directed and controlled the enterprise. Mr. Murphy participated in offshore governance, approvals, liquidation, and implementation. Mr. Raver participated in administration, accounting, legal, and operational execution. Shields designed, documented, and helped implement the restructuring and concealment plan. ValueScope Inc. knowingly supplied the valuation instrument used to redeem existing charitable rights. Mr. Patrick improperly directed CDMCFAD, LLC, DFW Charitable Foundation, CDH GP, Ltd., Rand Advisors, Rand PE Fund

Management, LLC, Atlas IDF GP, LLC., Atlas IDF, L.P., Rand PE Fund I, L.P., Beacon Mountain, LLC, Hunter Mountain Investment Trust, Charitable DAF Fund, L.P., Charitable DAF HoldCo, Ltd., Charitable DAF GP LLC, CLO Holdco, Ltd., CLO Holdco, LLC, and CDH GP, Ltd. to accept, hold, transfer, or control rights and value moved through the scheme. Messrs. Patrick, Murphy, and Raver, acting jointly and through Mr. Patrick's positions of power with respect to CDMCFAD, LLC, DFW Charitable Foundation, CDH GP, Ltd., Rand Advisors, Rand PE Fund Management, LLC, Atlas IDF GP, LLC., Atlas IDF, L.P., Rand PE Fund I, L.P., Beacon Mountain, LLC, Hunter Mountain Investment Trust, Charitable DAF Fund, L.P., Charitable DAF HoldCo, Ltd., Charitable DAF GP, LLC, CLO Holdco, Ltd., CLO Holdco, LLC, and CDH GP, Ltd., impermissibly formed and/or directed each of these entities in a series of complicated transactions to steal approximately $270 million in charitable assets away from the Charitable DAF Fund, L.P. for their own financial benefit. Mr. Patrick, through his control of the relevant entities, issued participation shares to DFW Charitable Foundation to assist with exiting the charities. CLO Holdco, LLC and Rand PE Fund Management, LLC entered into a transaction to move money around and exchange the interests in Beacon Mountain, LLC and Hunter Mountain Investment Trust between both structures. Atlas IDF GP, LLC provided support for the Beacon Mountain, LLC transaction and sought to conceal it from other investors.

143. Defendants and Nominal Defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity. The pattern included multiple acts of wire fraud under 18 U.S.C. § 1343, mail fraud under 18 U.S.C. § 1341 where hard-copy transmissions or mails were used, bankruptcy-related fraud within the meaning of 18 U.S.C. § 1961(1)(D) to the extent Defendants used bankruptcy proceedings and filings to execute or conceal the scheme, acts of money laundering, including the purchase of the

Ashland Property, under 18 U.S.C. § 1957, and any additional predicate acts shown by discovery.

144. The wire- and mail-fraud predicates consisted of a scheme to defraud Plaintiffs and the affected charitable entities of money and property; Defendants' knowing and intentional participation in that scheme; foreseeable use of interstate wires and mails; and actual use of interstate wires and mails in furtherance of the scheme.

145. Defendants' misrepresentations and omissions were material. They concerned who controlled the replacement entities, whether the restructuring was authorized and consistent with fiduciary obligations, whether conflicts had been disclosed and consented to, whether the existing supported charities retained their participation and liquidation rights, whether DFW Charitable Foundation was independent, whether the ValueScope Inc. valuation reflected fair value, and whether the bankruptcy settlement was a good-faith compromise rather than a mechanism to suppress claims and conceal prior misconduct.

146. Defendants acted with intent to defraud. Intent is shown by, among other facts, Defendants' refusal to notify Plaintiffs and the affected charities; Defendants' material omissions to the Plaintiffs regarding the insertion of entities Mr. Patrick controlled; the false explanations provided by Defendants for the restructuring; the effort to obtain and use a 99.4% valuation discount after PwC and FTI would not support the transaction thereby devaluing the Charitable DAF Fund, L.P. of which Plaintiffs had advisory rights; the use of liquidation and bankruptcy proceedings after the transfers; and the millions of dollars in fees, control, releases, and other benefits retained by Defendants.

147. The predicate acts were related and continuous for the reasons alleged above. They were neither sporadic nor isolated. They formed a coordinated course of conduct over more than eighteen months, with the same participants, same victims, same concealment methods, and same

objective of diverting or impairing charitable and investment rights.

148. Plaintiffs were injured in their business or property by reason of Defendants' RICO violations. The injuries were direct and foreseeable: Defendants' predicate acts enabled the transfer, redemption, concealment, impairment, or release of Plaintiffs' specific property, contractual, governance, advisory, note, and claim rights.

