**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| THE DUGABOY INVESTMENT TRUST and JAMES D. DONDERO,<br><br>Plaintiffs,<br><br>v.<br><br>MARK E. PATRICK, individually and as trustee of DAAM REAL ESTATE TRUST; DAAM REAL ESTATE TRUST; PAUL MURPHY; SHAWN RAVER; VALUESCOPE INC. n/k/a MARSHALL & STEVENS DALLAS-FORT WORTH; SHIELDS LEGAL GROUP, P.C.; CDMCFAD, LLC; DFW CHARITABLE FOUNDATION; ATLAS IDF, GP, LLC; RAND ADVISORS, LLC; RAND PE FUND MANAGEMENT, LLC; HUNTER MOUNTAIN INVESTMENT TRUST; CHARITABLE DAF GP, LLC; CLO HOLDCO, LTD.; CLO HOLDCO, LLC; and CDH GP, LTD.,<br><br>Defendants,<br><br>-and-<br><br>ATLAS IDF, L.P.; CHARITABLE DAF FUND, L.P.; RAND PE FUND I, L.P.; BEACON MOUNTAIN, LLC; and CHARITABLE DAF HOLDCO, LTD.,<br><br>Nominal Defendants. | Case No. 4:26-CV-00738<br>Hon. Roseann A. Ketchmark<br><br>ORAL ARGUMENT REQUESTED |

**<u>MOTION FOR APPOINTMENT OF A RECEIVER</u>**

Pursuant to Federal Rule of Civil Procedure 66, Plaintiffs The Dugaboy Investment Trust and James D. Dondero respectfully request that this Court appoint a receiver over Defendants DAAM Real Estate Trust, CDMCFAD, LLC, DFW Charitable Foundation, Atlas IDF GP, LLC, Rand Advisors, LLC, Rand PE Fund Management, LLC, Hunter Mountain Investment Trust, Charitable DAF GP, LLC, CLO HoldCo, Ltd., CLO HoldCo, LLC, and CDH GP, Ltd, and Nominal Defendant Atlas IDF, L.P. (collectively, "Proposed Receivership Entities"). In support of this Motion, Plaintiffs state as follows:

## **FACTUAL BACKGROUND**

1. In 2011, Plaintiff James Dondero established an organization of entities designed to provide long-term, stable income to charitable endeavors. Ex. 1, Statement of Claim, ¶¶ 52–56. This structure of entities is referred to herein as the Charitable DAF Structure.

2. At the top of the Charitable DAF Structure sat three (later four) established charities that Mr. Dondero selected for their integrity and common interest in doing good. *Id.*; *see also* ECF No. 1, Compl. at 20. The established charities were the Greater Kansas City Community Foundation, The Dallas Foundation, the Santa Barbara Foundation, and later the Community Foundation of North Texas. Ex. 1, ¶¶ 55–56.

3. Each of the four charitable beneficiaries had a corresponding supporting organization established under Section 509(a)(3) of the Internal Revenue Code, designed to support the charities. *Id.* at ¶¶ 61–65. Each supporting owned an equity stake in the Charitable DAF entities that held the assets. *Id.* at ¶ 19. In the core documents of the Charitable DAF, these organizations were called the "indirect charitable owners" of the Charitable DAF's assets and all associated with the Charitable DAF were bound to act in their best interest and to maximize their ownership stake.

4. Mr. Dondero sits on the board on each of the supporting organizations. This structure is designed to give him a substantial say as to what specific noble causes the established charities would give the proceeds of his gift and how the assets that he gave would be invested in the meantime.

5. In 2015, Mr. Dondero and one of his longtime business partners, Mark Okada, sought to expand their charitable legacy by forming the Hunter Mountain Investment Trust ("Hunter Mountain"), exchanging 99.5% of the outstanding limited partnership shares of what was then their highly successful hedge fund they had founded— Highland Capital Management, L.P.— for notes payable worth tens of millions of dollars. ECF No. 1, Compl., ¶ 67.

6. Messrs. Dondero and Okada set up a similar structure of entities to ensure that the gift of the equity stake in Highland would benefit an established charity and the donors would have a say on the good works to which the proceeds of the gift would ultimately be donated. At the top of this structure was The Dallas Foundation, again assisted by two organizations on the board of which Messrs. Dondero and Okada sat. *Id.* at ¶¶ 68–70.

