**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| THE DUGABOY INVESTMENT TRUST and JAMES D. DONDERO,<br><br>Plaintiffs,<br>v.<br><br>MARK E. PATRICK, individually and as trustee of DAAM REAL ESTATE TRUST; DAAM REAL ESTATE TRUST; PAUL MURPHY; SHAWN RAVER; VALUESCOPE INC. n/k/a MARSHALL & STEVENS DALLAS-FORT WORTH; SHIELDS LEGAL GROUP, P.C.; CDMCFAD, LLC; DFW CHARITABLE FOUNDATION; ATLAS IDF, GP, LLC; RAND ADVISORS, LLC; RAND PE FUND MANAGEMENT, LLC; HUNTER MOUNTAIN INVESTMENT TRUST; CHARITABLE DAF GP, LLC; CLO HOLDCO, LTD.; CLO HOLDCO, LLC; and CDH GP, LTD.,<br><br>Defendants,<br><br>-and-<br><br>ATLAS IDF, L.P.; CHARITABLE DAF FUND, L.P.; RAND PE FUND I, L.P.; BEACON MOUNTAIN, LLC; and CHARITABLE DAF HOLDCO, LTD.,<br><br>Nominal Defendants. | Case No. 4:26-CV-00738<br>Hon. Roseann A. Ketchmark<br>ORAL ARGUMENT REQUESTED |

**<u>SUGGESTIONS IN SUPPORT OF MOTION FOR APPOINTMENT OF A RECEIVER</u>**

## TABLE OF CONTENTS

**Page**

INTRODUCTION .......... 2

LEGAL STANDARD .......... 3

ARGUMENT .......... 4

I. Plaintiffs State a Valid Claim for Relief for Violation of and Conspiracy Under the Racketeer Influenced Corrupt Organizations Act. .......... 5

II. Fraudulent Conduct Has Occurred and Likely Would Recur to Frustrate Plaintiffs' Claims if a Receiver Were Not Appointed. .......... 8

III. There Is Significant Danger the Property Will Be Concealed, Lost, or Diminished in Value Should a Receiver Not Be Appointed Over the Proposed Receivership Enterprise Entities. .......... 8

IV. Legal Remedies Are Inadequate Because of the Complexity of the Transactions and Defendants' Pattern of Concealment and Duplicity .......... 10

V. No Less Drastic Equitable Remedy Exists Than a Receivership. .......... 13

VI. Appointment of a Receiver Will Do More Good Than Harm. .......... 14

CONCLUSION .......... 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashton v. Penfield*,
135 S.W. 938 (Mo. 1911) (en banc) ....................10

*Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*,
999 F.2d 314 (8th Cir. 1993) .................... *passim*

*Boyle v. United States*,
556 U.S. 938 (2009).................... 5

*Compeer Fin., ACA v. Corp. Am. Lending, Inc.*,
No. 25-1830, 2026 WL 1945665 (8th Cir. July 6, 2026).................... 8

*Crest Const. II, Inc. v. Doe*,
660 F.3d 346 (8th Cir. 2011) .................... 5

*Haase v. Chapman*,
308 F. Supp. 399 (W.D. Mo. 1969) .................... 4

*Morgan Stanley Smith Barney LLC v. Johnson*,
952 F.3d 978 (8th Cir. 2020) ....................4, 8, 10, 12

*Netsphere, Inc. v. Baron*,
703 F.3d 296 (5th Cir. 2012) ....................13

*Oliver and Co. v. Zamber*,
No. 4:25-cv-00132-MTS, 2025 WL 1580288 (E.D. Mo. June 4, 2025)
....................9, 10, 11, 12

*S.E.C. v. Barton*,
79 F.4th 573 (5th Cir. 2023) ....................12

*S.E.C. v. Barton*,
No. 24-10788, Dkt. 117-1 (5th Cir. Mar. 3, 2026) ....................12

*Stonebridge Collection, Inc. v. Carmichael*,
791 F.3d 811 (8th Cir. 2015) .................... 5

*Tempur-Pedic Int'l, Inc. v. Waste to Charity, Inc.*,
483 F. Supp. 2d 766 (W.D. Ark. 2007)....................15

*United States v. Hoffman*,
560 F. Supp. 2d 772 (D. Minn. 2008)....................11