149. As a result, Plaintiffs are entitled to recover treble damages, costs, attorneys' fees, and all other relief available under 18 U.S.C. § 1964(c).

**COUNT II**
**RICO CONSPIRACY, 18 U.S.C. § 1962(d)**
**(Against All Defendants)**

150. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth in this Count.

151. Defendants knowingly agreed that at least one member of the enterprise would conduct or participate in the enterprise's affairs through a pattern of racketeering activity, including the wire fraud, mail fraud, bankruptcy fraud, and money laundering predicate acts alleged above.

152. Defendants did not need to commit each predicate act personally. Each agreed to the essential objective of the scheme: to restructure the DAF and Hunter Mountain Investment Trust entities in secret, move control and value to Mr. Patrick-controlled or Mr. Patrick-influenced entities, procure or use a valuation that would redeem existing rights at a deep discount, and use liquidation and bankruptcy proceedings to conceal and protect the scheme.

153. The agreement is shown by Defendants' coordinated actions, including the November 2023 work plan, the February 5, 2024 "hard to find or track" email, the formation and insertion of CDH GP, Ltd. and CDMCFAD, LLC, the coordinated lulling statements made by various Defendants from October 2024 through February 2025, the creation and majority

positioning of DFW Charitable Foundation, the valuation process culminating in the fraudulent ValueScope Inc. valuation, the redemption of existing shareholder rights, the Hunter Mountain Investment Trust transaction, the Cayman liquidation, and coordinated actions to park and move money around the various Defendant entities.

154. Defendants' conspiracy directly and proximately caused Plaintiffs' injuries to business and property, including loss and impairment of specific assets, rights, claims, control, and proceeds. Defendants are jointly and severally liable for treble damages, costs, attorneys' fees, and all relief available under RICO.

**COUNT III**
**COMMON-LAW FRAUD**
**(Against All Non-Nominal Defendants)**

155. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth in this Count.

156. Defendants made affirmative misrepresentations and material omissions concerning Mr. Patrick's conflicts of interest; the ownership and control of CDH GP, Ltd., CDMCFAD, LLC, and DFW Charitable Foundation; the purpose and effect of the restructuring; the amount and recipients of compensation and fees; the fairness and reliability of the ValueScope Inc. valuation; the effect of the redemption on existing charitable rights; the sale of Hunter Mountain Investment Trust-related interests; and the purpose and effect of the bankruptcy settlement; and the other false statements detailed in this complaint.

157. Defendants had duties to disclose these facts. Messrs. Patrick, Murphy, and Raver, ValueScope Inc., and Shields Legal Group, knowing that Plaintiffs were relying on them to administer assets loyally and transparently, intentionally withheld Mr. Patrick's conflicts of interest with respect to the transactions he impermissibly caused as (a) the Sole Manager of Defendant CDMCFAD, (b) a Director of Defendant DFW Charitable Foundation, (c) the Sole

Manager of Defendant Rand Advisors, (d) the Sole Manager and President of Rand PE Fund Management, LLC, (e) the Sole Manager and President of Defendant Atlas IDF GP, LLC., (f) on information and belief, the Sole Manager of Defendant Beacon Mountain, LLC, (g) the Administrator of Defendant Hunter Mountain Investment Trust, (h) the control person, by virtue of his ownership of its general partner, of Charitable DAF Fund, L.P., (i) a Director of Defendant CLO Holdco, Ltd., (j) on information and belief, the sole manager of Defendant CLO Holdco, LLC, and (k) the sole owner and President of Defendant CDH GP, Ltd., including transactions by and between the entities listed as (a)–(k). Mr. Patrick, by his own choice, intentionally caused the entities listed as (a)–(k) to withhold information related to Mr. Patrick's conflicts of interest and the transactions between the entities listed as (a)–(k).

158. The omitted and misrepresented facts were material. A reasonable charity, donor, trustee, noteholder, adviser, or stakeholder would consider it important that Mr. Patrick had created entities designed to be difficult to trace, that those entities were being used to strip existing participation and liquidation rights, that DFW Charitable Foundation was controlled by Mr. Patrick, that a $270 million net-asset position would be redeemed for approximately $1.6 million, and that bankruptcy and liquidation proceedings would be used to impair claims and conceal the restructuring.