7. For years, these structures worked well and produced amazing results for numerous charitable causes throughout the country. The Charitable DAF, for example, through the investment decisions recommended by Mr. Dondero grew from an initial gift of approximately $35 million to giving away more than $55 million to deserving causes and having $270 million more in assets for future gifts. Under Mr. Dondero's recommendations, the Charitable DAF's munificence provided major financial backing for a Catholic high school for the economically disadvantaged and became the anchor donor for the George W. Bush Presidential Library. Between what was facilitated through his gift to the Charitable DAF and his other giving, Mr. Dondero has become one of the Nation's largest benefactors for injured veterans.

8. That all changed due to a man named Mark Patrick. Mr. Patrick had served as an in-house tax lawyer for various entities associated with Mr. Dondero and was involved in designing the Charitable DAF and the Hunter Mountain Structures. Ex. 1, ¶ 74; Ex. 2, Hunter Mountain Appointment of Successor Trustee, at 1. As detailed below, his knowledge as to how they worked would give him later insight about how they could be corruptly manipulated to his own advantage.

9. Both the Charitable DAF and the Hunter Mountain structures had administrators. For years, these organizations were managed by honorable men, dedicated to doing their best for the charitable entities. In 2021 and 2022, however, these managers retired from their roles. Ex. 1, ¶ 74.2; Ex. 2 at 1. Mr. Patrick volunteered to take over these ministerial positions, telling Mr. Dondero that he knew how they worked and that he could continue efficiently work in the best interests of the established charities.

10. The old managers and Mr. Patrick had fiduciary, contractual, statutory, and common-law duties to act loyally, disclose conflicts, preserve trust and charitable assets, avoid self-dealing, and administer the structures for their intended charitable and contractual purposes. *See* Ex. 3, HMIT Trust Agreement, ¶ 8; Ex. 1, ¶¶ 155–57.

11. Those obligations mattered to the previous managers. They did not to Mr. Patrick. In late 2023, Mr. Patrick secretly began planning to steal the Charitable DAF's assets through fraud and deception. He covertly commissioned Shields Legal Group to draw up a schematic for stripping the established charities of more than $270 million in assets and stuffing many of them into his own pocket. The deceptively anodyne title for the guidebook for corporate fraud was "Memorandum – Work Plan" ("Shields Work Plan"). *See* ECF No. 1, Compl. Ex. 3, Shields Work Plan.

12. The Shields Work Plan laid out step-by-step blueprint for Mr. Patrick restructure the Charitable DAF to put all of its assets into fake organization for his own use and in a way that neither the ultimate charitable beneficiaries nor the supporting organizations nor the original founders, Messrs. Dondero and Okada, would be likely to detect quickly. *Id.* at 1–2.

13. The Charitable DAF held most of its assets in limited partnerships, with ultimately the charitable supporting organizations owning the assets. As with all limited partnerships, they are run by one general partner without anyone noticing. And the first step was to create a new general partner for the Charitable DAF structure without anyone noticing. On February 5, 2024, Mr. Patrick asked Shields Legal Group to create an entity that was "hard to find or track, or trace," with a "generic name" and "strong litigation protection." ECF No. 1, Compl. Ex. 4, Mark Patrick Feb. 5, 2024 Email to Shields Legal Group.

14. Shields Legal Group obliged, and created the first of its non-descript alphabet soup entities carry out Mr. Patrick's theft: CDH GP, Ltd. Ex. 1, ¶¶ 36, 83. Mr. Patrick was the sole director and sole shareholder of CDH GP, Ltd. *Id.* at ¶ 37.

15. On March 7, 2024, without telling any of the stakeholders, they substituted CDH GP, Ltd. as the general partner of the Charitable DAF structure, replacing Charitable DAF GP, LLC. *Id.* at ¶¶ 74.6, 84; Ex. 4, Written Consent of Managing Member of Charitable DAF GP; Ex. 5, Excerpts from May 12, 2026 Hr'g Tr. at 48:17–49:14.

16. Mr. Patrick and Shields Legal Group then formed another difficult-to-find, generically-named entity, CDMCFAD, LLC, to serve as the main corporate vehicle for stealing the Charitable DAF's assets. Ex. 6, Certificate of Formation of CDMCFAD, LLC. Mr. Patrick was the sole manager of the CDMCFAD, LLC. *Id.*

17. On December 18, 2024, Mr. Patrick had his new general partner entity, CDH GP, insert CDMCFAD LLC into the Charitable DAF structure, right below the supporting organizations in a restructuring transaction that would eventually allow the pilfering of the DAF structure. Ex. 1, ¶¶ 99–103. The transaction, signed on all three sides by Defendant Patrick, assigned the limited partnership interest in the Fund to CDMCFAD LLC. *Id.*; Ex. 5, 30:15–32:3. In exchange, Charitable DAF HoldCo, Ltd. received the entire membership interest of CDMCFAD LLC, which Mr. Patrick, as the Manager, could make the Charitable DAF redeem for fair market value at his sole discretion. Ex. 1, ¶¶ 101–103; *see also* Ex. 5, 32:4–33:13.