*United States v. Mansion House Ctr. N. Redevelopment Co.*,
419 F. Supp. 85 (E.D. Mo. 1976)....4

**Statutes**

18 U.S.C. § 1341....5

18 U.S.C. § 1343....5

18 U.S.C. § 1957....5

18 U.S.C. § 1961....5, 6

18 U.S.C. § 1962....3, 5

**Other Authorities**

Fed. R. Civ. P. 66....1, 3

Pursuant to Fed. R. Civ. P. 66, Plaintiffs The Dugaboy Investment Trust and James D. Dondero request this Court appoint a receiver over Defendants DAAM Real Estate Trust, CDMCFAD, LLC, DFW Charitable Foundation, Atlas IDF GP, LLC, Rand Advisors, LLC, Rand PE Fund Management, LLC, Hunter Mountain Investment Trust, Charitable DAF GP, LLC, CLO HoldCo, Ltd., CLO HoldCo, LLC, and CDH GP, Ltd and Nominal Defendant Atlas IDF, L.P.

This case is about an increasingly common structure, a type of charitable donor advised fund. In a typical donor advised fund, a philanthropist donates assets for the benefit of designated established charities, and then retains a say on how the assets are invested to grow and the good works to which those assets are eventually put. The fund at issue here was seeded by donor James Dondero, who started one of the nation's most successful investment management empires and then sought to build a charitable legacy to outlive him.

The fund that Mr. Dondero founded is being pilfered by someone trusted to keep it safe. Mark Patrick and his coconspirators used his position of trust in the donor advised fund to steal a substantial equity stake in the investment fund Highland Capital Management and more than $270 million in other hard assets from four established charities and deprived their donor any say in how those assets are put to good work. Mr. Patrick continues to consume those assets through massive personal compensation and paying an army of law firms and accounting firms to defend his fraud. Absent appointment of a receiver to stem the exsanguination, there will be little left of the stolen assets to be restored to a properly functioning donor advised fund at the end of this case. That is irreparable harm for which there is no adequate remedy at law.

Plaintiffs respectfully request that the Court appoint a receiver over the proposed receivership entities to protect the assets currently held and controlled by them that are the subject of this dispute.

## INTRODUCTION

Mr. Mark Patrick and his confederates stole from the less fortunate to give to themselves. With coconspirators Shawn Raver and Paul Murphy, professional services firms ValueScope and the Shields Legal Group, P.C., and an alphabet soup of corporate entities he created to confuse his victims, Mr. Patrick stole the equity stake in Highland Capital Management and approximately $270 million in assets held for the benefit of legitimate charities. He did so by secretly restructuring the charitable structure at issue, the Charitable DAF, to be held by the DFW Charitable Foundation, an entity run by Mr Patrick for his own benefit. Along the way, Mr. Patrick paid himself and his co-director, Mr. Murphy, more than $18 million in just a matter of months and tens of millions more to his coconspirator law and accounting firms.

The scheme had all the hallmarks of nefarious behavior. The work was done in the shadows, with disclosure to no one, much less the charities and the donor from which Mr. Patrick was stripping assets and rights. He expressly instructed his lawyers to create entities that would become instruments of the fraud with "generic names" that would be "hard to track or trace." Motion, ¶ 13. Mr. Patrick and coconspirators then lied to the charities and others, lest they start inquiring about the status of the Charitable DAF or discover his clandestine activities, assuring them that the structure of the Charitable DAF would remain the same and the economic transactions that would benefit them were in the works.

This Court has the power to separate Mr. Patrick from the numerous entities he has unlawfully plundered—and to appoint a neutral third party to ensure yet more assets are not lost, dissipated, or diminished in value—while Mr. Patrick and his coconspirators are held to account for their theft.