159. Defendants knew the representations were false or misleading, or acted with reckless disregard for their truth. Defendants intended Plaintiffs and the affected entities to rely on the omissions and misleading communications by refraining from objection, consenting implicitly through silence, failing to seek emergency relief, and allowing Defendants to complete the transfers before the scheme was discovered.

160. Plaintiffs reasonably relied on Defendants' representations and omissions.

Plaintiffs had placed trust in Mr. Patrick and the professionals and entities he used; Defendants controlled the relevant documents and information; and Defendants deliberately structured the transactions so that Plaintiffs would not learn the truth until after their rights had been impaired.

161. As a direct and proximate result of Defendants' fraud, Plaintiffs suffered damages including loss or impairment of assets, participation-share rights, liquidation rights, governance rights, note rights, advisory rights, claims, causes of action, distributions, and other property in amounts to be proven at trial.

162. Defendants' conduct was intentional, malicious, willful, wanton, and in reckless disregard of Plaintiffs' rights, warranting punitive damages to the extent permitted by applicable law.

**COUNT IV**
**CONVERSION**
**(Against All Defendants)**

163. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth in this Count.

164. Plaintiffs had note and contractual rights, governance and consent rights, advisory rights, claims and causes of action, and traceable property value.

165. Defendants intentionally exercised dominion and control over that property in a manner inconsistent with Plaintiffs' rights. Defendants transferred, redeemed, discounted, liquidated, encumbered, released, concealed, or diverted the property to entities controlled by or benefitting Mr. Patrick and other enterprise participants.

166. Defendants' exercise of control was unauthorized and exceeded any authority conferred by governing documents, fiduciary obligations, professional duties, charitable governance rules, or applicable law. Mr. Patrick's administrative authority, if any, did not permit him to divert assets to himself, use entities designed to be difficult to trace, or redeem existing

charitable rights at a fraction of value based on a conflict-laden valuation.

167. Defendants continue to hold, control, or benefit from converted property and proceeds. Plaintiffs are entitled to damages, return of property, disgorgement, constructive trust, equitable lien, accounting, and all other available relief.

## COUNT V
## BREACH OF FIDUCIARY DUTY
## (Against Messrs. Patrick, Murphy, and Raver)

168. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth in this Count.

169. Messrs. Patrick, Murphy, and Raver owed fiduciary duties to Plaintiffs and/or the entities through which Plaintiffs' rights were held by virtue of their positions as trustees, directors, managers, advisers, counsel, administrators, officers, attorneys, accountants, or persons exercising control over charitable and investment assets. Those duties included duties of loyalty, candor, good faith, care, full disclosure, avoidance of conflicts, and preservation of trust and charitable assets.

170. Mr. Patrick breached his fiduciary duties by placing his personal interests above the interests of the entities and beneficiaries he served; creating and using entities designed to be difficult to trace; failing to disclose conflicts and self-dealing; causing assets and rights to be transferred, redeemed, or impaired for the benefit of Mr. Patrick-controlled or Mr. Patrick-influenced entities; extracting excessive fees; using conflicted valuations; and using liquidation and bankruptcy proceedings to conceal or protect the scheme.

171. Murphy breached his fiduciary duties by participating in, approving, facilitating, ratifying, concealing, or failing to prevent the restructuring of, DFW Charitable Foundation issuance, valuation process, redemption, liquidation, and related transactions despite knowing or having reason to know of Mr. Patrick's conflicts and the injury to existing charitable rights.

172. Mr. Raver breached his fiduciary duties by participating in, administering,

documenting, accounting for, facilitating, concealing, or failing to prevent the restructuring, expense increases, entity insertions, DFW Charitable Foundation transactions, and related transfers despite knowing or having reason to know of conflicts and injury to existing charitable and stakeholder rights.

173. These breaches directly and proximately caused Plaintiffs' damages, including diversion and dissipation of charitable and investment assets, diminution in value, impairment of claims and causes of action, loss of distributions, loss of governance rights, and traceable proceeds in amounts to be proven at trial.

**COUNT VI**
**BREACH OF CONTRACT**
**(Against Mr. Patrick)**

174. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth in this Count.

175. The Hunter Mountain Investment Trust Agreement and related governing documents are valid and enforceable contracts. Plaintiffs and/or the entities through which Plaintiffs hold rights are parties to, assignees of, or intended third-party beneficiaries of those agreements by merit of the fact, at least, that the Plaintiffs funded Hunter Mountain Investment Trust.