18. Mr. Patrick then created his final entity, DFW Charitable Foundation. He registered this as a 501(c)(3) charity, but it really wasn't intended for any charitable purposes; It was designed to be a receptacle for stolen assets. Ex. 7, Certificate of Formation of DFW Charitable; Ex. 5, 15:12–16:7.

19. With his three new entities established, Mr. Patrick had everything he needed to steal from the established charities and stuff his pockets with tens of millions of dollars. What happened next was a three-step process.

20. First, given his plan to take all the Charitable DAF's assets for himself, Mr. Patrick had to move the big asset of the Hunter Mountain structure—the equity stake in Highland—to the Charitable DAF. So, again, without notifying anyone, he sold Hunter Mountain into the Charitable DAF structure for a nominal $1 million payment. Ex. 8, Hunter Mountain Purchase Agreement; Ex. 5, 45:19–46:25 (Mr. Patrick admitting that he did not disclose this transaction to the charities or the owners). He was able to do this because, just like in the Charitable DAF Structure, Mr. Patrick exercised control over every side of the transaction.

21. The second step was diluting the charitable shares. With Hunter Mountain now in the Charitable DAF, Mr. Patrick set out to use his new "hard to track or trace" corporate entities to steal all of the Charitable DAF's assets. On February 7, 2025, he issued almost double the previously outstanding shares of the Charitable DAF to his new sham "charity"—DFW Charitable Foundation—diluting the existing shares of the charitable owners to 48.96%. Ex. 1, ¶¶ 118; Ex. 5, 20:21–22:23-; Ex. 9, Excerpts from May 11, 2026, Hr'g. Tr. at 107:24–110:8.

22. Then, in March 2025, he executed the third and final step. He cashed all the established charities out from their ownership of any of the Charitable DAF's assets. ECF No. 1, Compl. Ex. 8. For the equity ownership in Highland and the more than $270 million in other assets that the charities had owned before Mr. Patrick's mischief, he made a payment to the charities for $1.6 million. Ex. 5., 32:4-34:115. He called this a so-called "redemption" event. There was nothing "redeeming" about this event. It left his sham charity, DFW Charitable Foundation, as a centi-millionaire and the established charities that had owned Charitable DAF defrauded. Again, he was allowed to do this unilaterally.

23. Mr. Patrick could not pull this off alone. He assembled a corrupt enterprise to do so. He installed a man named Shawn Raver as a co-director of his sham charity. He recruited Paul Murphy as a co-director in many of the Charitable DAF entities, to give the patina of someone else signing off on his theft. He had the Shields Law Group as the pointy end of the spear, planning and papering his fraudulent restructuring stunts.

24. And he dragooned Defendant ValueScope into his fraud. How could anyone justify taking hundreds of millions of dollars from four established charities for $1.6 million? No uncorrupted person could. But Mr. Patrick got accounting firm ValueScope to provide a fraudulent valuation purporting to support the transaction for when it was detected. Messrs. Patrick, Raver,

Murphy, and Shields Legal Group had gone opinion shopping for a lowball valuation to justify their theft. After being turned down by two well-known independent accounting firms—PricewaterhouseCoopers and FTI, *see* Ex. 10, FTI 3.26.25 Email; ECF No. 1, Compl. Ex. 7; —ValueScope obliged. ECF No. 1, Compl. Ex. 6. Apparently, consistency did not matter to ValueScope. Despite sending the charities a valuation in November 2024, telling them they owned more than $270 million in assets, ValueScope determined secretly in March 2025 that the charities' stakes were worth only $1.6 million.

25. Key to this whole scheme was secrecy and deception. Of course, neither Mr. Patrick, ValueScope, nor any of the other Defendants told the charities of the transaction taking more than a quarter billion in assets from them or of the new sham valuation. ECF No. 1, Compl. Ex. 6. Nor did any of the Defendants disclose to the charities or the donors any of the other corrupt restructuring moves along the way. Ex. 11, Email from Charities to Mark Patrick and Paul Murphy; Ex. 12, Holland & Knight Email. When asked why Mr. Patrick repeatedly declined to disclose these clandestine moves to the charities or the donors, he said his "lawyers said he did not have to." Ex. 5, 29:17–24. Presumably, those lawyers included those from Shields Legal Group.