Extreme conduct warrants drastic remedies, especially if there is a risk that conduct will continue. Defendants planned, organized, and executed an audacious scheme to steal a substantial

equity stake in Highland Capital Management and $270 million in other assets from charities across three states to pay themselves. To accomplish this, Defendants formed an enterprise, vigorously planned each step to avoid detection, secretly set up companies with "generic name[s]" that were "hard to find or track, or trace," executed transactions concealed from the ultimate charitable beneficiaries of the assets, and made misrepresentations, false statements, and omissions before a bankruptcy court to further the scheme. *See* ECF No. 1, Compl., ¶¶ 81–126. The enterprise engaged in a pattern of racketeering activity, including but not limited to mail fraud, wire fraud, money laundering, and bankruptcy-related fraud before a proceeding occurring under Chapter 11. *See* 18 U.S.C. § 1962. Defendants' enterprise stole assets from charitable organizations that were making positive impacts in their local communities, while paying Mr. Patrick, and associates Messrs. Murphy and Raver, tens of millions of dollars for their effort, not to mention millions more in fees to confederate professional service providers that assisted them in doing so. Their sophisticated dismantling of charitable structures and looting of charitable assets can be stopped only with a receivership. Absent such relief, Defendants' enterprise will continue to take from the needy to fill Mr. Patrick's and his coconspirators' pockets, frustrating the charitable activities and intent of Plaintiffs.

## **LEGAL STANDARD**

The Federal Rules of Civil Procedure "govern an action in which the appointment of a receiver is sought," and the receiver's practice "must accord with the historical practice in federal courts." Fed. R. Civ. P. 66. "A receiver is an extraordinary equitable remedy that is only justified in extreme situations." *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993). When determining whether appointment of a receiver is warranted, courts in the Eighth Circuit holistically analyze the factors set forth in *Aviation Supply*: "[1] a valid claim by the party seeking the appointment; [2] the probability that fraudulent conduct has occurred or will occur to

frustrate that claim; [3] imminent danger that property will be concealed, lost, or diminished in value; [4] inadequacy of legal remedies; [5] lack of a less drastic equitable remedy; and [6] likelihood that appointing the receiver will do more good than harm." *Morgan Stanley Smith Barney LLC v. Johnson*, 952 F.3d 978, 980–81 (8th Cir. 2020) (quoting *Aviation Supply*, 999 F.2d at 316–17).

While "proof of fraud is not required to support a district court's discretionary decision to appoint a receiver[,]" the presence of "badges of fraud" counsel in favor of a receiver. *Aviation Supply Corp.*, 999 F.2d at 317. Similarly, a showing that, in the absence of a receiver, a plaintiff "may suffer irreparable harm as a result of [a] fraudulent transfer" warrants appointment of a receiver to protect the rights of the movant. *Haase v. Chapman*, 308 F. Supp. 399, 406 (W.D. Mo. 1969). Refusal to cooperate in discovery or answer questions about assets that the movant seeks to protect through receivership is another consideration in favor of appointing a receiver. *Aviation Supply Corp.*, 999 F.2d at 317.

A receivership may be granted on the motion papers and pleading alone and without an evidentiary hearing "where the record discloses sufficient facts to warrant appointment of a receiver." *United States v. Mansion House Ctr. N. Redevelopment Co.*, 419 F. Supp. 85, 87 (E.D. Mo. 1976).

## **ARGUMENT**

The Eighth Circuit has established a six-part test to guide district courts' equitable discretion in determining whether to appoint a receiver. Each of the six factors counsel in favor of a receiver here.

Plaintiffs present a claim on which they are likely to succeed. Fraud is occurring, and, absent a receiver, charitable assets will continue to be pillaged. The risk of further asset dissipation is imminent. The legal remedy of damages will not be adequate, because absent intervention that

corpus of charitable assets will have been consumed by Mr. Patrick and his coconspirators. Putting a faithful steward into these entities is the right answer; is not drastic under the circumstances; and will do tremendous good, not harm.

## I. <u>Plaintiffs State a Valid Claim for Relief for Violation of and Conspiracy Under the Racketeer Influenced Corrupt Organizations Act.</u>

To sustain a claim under the Racketeer Influenced Corrupt Organizations Act ("RICO"), "appellants [must] show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Crest Const. II, Inc. v. Doe,* 660 F.3d 346, 353 (8th Cir. 2011) (internal citations omitted); *see also* 18 U.S.C. § 1962. An enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity," 18 U.S.C. § 1961(4), and is defined as "a continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 948 (2009). A pattern of racketeering activity requires at least two predicate acts within 10 years of each other. 18 U.S.C. § 1961(5); *see also Stonebridge Collection, Inc. v. Carmichael*, 791 F.3d 811, 823 (8th Cir. 2015). Predicate acts of racketeering activity include but are not limited to wire fraud (18 U.S.C. § 1343); mail fraud (18 U.S.C. § 1341); bankruptcy-related fraud within the meaning of 18 U.S.C. § 1961(1)(D); and money laundering (18 U.S.C. § 1957). 18 U.S.C. § 1961(1).