176. The Trust Agreement required that trust assets be administered in accordance with its terms and for their intended purposes. It also provided that an administrator would be one that is trustworthy and thus automatically removed upon a Trigger Event, including conduct constituting a breach of fiduciary duty, dishonesty, fraud, willful misconduct, bad faith, or theft injurious to specified entities. Plaintiffs were a third party beneficiary of this term, in particular, which ensured that there would be a faithful steward of their donation.

177. Mr. Patrick breached the Trust Agreement by engaging in conduct constituting

events that required his automatic removal; continuing to act after his authority had been terminated or disabled; transferring Hunter Mountain Investment Trust-related interests through conflicted transactions; failing to obtain required consents; impairing trust assets and claims; concealing conflicts; and acting for personal benefit rather than in accordance with the governing documents.

178. Mr. Patrick's breaches were material and directly deprived Plaintiffs of the benefits of the agreements, causing damages in amounts to be proven at trial.

## COUNT VII
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
## (Against Mr. Patrick)

179. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth in this Count.

180. Every contract at issue, including the Hunter Mountain Investment Trust Trust Agreement, contains an implied covenant requiring the parties to exercise contractual discretion honestly, in good faith, and consistently with the agreement's purposes. Plaintiffs and/or the entities through which Plaintiffs hold rights are parties to, assignees of, or intended third-party beneficiaries of those agreements by merit of, at least, the fact that the Plaintiffs funded Hunter Mountain Investment Trust.

181. Mr. Patrick exercised contractual authority and discretion in bad faith by using his positions to benefit himself and entities he controlled or influenced; by concealing conflicts; by restructuring entities to defeat the rights of Plaintiffs and affected charities; by approving conflicted transactions; by impairing claims; and by using the governing documents as instruments to accomplish purposes contrary to those for which the structures were created.

182. Mr. Patrick's breach of the implied covenant directly and proximately caused Plaintiffs damages in amounts to be proven at trial.

**COUNT VIII**
**CIVIL CONSPIRACY**
**(Against All Defendants, other than the Nominal Defendants)**

183. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth in this Count.

184. Defendants combined, agreed, and acted with a meeting of the minds to accomplish unlawful objectives and lawful objectives by unlawful means: obtaining control over charitable and investment assets, concealing the restructuring from affected stakeholders, redeeming existing rights at a deep discount, diverting assets and fees, and impairing claims through liquidation and bankruptcy proceedings.

185. Each Defendant committed one or more overt acts in furtherance of the conspiracy, including preparing the work plan, forming or using concealed entities, communicating through interstate wires, issuing or accepting DFW Charitable Foundation participation shares, preparing or using the ValueScope Inc. valuation, approving redemptions and transfers, pursuing liquidation, and supporting or using the bankruptcy settlement.

186. The underlying unlawful acts include fraud, conversion, breach of fiduciary duty, unjust enrichment, RICO violations, and other tortious or unlawful conduct alleged in this Complaint.

187. As a direct and proximate result of Defendants' conspiracy, Plaintiffs suffered damages, including loss or impairment of assets, rights, claims, proceeds, distributions, governance rights, and other property in amounts to be proven at trial.

**COUNT IX**
**UNJUST ENRICHMENT**
**(Against All Defendants other than the Nominal Defendants, in the Alternative)**

188. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth in this Count.

189. This claim is pleaded in the alternative to Plaintiffs' legal claims.

190. Defendants received substantial benefits at Plaintiffs' expense, including compensation, fees, control over charitable entities and assets, majority participation rights, releases, settlement advantages, protection from liability, use of claims, use of information, and proceeds traceable to the challenged transactions.

191. Defendants knew of, accepted, retained, and enjoyed those benefits. Under the circumstances alleged, it would be unjust and inequitable for Defendants to retain those benefits without restoring them to Plaintiffs or compensating Plaintiffs for their losses.

192. Plaintiffs are entitled to restitution, disgorgement, constructive trust, equitable lien, accounting, and all other equitable and legal relief necessary to prevent Defendants' unjust enrichment.

## COUNT X
## IN REM CLAIM, CONSTRUCTIVE TRUST, EQUITABLE LIEN, AND TRACING
## (Against Mr. Patrick, Individually and as Trustee of DAAM Real Estate Trust, and the Ashland Property)

193. Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth in this Count.

194. Mr. Patrick wrongfully obtained money, property, assets, revenues, profits, benefits, fees, releases, control rights, and proceeds belonging to or traceable to Plaintiffs through the misconduct alleged above.

195. On information and belief, Mr. Patrick transferred, deposited, commingled, invested, or used Plaintiffs' money, property, or proceeds to acquire, preserve, maintain, improve, operate, refinance, reduce debt on, or increase the value of the Ashland Property.