26. Worse, Messrs. Patrick, Murphy, and others associated with the enterprise affirmatively lied to the charities to lull them into inaction while they were pulling off the fraud. Ex. 1, ¶¶ 89–90, 106–15; Ex. 11; Ex. 12. Using the interstate wires through conference calls, video meetings, and e-mails, Messrs. Patrick and Raver falsely told representatives of the established charities that they were not changing and would not change the structure of the Charitable DAF structure, that transparent financial statements were under preparation and would be released shortly, and that they were taking measures and would engage in investments that would increase

the value of the established charities' stakes in the Charitable DAF, not eliminate them. *See* Ex. 11. All of this was designed to forestall any inquiry into Mr. Patrick's activities.

27. What was driving all of these moves was the greed of several defendants. Messrs. Patrick and Murphy paid themselves ***more than $18 million*** from charitable funds, from the third quarter of 2024 through 2025. Ex. 5, 82:5–14, 82:25–83:12; Ex. 9, 131:10–23. These are breathtaking numbers in any context. But they are particularly striking in the context of running the Charitable DAF, which (when not engaging is a massive restructuring designed to steal all the organization's assets) is a part time job. Indeed, in previous years, directors and administrators for the Charitable DAF Structure entities had been paid tens of thousands per year for this part-time job.

28. For Mr. Patrick's part alone, he paid himself approximately $10.55 million during 2024, including $8.36 million in September and October of 2024 alone. Ex. 5, 82:5–7; Ex. 13, Excerpts from May 21, 2026, Hr'g Tr., 171:15–19; Ex. 14, MacInnis Affidavit, ¶¶ 52, 64–67.

29. Within weeks of the September and October payments, Mr. Patrick acquired substantial real estate in Boone County, Missouri. On November 4, 2024, he and his wife purchased property at 4909 Minor Hill Road, Ashland, Missouri, 65010, for approximately $1.66 million. Ex. 14, ¶¶ 53–53.1; ECF No. 1, Compl. Ex. 1. Approximately two weeks later, Mr. Patrick and his wife transferred the Ashland, Missouri, property into DAAM Real Estate Trust ("DAAM"), for which Mr. Patrick and his wife are the trustees. Ex. 14, ¶ 53.2; ECF No. 1, Compl. Ex. 2.

30. DAAM therefore serves a different function from the other corporate entities used to carry out the restructuring. Whereas those entities were held and managed the disputed

investment assets, DAAM holds real estate purchased with the misappropriated proceeds from Mr. Patrick's scheme.

31. And then there is the purpose of DFW Charitable Foundation and dumping the stolen assets that remained after this personal pay day into that. Let us be clear: There is nothing "charitable" about the DFW Charitable Foundation. In the year-and-a-half since Mr. Patrick and his coconspirators looted the Charitable DAF, the DFW Charitable Foundation has given away less than a million dollars to charitable causes. Ex. 5, 83:18–21. That money's real purpose is to pay professional services firms to somehow defend Mr. Patrick's fraud: During the same period, Messrs. Patrick and Murphy diverted more than $12 million to such firms. *Id.* at 76:6.

32. Mr. Patrick acquired control of the entities holding assets for charitable purposes. He then used overlapping positions to authorize a unilateral restructuring, redirect economic interests towards himself, and approve substantial payments at the expense of existing stakeholders. The original charitable participants struggled to obtain information about those transactions, and the same management remains in control now. The proposed receivership seeks to preserve that property and permit an independent accounting while the misconduct claims are adjudicated.

## DISCUSSION

33. Mr. Patrick stole an equity stake in Highland Capital and more than $270 million in other assets from four established charities. His job was to safeguard those assets for the charities; he instead abused his position of trust to enrich himself and to defraud them.

34. In the ordinary course of events, legal remedies at the end of a case would deal with misconduct like this. But this is not the ordinary course of events. Mr. Patrick and his coconspirators are burning through the assets they stole to pay themselves and to further the fraud. By the times legal remedies take hold, tens of millions more will have been consumed and lost to

their rightful owners forever. The right thing to do in these circumstances is to act quickly and stem the bleeding, pending final judgment. And the correct legal vehicle for doing so is to impose a court-appointed receiver to manage the corporate entities holding the stolen assets in question. That receiver can then safeguard the assets pending their rightful return to the established charities that owned them prior to Mr. Patrick's fraud. It is time to relieve the fox from guarding the henhouse.