Mr. Patrick, along with his coconspirators, Messrs. Raver and Murphy, and Shields Legal Group, P.C., directed a wide-ranging conspiracy designed to steal hundreds of millions of dollars in assets that were held for the benefit of specified charities and with the ability of the donor of the assets to have a say over the good work to which those assets would be put. In doing so, they conspired with and/or utilized the other Defendants to paper over and conceal their fraud and theft from the entities and individuals from whom they were stealing—including the ultimate charitable beneficiaries. The Plaintiffs' original purpose in creating the charitable structures was to establish

a charitable legacy by donating significant assets to a structure where the assets would grow and then be put to good work by four established charities working with the donor to find the best uses for the assets. But Defendants manipulated that plan to benefit themselves—in particular, Mr. Patrick—reorganizing the related structures all to pay him and his coconspirator firms tens of millions of dollars, rather than putting those assets to good use.

In early November 2023, Mr. Patrick and Shields Legal Group, P.C. began planning to pillage valuable assets from two separate structures designed to benefit charities for little to no consideration and in such a way that interested beneficiaries of the assets would not be informed about the transactions. Motion, ¶ 11–12. The coconspirators' strategy included creating a new general partner of the Charitable DAF that was "hard to find or track, or trace" so that it was difficult to "find owners" and so as to provide "strong litigation protection." *Id.* at ¶ 13.

From February 2024 to March 2025, Messrs. Patrick, Raver and Murphy, and their coconspirators executed the scheme. The conspiracy entailed replacing historical entities in the Charitable DAF, as well as the Hunter Mountain structure, with entities that the coconspirators created; inserting a bogus charitable beneficiary that was run by Mr. Patrick and granting the fake charity a majority ownership in the Charitable DAF structure; soliciting a sham valuation for the established charities' economic ownership of the $270 million in assets held by the Charitable DAF structure; and then ostensibly redeeming the charities' interest for pennies on the dollar. *Id.* at ¶¶ 15–24. Throughout this scheme, Mr. Patrick and his fellow fraudsters lied to the established charities to conceal the restructuring activities and to lull those charities into a false sense of comfort so they did not investigate Mr. Patrick's actions. *Id.* at ¶¶ 27–28.

Plaintiffs state a valid claim for relief. Defendants formed an "enterprise" within the meaning of 18 U.S.C. § 1961(4) with the common purpose of stealing the equity stake in Highland

Capital Management and more than $270 million of other assets from the established charities and the advisory rights of the donor. The enterprise was formed through relationships between and among parties, had longevity sufficient to permit the participants to pursue the common purpose, and existed beyond any single predicate act. Each Defendant was an active participant in the enterprise, performing work to achieve the common purpose, as detailed in the Motion and in Plaintiffs' Complaint. *See* Motion, ¶¶ 11–26; ECF No. 1, Compl., ¶ 128. The enterprise engaged in multiple instances of mail and wire fraud, money laundering, and bankruptcy-related fraud—i.e., a pattern of racketeering activity sufficient to state a valid claim under the RICO Act. Defendants utilized electronic entity-formation documents, resolutions, and emails to form entities and to represent that those entities were inserted into the Charitable DAF and Hunter Mountain Investment Trust structures. Defendants used interstate electronic and telephonic communications to organize, plan, and carry out the conspiracy to remove the assets from the charitable beneficiaries and to divert those assets to Defendants' pockets. Such communications include the November 2023 work plan, a February 2024 email regarding the clandestine formation of a new general partner, various corporate consents and resolutions effectuating the restructuring between February 2024 and March 2025, electronic communications and telephone conferences with the established charities lying to them about the fraudulent restructuring and Mr. Patrick's plans for the Charitable DAF, emails concerning the fraudulent ValueScope valuation of the participating shares in the Charitable DAF Structure at $1.6 million. *See* Motion, Ex. 1, ¶¶ 89–90, 106–15; *Id.*, Exs. 4–6; ECF No. 1, Compl., Exs. 3–8. Defendants used telephone and videoconferencing technology to issue false lulling statements to the original charitable beneficiaries of the assets to conceal the restructuring and prevent those with economic interests in the charitable structures from investigating or objecting to the scheme. Motion, ¶¶ 25–26.