196. In addition, Mr. Patrick used the Ashland property as the headquarters for the corrupt conduct, directing the RICO and illegal enterprise and scheme from that location.

197. Legal title to the Ashland Property is held by DAAM Real Estate Trust, for which Mr. Patrick serves as trustee. To the extent the property was acquired, preserved, improved, or maintained using Plaintiffs' assets or proceeds, Mr. Patrick and DAAM Real Estate Trust hold legal title subject to Plaintiffs' superior equitable rights.

198. Plaintiffs lack an adequate remedy at law because proceeds have been transferred into, commingled with, invested in, or embodied in real property and other assets, making equitable tracing necessary. Without equitable relief, Mr. Patrick and DAAM Real Estate Trust may transfer, encumber, dissipate, or conceal the property and proceeds.

199. Plaintiffs are entitled to trace their assets and proceeds into the Ashland Property and to the imposition of a constructive trust, equitable lien, accounting, disgorgement, and any other relief necessary to preserve and restore traceable value.

**DEMAND FOR JURY TRIAL**

200. Plaintiffs demand a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

201. WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and against Defendants and award all relief available at law and in equity, including:

a. A declaration that Defendants violated RICO and conspired to violate RICO;

b. Compensatory damages in an amount to be proven at trial;

c. Treble damages, costs, and reasonable attorneys' fees under 18 U.S.C. § 1964(c);

d. Restitution, disgorgement, accounting, and equitable tracing of all wrongfully obtained assets and proceeds;

e. A constructive trust over all property, funds, assets, claims, proceeds,

profits, appreciation, and value wrongfully obtained or held by Defendants;

f. A preliminary and then a permanent injunction against Defendants using, alienating, transferred, dealing in, or otherwise taking any steps to effect the status quo of all assets formerly belonging to the Charitable DAF or Hunter Mountain Investment Trust structures;

g. The immediate appointment of a receiver over the Hunter Mountain Investment Trust, Beacon Mountain LLC, Charitable DAF Fund, L.P., CLO Holdco, Ltd., CLO Holdco, LLC, CDH GP, Ltd., CDMCFAD LLC, Charitable DAF Holdco Ltd, DFW Charitable Foundation, and all entities directly or indirectly owned or controlled, in whole or in part, by Messrs. Patrick, Raver, and Murphy;

h. An equitable lien against the Ashland Property and any other traceable property in an amount to be determined at trial;

i. An order preserving, transferring, assigning, or conveying property, claims, proceeds, records, and control rights as necessary to restore Plaintiffs' rights and prevent further dissipation;

j. Punitive damages to the extent permitted by applicable law;

k. Prejudgment and post-judgment interest at the highest lawful rate;

l. Costs and attorneys' fees as permitted by law, contract, statute, or equity; and

m. All other relief the Court deems just and proper.

Dated: August 31, 2026

Respectfully submitted,

/s/ *Avery Joseph Welker*

Avery Joseph Welker
Missouri Bar No. 77661
1000 Louisiana Street, Suite 4000
Houston, TX 77002-5005
Tel.: (713) 890-5000
Fax: (713) 890-5001
Email: avery.welker@morganlewis.com

Michael J. Edney (*pro hac vice* forthcoming)
D.C. Bar No. 492024
Torsten Kracht (*pro hac vice* forthcoming)
D.C. Bar No. 501395
Mark C. Ingram (*pro hac vice* forthcoming)
D.C. Bar No. 90031689
Aubrianna Mierow (*pro hac vice* forthcoming)
D.C. Bar No. 90027117
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004-2541
Tel.: (202) 739-3000
Fax: (202) 739-3001
Email: michael.edney@morganlewis.com
Email: torsten.kracht@morganlewis.com
Email: mark.ingram@morganlewis.com
Email: aubrianna.mierow@morganlewis.com

Martha B. Stolley (*pro hac vice* forthcoming)
New York Bar No. 2965374
101 Park Avenue
New York, NY 10178-0060
Tel.: (212) 309-6000
Fax: (212) 309-6001
Email: martha.stolley@morganlewis.com

L. Heidi Manschreck (*pro hac vice* forthcoming)
New York Bar No. 4537585
110 North Wacker Drive
Chicago, IL 60606-1511
Tel.: (312) 324-1000
Fax.: (312) 324-1001
Email: heidi.manschreck@morganlewis.com

**MORGAN, LEWIS & BOCKIUS LLP**
Attorneys for Plaintiffs