35. Imposing a receiver is a drastic remedy. But it is less drastic where entities proposed for receivership are comprised solely of stolen assets—or property that is the subject matter of the litigation. That is the case here for all but one of the entities (the DAAM Real Estate Trust): Those proposed receivership entities have no other purpose than to hold assets for the charitable owners, but they have been perverted by Mr. Patrick and his coconspirators as a personal piggybank.

36. The receivership remedy is also less drastic where the person who would be removed from administering the subject corporate entities was put in that position as a fiduciary to manage the assets of others. Such a circumstance distinguishes this case from cases where, for example, the founder of a company and significant shareholder is being removed from control for the benefit of minority shareholders. That would be violently wresting property rights from a defendant in advance of final judgment. But Mr. Patrick and his co-directors have no property interest in the corporate entities and assets. They were put in place to safeguard the property of others, and they have been doing a horrible—indeed, criminal—job of it.

37. Federal law and equitable principles govern whether the appointment of a receiver is warranted. Fed. R. Civ. P. 66. In determining whether to exercise their equitable authority to appoint a receiver, courts analyze whether there is "[1] a valid claim by the party seeking the

appointment; [2] the probability that fraudulent conduct has occurred or will occur to frustrate that claim; [3] imminent danger that property will be concealed, lost, or diminished in value; [4] inadequacy of legal remedies; [5] lack of a less drastic equitable remedy; and [6] likelihood that appointing the receiver will do more good than harm." *Morgan Stanley Smith Barney LLC v. Johnson*, 952 F.3d 978, 980–81 (8th Cir. 2020). All these factors point in favor of appointing a receiver.

38. First, Plaintiffs have stated a valid claim under the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1960, *et seq.* To establish a violation of § 1962(c), Plaintiffs must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011).

39. Defendants formed an "enterprise" with the common purpose of stealing $270 million of assets held for the benefit of certain charitable entities. *See* 18 U.S.C. § 1961(4). The enterprise engaged in a pattern of racketeering activity, as the participants in the enterprise engaged in multiple instances of mail and wire fraud, money laundering, and bankruptcy-related fraud. Each instance is a "predicate act" under 18 U.S.C. § 1961(1) of the RICO Act, and collectively those instances are sufficient to establish a pattern of such activity.

40. Fraudulent conduct has occurred and likely will continue, in the absence of the requested receivership. Defendants' enterprise operated in secret, clandestinely planning and executing the fraudulent restructuring scheme with the intention to make it hard to detect. Covertly and telling no one, Messrs. Patrick, Raver, Murphy, and Shields Legal Group created "difficult to track or trace" corporate entities to insert into the Charitable DAF in order to carry out the enterprise's theft of charitable assets. Mr. Patrick caused one of the relevant entities to "sell" the equity stake in Highland Capital into the Charitable DAF, to pre-position it for Mr. Patrick's

impending theft. Mr. Patrick then recruited ValueScope to provide a fraudulent valuation of established charities' stake in the Charitable DAF to paper the stealing of the Highland equity stake and more than $270 million in other assets for a pittance of $1.6 million. Messrs. Patrick, Murphy, CDH GP, Ltd. DFW Charitable Foundation then took all the assets from the established charities.

41. In doing so, Mr. Patrick deprived Mr. Dondero and The Dugaboy Investment Trust of their right as donors to have a say in the ultimate good works to which the charitable asserts would be put. Mr. Patrick declined to disclose any of these machinations to the established charitable owners or the Plaintiff donors who he was stripping of their charitable legacy. To the contrary, throughout the enterprise's scheme, Messrs. Patrick, Murphy, their agents, and coconspirators, made false statements to the established charities in order to delay inquiry into these fraudulent steps until they could be completed and to dupe Plaintiffs and the charitable owners into inaction. Each of these steps involved multiple instances of wire fraud, using interstate financial wires and communications to carry out this scheme. All of them show a slew of predicate acts that manifest a violation of the Racketeering and Corrupt Influenced Organizations Act.

42. Second, as described above, fraudulent conduct has occurred and is likely to recur in the absence of a receiver. *Morgan Stanley*, 952 F.3d at 981. Defendants have shown a pattern of concealment of their activities to divest those with economic interests in the charitable assets held by the Charitable DAF and Hunter Mountain Structures. Without the oversight of a neutral, third-party receiver to ensure such divestiture does not recur, Defendants will continue their fraudulent enterprise to frustrate Plaintiffs' claims against them and/or to nullify any relief this Court may provide. And the evidence shows the Defendants continue to consume stolen assets at a prodigious rate, pumping professional fees into their law firm and accounting firm coconspirators

at the rate of a million or millions per month and reserving the right to pay themselves tens of millions more without judicial intervention. Ex. 5, 75:18–76:9; Ex. 14, ¶¶ 63–69.