## II. <u>Fraudulent Conduct Has Occurred and Likely Would Recur to Frustrate Plaintiffs' Claims if a Receiver Were Not Appointed.</u>

Mr. Patrick and his coconspirators have engaged in a grotesque and (up until the Summer of 2025) secret fraud. Absent appointment of a receiver, their fraud will continue.

Defendants have already engaged in multiple acts of deception, misrepresentation, and concealment to avoid being held accountable for their misconduct and fraud. Lack of transparency and concealment are indicative of a defendant's intent to frustrate a plaintiff's claim. *See, e.g.*, *Compeer Fin., ACA v. Corp. Am. Lending, Inc.*, No. 25-1830, 2026 WL 1945665, at *10 (8th Cir. July 6, 2026); *Morgan Stanley*, 952 F.3d at 983 (defendant concealed assets and prevented plaintiff from collecting funds it was owed, justifying appointment of receiver). Part and parcel of the fraud has been Mr. Patrick and his coconspirators burning through charitable assets for their own personal enrichment. Absent a receivership, the misconduct is bound to continue, perhaps to the point where there will be no charitable assets to restore at the end of this case.

To the extent that charitable assets have been further secreted out of the entities identified here, a receiver now is necessary to use those entities' information to trace their destination before the trail goes cold. Here, Defendants continue to drain assets from the relevant entities, pumping millions, if not tens of millions, of professional fees into their coconspirator law and accounting firms and reserving the right to pay themselves millions more in compensation and bonuses without judicial intervention. *See* Motion, Ex. 5, 75:18-76:9; *see also* Ex. 14, ¶¶ 63-69.

## III. <u>There Is Significant Danger the Property Will Be Concealed, Lost, or Diminished in Value Should a Receiver Not Be Appointed Over the Proposed Receivership Enterprise Entities.</u>

Appointment of a receiver is warranted when there is imminent danger of the property being sold, lost, or diminished in value. *Aviation Supply Co.*, 999 F.2d at 316.

Here, there is considerable danger that, should the entities remain in the hands of the Defendants, assets and property owned and controlled by those entities will be sold, lost, or diminished in value, primarily through additional restructuring to conceal or put the assets out of reach of this Court. As Messrs. Patrick, Raver, and Murphy, and their associated entities in the enterprise have demonstrated, they are adept at engineering clandestine restructuring, transferring assets away from economic beneficiaries who unknowingly end up with a tiny percentage of what their interests were worth before Defendants' manipulations.

In addition to defendants' history of clandestine restructuring, there is a very real danger of concealment, loss, or diminution in value of the assets held and controlled by the entities as a result of Messrs. Patrick and Murphy paying themselves and others outrageous fees. Historically, the part-time administrative positions Mr. Patrick secured in 2021 and 2022 were compensated via an annual salary of $60,000. Motion, Ex. 13, Excerpts from May 21, 2026 Hr'g Tr., 171:15–17; *see also* ECF No. 1, Compl., ¶ 76. When he kicked his fraudulent scheme into overdrive, Mr. Patrick paid himself and his coconspirator Mr. Murphy more than $18 million from the Charitable DAF's assets in just the last quarter of 2024 and the first quarter of 2025. Motion, ¶ 27; *see also id.*, Ex. 5, 131:22–23. Further, Mr. Patrick and his coconspirators raided the Charitable DAF and Hunter Mountain Structures of an additional $12 million to pay massive fees to various professional services firms in efforts to prevent revelation of their fraud. Motion at ¶ 31; *see also id.*, Ex. 5, 76:6. There is every indication that such dissipation continues at the rate of more than a million, if not millions, per month.

Courts in this circuit have held that evidence of defendants siphoning off funds from an entity to pay themselves indicates a serious danger of dissipation of the value of property at issue. *See, e.g.*, *Oliver and Co. v. Zamber*, No. 4:25-cv-00132-MTS, 2025 WL 1580288, at *10 (E.D.