43. Third, there is significant danger that the assets held and controlled by the proposed receivership entities will be concealed, lost, or diminished in value should this Court decline to appoint a receiver. *Morgan Stanley*, 952 F.3d at 981. Defendants' corrupt enterprise operated to steal remove ownership of hundreds of millions of dollars in assets from the established charities and to remove a say in the disposition of those charitable assets from the donor Plaintiffs, and the hallmark of the enterprise's actions was secrecy and concealment. In the process, Messrs. Patrick, Raver, and Murphy paid themselves hefty sums from the Charitable DAF assets—nearly $20 million between 2024 and 2025. During that same period, Defendants paid more than $12 million from the Charitable DAF and Hunter Mountain assets to professional services firms, including Shields Legal Group, a number that builds every day a receivership is not in place. If a receiver is not appointed, Defendants will continue to pay themselves, their coconspirators, and professional services firms millions of dollars from assets originally destined to provide long-term support to legitimate charitable organizations.

44. Federal courts applying the Eighth Circuit's standard have appointed a receiver to oversee companies when the underlying complexity of the transactions at issue and significant misrepresentations, omissions, and fraudulent statements by defendants made it otherwise impossible to ensure forthrightness and proper administration of the companies under the Court's scrutiny. *See Oliver and Co. v. Zamber*, No. 4:25-cv-00132-MTS, 2025 WL 1580288, at *9 (E.D. Mo. June 4, 2025). Here, the Defendants and members of the corrupt enterprise engaged in a pattern of complex transactions involving a web of entities they created, deliberately concealing the restructuring of the Charitable DAF and Hunter Mountain Structures and making it inscrutable

to the outside observer if discovered.  Appointment of a third-party receiver is necessary to untangle the intentional complexity and to ensure careful stewardship of the proposed receivership entities and the assets they hold.

45. Fourth, legal remedies are inadequate. *Morgan Stanley*, 952 F.3d at 981. At the end of the day, Plaintiffs are confident that final judgment will be entered for the damages caused by the actions of Mr. Patrick and his coconspirators. But when that happens, the damages award will be an inadequate remedy. That is because the Defendants are dissipating the charitable assets in real time, and any judgment risks becoming a paper judgment only with inadequate assets to enforce against. *Id*. Importantly, this is not a receivership seeking to front-run a final judgment, locking down assets belonging to the Defendant for payment of an eventual verdict. *See, e.g., S.E.C. v. Barton,* No. 24-10788, Dkt. 117-1 (5th Cir. Mar. 3, 2026); *S.E.C. v. Barton*, 79 F.4th 573, 579–81 (5th Cir. 2023); *Netsphere, Inc. v. Baron*, 703 F.3d 296, 310 (5th Cir. 2012). Instead, the receivership entities either entirely or mostly possess the charitable assets themselves, the very subject matter of this litigation. And that goes too for DAAM Real Estate Trust, as the evidence shows that Mr. Patrick plowed substantial sums into that in the Fall of 2024 almost immediately after fraudulently paying himself an eight figure sum from the charitable assets he was stealing. Ex. 14, ¶¶ 52–53.2.

46. Fifth, Plaintiffs lack a less drastic equitable remedy other than a receivership. *Morgan Stanley*, 952 F.3d at 981. A simple preliminary injunction freezing assets or barring transactions will not suffice, as a neutral receiver needs to get to work tracking down the destinations to which Defendants' secreted assets and attempting to recover them back for the court's use. *Netsphere*, 703 F.3d at 309. Also, Mr. Patrick's brazen conduct indicates that a mere court order to stop will be little deterrent to his continued misconduct and dissipation of assets.