Mo. June 4, 2025) (appointing receiver over entities based on risk of dissipation of assets due to defendant's previous conduct taking assets). A receiver is further necessary to unwind the intentionally complex restructuring performed by the RICO enterprise and ensure the assets meant to support charitable endeavors are stewarded carefully through this process.

## IV. Legal Remedies Are Inadequate Because of the Complexity of the Transactions and Defendants' Pattern of Concealment and Duplicity.

Appointment of a receiver is merited when there are no other adequate legal remedies to protect the movant. *Aviation Supply*, 999 F.2d at 316. Legal remedies are insufficient to protect assets that would be subject to the receivership when efforts are frustrated by a defendant's willful nondisclosure or other efforts to hinder the movant from obtaining legal remedies. *Id.* at 317. In cases of complicated investments and interlocking transactions and corporations, in relation to which there has been considerable concealment, misrepresentation, or omission about ownership of assets and financial health, courts have found appointment of a receiver necessary to assess adequate remedies. *Oliver and Co.*, 2025 WL 1580288, at *9. A court imposing equitable remedies "has power to appoint a receiver where there is such fraud or dissension as to make it impossible for the corporation to carry on its business honestly and to the advantage of its stockholders." *Ashton v. Penfield*, 135 S.W. 938, 947 (Mo. 1911) (en banc); *cf. Morgan Stanley*, 952 F.3d at 983 ("[I]n the absence of substantial federal precedent in a particular context, federal courts are quite likely to look to state law for guidance.").

A final judgment of damages will not be an adequate remedy in this case. First, there is substantial evidence that Mr. Patrick and his coconspirators are consuming the assets of these entities at a significant pace in transactions that are not easily unwound, making it difficult if not impossible for Plaintiffs to recover all that has been stolen. In this way, the remedy of damages is likely to be incomplete, if not woefully inadequate, because there will be little left to recover.

Second, the complexity of transactions and sheer volume of misrepresentations and omissions accompanying those transactions require appointment of a receiver to unravel the mess and steward the company through litigation. *Oliver and Co.*, 2025 WL 1580288, at *9-10 (finding that a receiver was necessary in such financially complex and intentionally inscrutable economic organizations to prevent additional fraud). The complexity of the underlying structures frustrates normal legal processes and hampers the availability of legal remedies. *See, e.g.*, *United States v. Hoffman*, 560 F. Supp. 2d 772, 777–78 (D. Minn. 2008) (appointing receiver to oversee property used as part of a wide-ranging and complex scheme engaged in mail, wire, and bank fraud to organize the complex system and protect innocent third parties).

Defendants have a long and catalogued history of duplicity, concealment, and omissions, which only a receiver will be able to stop. The examples are many and grave. Mr. Patrick and Shields Legal Group, P.C., secretly schemed to create generically named and "hard to find or track, or trace" corporations to transfer ownership and rights from the charitable structures' historical entities to entities owned and controlled by Mr. Patrick. Motion, ¶¶ 11–22. Messrs. Patrick, Raver, and Murphy made multiple false statements to the economic beneficiaries of the charitable structures during the execution of the scheme to divest those beneficiaries from the charitable assets. *Id.* at ¶¶ 25–26. These statements were designed to lull those beneficiaries into inaction and conceal the harmful transactions being consummated under their noses. *See* Compl., ¶¶ 123–26; Motion, Ex. 1, ¶¶ 89–90, 106–15. Messrs. Patrick, Raver, and Murphy assured the charitable beneficiaries that accurate financial statements for the charitable structures would be provided, yet never delivered on that promise. Motion, ¶ 26; *see also id.*, Ex. 1, ¶¶ 89–90, 106–15. ValueScope created a fraudulent valuation, deeming the established charities' interest in the Charitable DAF's $270 million of assets worth only $1.6 million without any basis and despite the refusal by two

well-regarded independent accounting firms to do the same. Motion, ¶ 24. Defendants then used that fraudulent valuation to cash out the charitable beneficiaries for just $1.6 million, falsely representing that this price was "fair market value" for their interest in the Charitable DAF's $270 million in assets. ECF No. 1, Compl., Ex. 6 at 6, 8.