47. Also, putting a trustworthy steward of charitable assets in place aligns with the purpose of these structures to begin with, and Mr. Patrick and his co-defendants have provided ample evidence to disqualify themselves as ethical caretakers. In this way, the proposed receivership aligns with the timing and purposes of the underlying agreements standing up these charitable structures. After all, the donor Plaintiffs put in place contractual provisions that would automatically remove an administrator, like Mr. Patrick, who had engaged in wrongful conduct. And that was to occur with immediate effect. Specifically, the Hunter Mountain Investment Trust Agreement provides that the administrator would be automatically removed upon a breach of fiduciary duty, dishonesty, fraud, willful misconduct, bad faith, or theft "in any capacity." ECF No. 1, Compl., ¶ 73; *see also* Ex. 3, §§ 1, 16. Creating an enterprise and planning a scheme to steal all valuable assets from the trust's beneficiaries is a blatant direct breach of fiduciary duties as administrator, and a receivership would advance what should have happened automatically without judicial intervention, that Mr. Patrick would be pulled from his position and no longer authorized to act. This is time sensitive as Mr. Patrick continues to deal away the established charities' assets purportedly in the name of the Hunter Mountain Investment Trust. He entered into, and continued to defend, a giveaway of assets in the Highland bankruptcy. 9019 Settlement Agreement at 22–23, *In re Highland Capital Mgmt., L.P.*, No. 3:19-34054-sgj, Dkt. 4217-1 (N.D. Tex. May 19, 2025).

48. Sixth, a receiver will do more good than harm. A receiver will be able to parse through the complicated financial transactions and corporate structures created by Mr. Patrick and his co-conspirators. A receiver also will prevent further dissipation of assets resulting from additional restructuring, paying fees to an unnecessary number of law firms in an effort to conceal the enterprise, and/or paying Messrs. Patrick, Raver, and Murphy exorbitant fees and

compensation for stealing assets originally donated to charity. If there were no receiver appointed, the Defendants' enterprise may continue moving assets around—likely in a manner designed to avoid any adequate remedy from this Court—and otherwise engage in further misconduct. If a receiver is appointed, the only harm the non-Receiver Entity Defendants face is the inability to retain control over assets they stole from charity or to pay themselves exorbitant salaries from those assets. And they have no moral or legal right to remain in that position. The assets they are playing with do not belong to them. They did not found a company or build a business. They were supposed to be stewards of other people's money, and it is no tragedy to pause that stewardship, through a receivership, amidst significant evidence of misconduct.

49. Based on the facts set forth in the Complaint, this Motion, and its accompanying Suggestions and exhibits, including the racketeering enterprise's restructuring of assets away from charitable endeavors and into Messrs. Patrick, Raver, and Murphy's pockets, numerous predicate acts under RICO, and multiple documented instances of misrepresentation, fraud, and misconduct, Plaintiffs clearly have a need for a disinterested receiver for the Proposed Receivership Entities to:

A. Undertake and exercise all of the powers and authority granted to receivers under 28 U.S.C. §§ 754, 959, and 1692, and Fed. R. Civ. P. 66.

B. Obtain, collect, preserve, and protect the assets owned by the proposed receivership entities;

C. Uncover the true and actual income, expenses, and value of the assets held by the proposed receivership entities;

D. Operate and manage the proposed receivership entities;

E. Assemble, take control and possession of, collect, manage, and, where appropriate and with the consent of this Court and the parties herein, liquidate the assets held by the proposed receivership entities;

F. Take any and all actions the Receiver deems reasonable and appropriate to manage and prevent waste to the proposed receivership entities, and to preserve, secure, manage, maintain, and safeguard the valuable assets owned by the proposed receivership entities;

G. Enjoin the parties and all persons, firms, or corporations, and any persons acting under their direction, or any persons or entities controlling any of the proposed receivership entities, from disturbing in any manner the Receiver's possession and disposition of the proposed receivership entities, or any other property that is the subject of the Court's order, and order that such persons and entities are prohibited and restrained from disposing of, dissipating, mishandling or misappropriating the assets held by the proposed receivership entities or the entities themselves, all until further order of the Court;

H. Communicate with the parties and third parties on any matters related to the proposed receivership entities, and enter into any contracts, agreements, consent orders, memoranda, or other documents with the parties and third parties as the Receiver may determine appropriate with respect to the proposed receivership entities;

I. Gain access to the books and records and all information necessary to collect, manage, and preserve the proposed receivership entities;

J. Institute, prosecute, defend, compromise, or intervene in or become a party to such actions or proceedings in state or federal court relating to Defendants, and those necessary to recover or dispose of any income from the proposed receivership entities, for the carrying out

of the terms and provisions of the Court's order appointing the Receiver, and/or to defend against any action brought against the Receiver acting in such capacity;

K. Retain, hire, or discharge such managers, agents, employees, servants, accountants, and attorneys as may in the Receiver's judgment be advisable or necessary in the management, conduct, control, or custody of the proposed receivership entities;