Concealment, misrepresentations, and omissions all work to frustrate legal remedies, and thus justify appointment of a receiver. *See Aviation Supply*, 999 F.2d at 317 (appointing receiver in light of defendant's "pattern of willful nondisclosure and false disclosure"); *Morgan Stanley*, 952 F.3d at 983 (appointing receiver where defendant "appeared committed to not disclosing assets and not making LLC distributions, thereby keeping substantial assets out of [plaintiff's] reach"); *Oliver and Co.*, 2025 WL 1580288, at *10–11 (appointing receiver in light of "gross mismanagement" and "repeated material misrepresentations" by defendants). Defendants' enterprise is premised on fraud, concealment, and misrepresentation to interested parties. Appointment of a receiver is necessary to ensure accurate reporting on the entities themselves because the Defendants masterminding the scheme at issue have done nothing but deceive, while removing assets for their own benefit and paying themselves handsomely.

Defendants are further paying themselves and their enterprise coconspirators outrageous sums while in control of the entities at issue. This steady depletion of assets could work to turn any judgment of this court into a paper judgment against hollowed-out entities with inadequate assets to remedy the harm recognized. This temporary appointment of a receiver is meant to maintain the assets misappropriated—the very subject matter of the litigation—rather than lock down other assets for payment of an eventual verdict. *See, e.g.*, *S.E.C. v. Barton*, No. 24-10788, Dkt. 117-1 (5th Cir. Mar. 3, 2026); *S.E.C. v. Barton*, 79 F.4th 573, 579–81 (5th Cir. 2023);

*Netsphere, Inc. v. Baron*, 703 F.3d 296, 310 (5th Cir. 2012). A receiver will work to prevent further harm, not just protect Plaintiffs' potential recovery.

## V. No Less Drastic Equitable Remedy Exists Than a Receivership.

No less drastic remedy exists in equity that can prevent the dissipation of assets, frustration of Plaintiffs' claims, and further misconduct by Defendants than a receivership. The only other form of equitable relief that may arguably prevent Defendants from engaging in further restructuring of the entities at issue here to frustrate Plaintiffs' claims and/or dissipate the property is a preliminary injunction. Injunctive relief would not, however, sufficiently protect the assets held and controlled by the Proposed Receivership Enterprise Entities from the RICO enterprise's machinations. A preliminary injunction is insufficient to prevent further misconduct by Defendants because their pattern of misconduct, misrepresentation, and fraud indicates they cannot be trusted to comply with a preliminary injunction. Further, appointment of a neutral receiver is the only way to track down the assets Defendants have moved around and secreted away for their own benefit. *See, e.g.*, *Aviation Supply*, 999 F.2d at 317.

The receivership remedy also aligns with the founding documents of the entities to be placed into receivership. Mr. Patrick became administrator of the Hunter Mountain Investment Trust in 2022. Motion, ¶ 9. The Hunter Mountain Trust Agreement provided that the administrator would be automatically removed upon engaging in any breach of fiduciary duty, dishonesty, fraud, willful misconduct, bad faith, or theft "in any capacity." *See* Ex. 3, §§ 1, 16. Such removal was automatic and required no further action from the trustee or any other party. *Id.* Creating an enterprise through which to steal all valuable assets out from the Hunter Mountain's intended beneficiaries is, at a minimum, a breach of fiduciary duties that would disqualify Mr. Patrick as administrator.

There exists no less drastic equitable relief other than a receivership because Defendants have shown they will act without authority when it suits them. A receiver is required to remove Defendants from control to actively operate the proposed receivership entities, otherwise Mr. Patrick and his coconspirators could put the assets Plaintiffs seek to protect and recover outside the reach of this Court through further complex transactions. Further, only a receiver could discover what assets Mr. Patrick and the other Defendants have squirrelled away, as their pattern of concealment throughout operation of the enterprise casts serious doubt on their ability to be forthright and honest to this Court. Only a receiver could remove the wrongdoers from control of the entities and assets which they could use to further enrich themselves, do more harm, and conceal their machinations from this Court.

## VI. <u>Appointment of a Receiver Will Do More Good Than Harm.</u>

In light of the Defendants' fraudulent enterprise, documented instances of false statements and omissions designed to steal from charity, and the imminent threat of the diminution or dissipation of assets, a receiver will do more good than harm. As detailed *supra*, a receiver will be able to parse through the complicated financial transactions and corporate structures that the Defendants created. A receiver will also prevent further dissipation of assets through additional restructuring, paying excessive fees to professional services firms in an effort to conceal the enterprise, and paying Messrs. Patrick, Raver, and Murphy exorbitant fees and compensation for stealing assets originally donated to charity. Absent a receiver, the Defendants could continue to secret and dissipate assets in a manner that promises to thwart any remedy sought by Plaintiffs in this litigation.