L. Retain legal counsel to enforce the Receiver's duties, which counsel may be the same as counsel representing the Plaintiffs, and to retain such other legal counsel as may be necessary to protect his interests;

M. Retain any other person, firm, or corporation that the Receiver deems necessary to carry out his duties to manage the proposed receivership entities and their assets;

N. Make such payments and disbursements, in the ordinary course of business, as may be necessary or proper for the preservation of the proposed receivership entities;

O. Negotiate and execute any service contracts or agreements needed in connection with the proposed receivership entities;

P. Prepare and file any federal and state income, payroll, sales, real and personal property, and similar tax returns that may be needed in connection with the proposed receivership entities, or retain any accountants or tax preparers for this purpose, except that this authorization shall not impose any duty on the Receiver to prepare or file any such tax returns, and the obligation to do so shall remain with the entity or entities ordinarily responsible for doing so; and

Q. Negotiate and enter into any other new contracts with respect to the proposed receivership entities; modify existing contracts in the ordinary course of business or as necessary to preserve, protect, manage, or prevent dissipation of any of the assets held by the

proposed receivership entities; pay all expenses and other obligations secured by or which may give rise to liens and all other outstanding obligations in the ordinary course of business, including obligations incurred prior to the commencement of the receivership so long as the Receiver has determined that it is prudent to do so in order to maintain business relationships that are beneficial to the conduct of the receivership.

50. By reason of the foregoing facts, this honorable Court should now appoint a receiver to carry out the above and foregoing actions, and to protect and preserve the proposed receivership entities and the assets held by them, and the appointment of a receiver is appropriate and is authorized under Federal Rule of Civil Procedure 66.

51. Plaintiffs propose Christopher S. Dove of Hunter Law Group for appointment as receiver. Mr. Dove is a capable and experienced attorney who is suitable to serve as receiver for the Proposed Receivership Entities. He has worked in asset recovery for approximately twenty-three years and has direct experience serving as a receiver in multiple prior cases before this Court, most recently in 2025. Mr. Dove also has a background in federal enforcement, previously serving as an attorney in the Department of Justice's Tax Division. The resume of Mr. Dove is attached hereto and incorporated herein as Exhibit 15.

52. Notwithstanding Plaintiff's proposal to appoint Mr. Dove, Plaintiff underscore that the important remedy is to appoint a receiver, whether that be an individual that the Court prefers or the recommended candidate.

WHEREFORE, Plaintiffs herewith respectfully request this honorable Court enter an order appointing a receiver as appropriate relief under equity, with all of the above powers and authority:

Dated: October 30, 2026

Respectfully submitted,

/s/ *Michael J. Edney*

MORGAN, LEWIS & BOCKIUS LLP
Avery Joseph Welker
Missouri Bar No. 77661
1000 Louisiana Street, Suite 4000
Houston, TX 77002-5005
Tel.: (713) 890-5000
Fax: (713) 890-5001
Email: avery.welker@morganlewis.com

Michael J. Edney (*pro hac vice*)
D.C. Bar No. 492024
Torsten Kracht (*pro hac vice*)
D.C. Bar No. 501395
Mark C. Ingram (*pro hac vice*)
D.C. Bar No. 90031689
Aubrianna Mierow (*pro hac vice* forthcoming)
D.C. Bar No. 90027117
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004-2541
Tel.: (202) 739-3000
Fax: (202) 739-3001
Email: michael.edney@morganlewis.com
Email: torsten.kracht@morganlewis.com
Email: mark.ingram@morganlewis.com
Email: aubrianna.mierow@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
101 Park Avenue
New York, NY 10178-0060
Tel.: (212) 309-6000
Fax: (212) 309-6001
Email: martha.stolley@morganlewis.com

L. Heidi Manschreck (*pro hac vice*)
New York Bar No. 4537585
110 North Wacker Drive
Chicago, IL 60606-1511
Tel.: (312) 324-1000
Fax.: (312) 324-1001
Email: heidi.manschreck@morganlewis.com

Karrie J. Clinkinbeard

Missouri Bar No. 51413
ARMSTRONG TEASDALE LLP
2345 Grand Boulevard, Suite 1500
Kansas City, MO 64108
Tel.: (816) 472-3175
Email: kclinkinbeard@atllp.com

*Attorneys for Plaintiffs James D. Dondero and The Dugaboy Investment Trust*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on October 30, 2026, the foregoing was filed electronically with the Clerk of Court by operation of the Court's electronic filing system and served upon counsel of record via electronic email.

*/s/ Michael J. Edney*
Michael J. Edney