In sum, Plaintiffs face significant harm if a receiver is not appointed. Dugaboy and Dondero are being deprived of their say in the good works to which the charitable assets will be put; the charities continue to be deprived of the substantial asset base created and invested to fund

those good works; and, at present, all of those assets are being squandered by individuals and entities that have no meaningful charitable purpose or intentions. *See Tempur-Pedic Int'l, Inc. v. Waste to Charity, Inc.*, 483 F. Supp. 2d 766, 775–76 (W.D. Ark. 2007). In contrast, the Defendants have no moral or legal right over the subject assets, as their relationship with them is only to safeguard the assets for the established charities, an obligation that they have flaunted. There is no harm in separating the Messrs. Patrick, Raver, and Murphy from the assets and putting in place a temporary steward in which the Court can have confidence. Those assets do not exist to enrich or support the Defendants. Instead, Defendants were appointed to steward those assets for the public benefit. A receivership will restore that stewardship during investigation and resolution of the serious allegations of misconduct at issue.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court appoint a general receiver over the proposed receivership entities and deem all property and assets under their control, including bank accounts, as property of the receivership and subject to administration by the Receiver. Plaintiffs respectfully request that the Court define the receiver's powers according to the proposed order Plaintiffs submit with this motion. Plaintiffs respectfully request the Court order the Defendants, as well as their officers, agents, directors, servants, employees, independent contractors, corporations, subsidiaries, affiliates, successors, and assigns, fully cooperate with and assist the Receiver in administration of the receivership. Plaintiffs further request that the Receiver's appointment last through the duration of this lawsuit and that the Defendants be restricted from access to any of the property or assets held in the receivership for the duration of the Receiver's appointment, with access being granted based solely on the Receiver's determination that such access is warranted and Plaintiffs' consent thereto.

Dated: October 30, 2026

Respectfully submitted,

/s/ *Michael J. Edney*

MORGAN, LEWIS & BOCKIUS LLP
Avery Joseph Welker
Missouri Bar No. 77661
1000 Louisiana Street, Suite 4000
Houston, TX 77002-5005
Tel.: (713) 890-5000
Fax: (713) 890-5001
Email: avery.welker@morganlewis.com

Michael J. Edney (*pro hac vice*)
D.C. Bar No. 492024
Torsten Kracht (*pro hac vice*)
D.C. Bar No. 501395
Mark C. Ingram (*pro hac vice*)
D.C. Bar No. 90031689
Aubrianna Mierow (*pro hac vice* forthcoming)
D.C. Bar No. 90027117
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004-2541
Tel.: (202) 739-3000
Fax: (202) 739-3001
Email: michael.edney@morganlewis.com
Email: torsten.kracht@morganlewis.com
Email: mark.ingram@morganlewis.com
Email: aubrianna.mierow@morganlewis.com

Martha B. Stolley (*pro hac vice*)
New York Bar No. 2965374
101 Park Avenue
New York, NY 10178-0060
Tel.: (212) 309-6000
Fax: (212) 309-6001
Email: martha.stolley@morganlewis.com

L. Heidi Manschreck (*pro hac vice*)
New York Bar No. 4537585
110 North Wacker Drive
Chicago, IL 60606-1511
Tel.: (312) 324-1000
Fax.: (312) 324-1001
Email: heidi.manschreck@morganlewis.com

Karrie J. Clinkinbeard
Missouri Bar No. 51413

ARMSTRONG TEASDALE LLP
2345 Grand Boulevard, Suite 1500
Kansas City, MO 64108
Tel.: (816) 472-3175
Email: kclinkinbeard@atllp.com

*Attorneys for Plaintiffs James D. Dondero and The Dugaboy Investment Trust*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on October 30, 2026, the foregoing was filed electronically with the Clerk of Court by operation of the Court's electronic filing system and served upon counsel of record via electronic email.

*/s/ Michael J. Edney*
Michael J. Edney