# EXHIBIT 5

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In Re: | ) | **Case No. 19-34054-sgj11** |
| | ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | Lubbock, Texas |
| | ) | May 12, 2026 |
| | ) | 9:00 a.m. Docket |
| Reorganized Debtor. | ) | |
| | ) | MOTION TO RECONSIDER (4513) |
| | ) | OBJECTION (4535) |
| | ) | JOINDER TO OBJECTION (4537) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE BRAD W. ODELL,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Reorganized Debtors: | John A. Morris<br>PACHULSKI STANG ZIEHL & JONES, LLP<br>780 Third Avenue, 34th Floor<br>New York, NY 10017-2024<br>(212) 561-7760 |
| For The Dugaboy Investment Trust: | Michael J. Edney<br>MORGAN LEWIS<br>1111 Pennsylvania Avenue, NW<br>Washington, DC 20004<br>(202) 739-3000 |
| For Mark Patrick, et al.: | Louis M. Phillips<br>KELLY HART & PITRE<br>301 Main Street, Suite 1600<br>Baton Rouge, LA 70801<br>(225) 381-9643 |
| For Highland Capital Management, et al.: | Joshua Seth Levy<br>WILLKIE FARR & GALLAGHER, LLP<br>1875 K Street, NW<br>Washington, DC 20006<br>(202) 303-1147 |

Recorded by: Nicholas Noble
UNITED STATES BANKRUPTCY COURT
George Mahon Federal Building
1205 Texas Avenue, Room 306
Lubbock, TX 79401-4002
(806) 472-5007

Transcribed by: Kathy Rehling
311 Paradise Cove
Shady Shores, TX 76208
(972) 786-3063

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

A Yes.
Q And you're also involved with litigation in the Cayman Islands; is that correct?
A Yes.
Q And the Highland Dallas Foundation is involved in that litigation as well; is that correct?
A Yes.
Q Now, is it your view that -- that Mr. Dondero is responsible for or assisting those various litigations? Is that right?
A It -- it's my view that he is responsible for those litigations.
Q All right. And --
A Yes.
Q And do you know what the Dugaboy Investment Trust is?
A Yes, I do.
Q Does that come from you formerly working in connection with Mr. Dondero?
A Yes.
Q And what do you understand The Dugaboy Investment Trust to be?
A It's his family trust.
Q Do you feel like you're in an adverse position to Mr. Dondero?
A From a litigation and business context, yes.

Q And what about The Dugaboy Investment Trust?
A Yes. I believe we have litigation with The Dugaboy Investment Trust. HMIT does.

MR. EDNEY: Your Honor, on the basis of the foregoing questions, I request the Court's permission to treat Mr. Patrick (inaudible).

THE COURT: Okay. Any objections?

A VOICE: No objection.

THE COURT: No one objects? Okay. You may.

MR. EDNEY: Thank you, Your Honor.

BY MR. EDNEY:
Q Mr. Patrick, what is the DFW Charitable Foundation?
A It is a nonprofit organization organized under -- in the U.S.
Q And did you form the DFW Charitable Foundation?
A Yes.
Q And when did you form it?
A It was formed in late 2024.
Q And you're the sole member of the DFW Charitable foundation; isn't that correct?
A Yes.
Q And you are today one of two directors of the DFW Charitable Foundation; is that right?
A Yes.
Q Who is the other director?

A Shawn Raver.
Q You make decisions on behalf of the DFW Charitable Foundation?
A Together, we do.
Q And the DFW Charitable Foundation's place of business is at your home residence in Dallas; is that right?
A Yes.
Q Since the DFW Charitable Foundation was formed, it has given away less than a million dollars to charity; isn't that right?
A I think it's closer to a million. We did -- and I know in our deposition -- I have done a one off grant to a church in Fort Worth, which was a couple hundred thousand dollars. So close to a million.
Q But less than a million dollars; is that right, Mr. Patrick?
A I think that's fair, yes.
Q And as things are currently structured, DFW Charitable Foundation is the sole economic beneficiary of more than $270 million in assets? Is that right?
MR. LEVY: Object to form.
THE WITNESS: No.
MR. EDNEY: (inaudible), sir.
THE COURT: Yes. Did you want to state your objection more specific?

MR. LEVY: Lack of foundation.

THE COURT: I'll overrule.

THE WITNESS: No.

BY MR. EDNEY:

Q DFW Charitable, it pays you for your work on its behalf; isn't that right?

A No.

Q You don't draw any salary from DFW Charitable?

A That's correct.

Q No other compensation or director fees?

A Nothing.

Q No reimbursement of expenses?

A Nothing.

Q Let's go back to the question of much is under DFW Charitable today. Let's pull up Exhibit 243, please. Go to Slide 18. Bear with me one minute, Mr. Patrick. Slide 18. All right. And perhaps go down slightly. All right. There we are.

Mr. Patrick, between 2024 and 2025, you engaged in the restructuring of the entity that surrounds the Charitable DAF Fund, LP; isn't that right?

A By restructuring, I describe it as I appointed a new discretionary beneficiary of DAF, which I define as Charitable DAF Fund, LP.

Q Okay. And that's that entity in the middle of this chart,

A Yes.
Q Let's look at a slide on that. Let's pull up Slide 7. All right. So Charitable DAF Holdco, LP was a -- was an entity that was under the DAF structure at some point. Is that right?
A Again, I define the DAF structure as Charitable DAF Fund, LP. So not -- it was -- it was a blocker pass-through entity, just ultimately to indirect nonprofits.
Q And it -- and it held an indirect stake -- share in Charitable DAF Fund, LP; is that right?
A Yes.
Q And Charitable DAF Holdco, Ltd. had a series of what you call discretionary economic beneficiaries; is that right?
A Yes.
Q And before 2024, there were four of those; isn't that right?
A Yes.
Q And one of them was the Highland Dallas Foundation Incorporated; isn't that right?
A Yes.
Q And another was the Highland Kansas City Foundation, Incorporated, correct?
A Yes.
Q And another was the Highland Santa Barbara Foundation, Incorporated. Correct?

A Yes.
Q And another was the HC NLP General Fund. Right?
A Yes. A donor-advised fund account, the Community Foundation of North Texas.
Q And the -- and each of those entities that held participation shares, they supported 501(c)(3) charities; is that right?
A Yes.
Q And those -- you can see those at the top of the chart that's in front of you. Isn't that right?
A Yes.
Q And those are the Dallas Foundation, right?
A Yes.
Q And the Kansas -- Greater Kansas City Community Foundation?
A Yes.
Q And the Santa Barbara Foundation?
A Yes.
Q And the Community Foundation of North Texas. Correct?
A Correct.
Q Did there come a time where you decided to have Charitable DAF Holdco, Ltd. issue new participation shares to the DFW Charitable Foundation?
A Yes.
Q And did you issue 51 percent of the shares in Charitable

DAF Holdco to DFW Charitable Foundation?
A My director and myself as directors of Charitable DAF Holdco, Ltd. authorized resolutions to do so.
Q And you did that through your capacity as the general partner of various DAF entities; is that correct?
A No.
Q You did it in your capacity as directors of Charitable DAF Holdco, Ltd.?
A Yes.
Q And that issuance of 51 percent shares to DFW Charitable Foundation had the effect of diluting the participation shares of the other four charities. Is that right?
A No.
Q Previous to the decision to issue DFW Charitable Foundation participation shares in Charitable DAF Holdco, Ltd., the four charities that I mentioned owned a hundred percent of the participation shares. Is that right?
A Yes. I can explain.
Q And thereafter, they owned 49 percent. Isn't that right?
A Yes. I can -- I take issue with the word dilution. These are all discretionary charitable beneficiaries, so the concept of dilution is a bit of a misnomer. It's not the same in a corporate ownership sense.
Q All right. But after the decision --
THE COURT: Mr. Edney, I know you -- I understand, I

don't want to take you out of comfortable positions, but we've got to be able to pick you up on the mic, and if you stand like that with your hand covering your mouth, we won't be able to hear you.

MR. EDNEY: No, that's a fair point, Your Honor. Thanks for keeping me on track.

BY MR. EDNEY:

Q All right. After the decision to issue DFW Charitable Foundation 51 percent of the shares in Charitable DAF Holdco, Ltd., the four historical charities held fewer of those participation shares. Isn't that right?

A Yes.

Q But you don't call that a dilution. Correct?

A Correct. They're all discretionary beneficiaries.

Q Okay. And you made the decision to issue those new shares to DFW Charitable Foundation. Correct?

A Myself and Mr. Murphy as directors of Charitable DAF Holdco, Ltd.

Q And that had the effect of reducing the number of participation shares owned by the other four charities. Isn't that right?

A Yes, held by the supporting organizations. I wouldn't describe it as owned.

Q Okay. Bear with me just a second.

(Pause.)

Q Now, Mr. Patrick, when did you issue these new shares to DFW Charitable Foundation?
A I recall in March of 2025.
Q In March of 2025? And -- but you had been considering forming a new charity and issuing new participation shares in Charitable DAF Holdco for quite some time, didn't you?
A Yes.
Q As a matter, you had been considering doing so since at least November of 2023. Isn't that right?
MR. LEVY: Objection; foundation.
THE WITNESS: Yeah.
THE COURT: Overruled.
THE WITNESS: Yeah. No.
BY MR. EDNEY:
Q All right. We'll pull up Movant's Exhibit 7. And move to Page 1433. Mr. Patrick, what is the Shields Law Group?
A It's a law firm that advises the DAF.
Q And by the DAF, you mean what?
A Charitable DAF Fund, LP. And the entities below it.
Q And you turn to the Shields Law Group regularly for advice on corporate structuring matters; is that right?
A Yes.
Q And in 2023, you commissioned the Shields Law Group to take a -- to take a look at how the DAF could be restructured, didn't you?

the question without divulging any privileged communication, you may answer it. Otherwise, it is a sustained objection.

THE WITNESS: My understanding, Walkers was counsel for CLO Holdco.

MR. PHILLIPS: Your Honor, Mr. Patrick, the judge asked you to answer the question without reference --

THE WITNESS: Oh.

MR. PHILLIPS: -- to legal advice.

THE WITNESS: Oh, okay.

MR. PHILLIPS: If you can do that, it would be (inaudible).

THE WITNESS: All right. I can't. Thank you.

BY MR. EDNEY:

Q All right. Mr. Patrick, last Thursday did you sit for a deposition with me asking questions?

A Yes, I did.

Q And during that deposition, did you tell the court reporter that your lawyers told you that you had no obligation to inform the charities of their dilution?

A Yes.

Q All right. And aside from not having an obligation to inform them, you chose not to inform them anyway. Isn't that right?

A Correct.

Q Now, after this transaction issuing new shares to DFW

Charitable Foundation, you transferred Charitable DAF Holdco, Ltd. interests in the Charitable DAF Fund, LP to a new company you created, didn't you?

A My -- my director and myself authorized resolutions to contribute the Charitable DAF, LP interests into a new company.

Q Pull up I believe previously-admitted Exhibit 44.

MR. EDNEY: Your Honor, does your record so show?

THE COURT: Yes, I do show that Dugaboy Exhibit 44 has been admitted into evidence.

BY MR. EDNEY:

Q Mr. Patrick, I am showing you what's been previously admitted as Movant's Exhibit 44. Do you see that?

A Yes.

Q And it's entitled (inaudible) Written Resolution (inaudible) Records of the Company past 18 December 2024, in accordance with the articles of association.

Do you see that?

A Yes.

Q Now, Mr. Patrick, is this the instrument by which you transferred the company's interests in Charitable DAF Fund, LP -- and by the company, I mean Charitable DAF Holdco, Ltd. -- to another company?

A It's the resolutions. I think from a corporate standpoint it doesn't effectuate, you know, effectuate it. So it's not

the document -- it's not the contribution agreement. But it is the resolution authorizing that.

Q And did you effect a transfer around that time?

A Yes.

Q Okay. And did you inform the charities that you had made this transfer around December 2024?

A No.

Q After this -- after this transaction, the interests of Charitable DAF Holdco, Ltd. in Charitable DAF Fund, LP was transferred to a new company called CDM CFAB, LLC. Is that right?

A Yes.

Q And perhaps if we can pull up Exhibit 242 and Slide 19. All right. That, on Slide 19, that company is reflected. It's the topmost blue box. Is that correct?

A Yes.

Q And thereafter, it owned a hundred percent of the interests in Charitable DAF Fund, LP; is that right?

A I wouldn't characterize it as ownership, but it was the holder of that interest. It was the new discretionary beneficiary.

Q There was no other holder or discretionary beneficiary than CDM CFAB, LLC; isn't that right?

A Yes.

Q And Charitable DAF Fund, LP held the -- held the corpus of

the DAF assets, the $270 million that we've been talking about?

A Yes.

Q After the transfer of this interest to CDM CFAB, LLC, you then redeemed the interests of the four historical charities in that new company; isn't that right?

A Yes.

Q And by the four historical charities, I mean the Highland Dallas Foundation, correct?

A Yes.

Q And the Highland Kansas City Foundation. Correct?

A Yes.

Q And the Highland Santa Barbara Foundation. Correct?

A Yes.

Q And the HCMLP Charitable Fund. Correct?

A Yes, but as a point of clarification, the redemption was -- or the redemption of Charitable DAF Holdco, Ltd.'s membership interests in CDM, LLC, and so then indirectly -- indirectly those -- those as well as DFW Foundation were -- had -- no longer had indirect exposure to the DAF.

I'm just clarifying. There was no redemption of the participation shares in the supporting orgs that you just indicated. You know, there's a step below.

Q That's right. So what you're telling me is that Charitable DAF Holdco, Ltd. was the -- was the interest holder

in CDM CFAB, LLC, right?
A Yes.
Q And that's how the four historical charities participated, right?
A Yes.
Q And you redeemed their interests in Charitable DAF Holdco, LP, right?
A The interest redeemed was the membership interest and the CDM entity from Charitable DAF Holdco, Ltd.
Q Right. That had the effect of divorcing or ending any interest that, directly or indirectly, that those four historical charities have had in CDM CFAB, LLC; isn't that right?
A Yes.
Q And it had the effect of ending any interest, direct or indirect, that those four historical charities might have had in the Charitable DAF Fund, LP. Isn't that right?
A Yes.
Q And that was the entity that held more than $270 million in assets at the time; isn't that right?
A Yes.
Q And you redeemed this interest in exchange for a payment of $1,637,192. Isn't that right?
A Yes.
Q And the basis -- and a principal basis for coming up with

that number was the valuation from a company called Evalueserve. Isn't that right?
A Yes.
Q And let's pull up our Movant's Exhibit 12, please. But then you -- I think you previously admitted Movant's Exhibit 12, the valuation analysis of certain participation shares in Charitable DAF Holdco, Ltd. as of March 25th, 2025. Do you see that?
A Yes.
Q Was this the valuation document that formed the basis of the $1,637,192 payment?
A Yes.
Q All right. Now, the assets that were held by Charitable DAF Fund, LP, the more than $270 million, can I ask you some questions about that?
A Yes.
Q Approximately half of those assets were held in cash or Treasury bonds. Isn't that correct?
A I just don't -- I don't recall specifically.
Q Okay. Were some of the assets of the $270 million held in cash or Treasury bonds?
A Yes.
Q Was it more than $50 million?
A What time period?
Q This is at the time of the redemption, sir, in March of

2025.
A Yes.
Q Was it more than $100 million?
A It might have been around $100 million.
Q Was it more than $125 million?
A I don't specifically recall.
Q Okay. And then the other part of the $270 million in assets, those were held in corporate bonds. Isn't that right?
A No.
Q What were they held in?
A A variety of different securities and assets. And private -- private bonds.
Q Can you describe them for me?
A Sure. The predominant asset was a private bond in a company called MidWave. I don't recall exactly what the value of that private debt was, but -- at that time, but probably around $90 to $100 million, I would say. And then the remaining amount was a variety of marketable securities, and then land holdings.
Q The marketable securities, they had the value of whatever the market or the price of them as, as of March 25th. Is that right?
A Yes.
Q And the -- was it MidWave private bond, was that bond performing well?

Q And when you sold Hunter Mountain into CLO Holdco, you severed that economic relationship with the Dallas Foundation, too. Isn't that right?

A No.

Q After the February 12th, 2025 sale of Hunter Mountain into CLO Holdco, did the Dallas Foundation have its historical economic relationship with that asset?

A No.

Q Okay. I think that's the answer I wanted.

And you didn't inform the Dallas Foundation of that February 12th, 2025 sale, either, did you?

A That is correct.

Q All right. Let's move to Slide 242, or Exhibit 242, Slide 12. We have -- (inaudible) mark these. No. Yes. Thank you.

(Discussion.)

BY MR. EDNEY:

Q So I'm showing you Exhibit 242, Slide 13. Prior to the February 12th, 2025 sale of Hunter Mountain into CLO Holdco, LLC, it was owned indirectly by Rand PE Fund I, LP. Isn't that right?

A Yes.

Q And you controlled Rand PE Fund I, LP, didn't you?

A Yes.

Q And you did so through a relationship between Rand PE Fund I, LP and Rand Advisors, LLC. Isn't that right?

A Yes.
Q And your relationship was one of investment management duties. Isn't that right?
A Yes.
Q And Rand Advisors, LLC, that was a registered investment advisor. Isn't that right?
A Yes.
Q Now, Mr. Patrick, registered investment advisors owe fiduciary duties to the beneficial owners of the assets they manage, don't they?
A They owe fiduciary duties to their investors.
Q Okay. And the investor in Rand PE Fund I, LP was what?
A Atlas IDF, LP was a 99 percent investor. This chart, you know, as I pointed out in my deposition, is inaccurate. And Dolomiti and Hakusan combined had a one percent interest.
Q So did you at least owe fiduciary duties to those three entities that you just mentioned?
A Yes.
Q And you also had an investment management agreement relationship between Rand Advisors, LLC and Atlas IDF, LP. Isn't that right?
A Yes.
Q And so you owed a fiduciary duty to the investors in Atlas IDF, LP; isn't that correct?
A Yes. Only Crown Global.

Q And one of those investors was Crown Global; is that right?
A Yes.
Q Okay. And one of those fiduciary duties is to keep investors informed of your investment decisions, isn't it?
A Pursuant to the constituent documents of the respective fund, I would agree.
Q And to act in the best interest of those investors. Isn't that right?
A Yes.
Q But when you sold Beacon Mountain, LLC, you didn't tell Crown Global that you had sold it, did you?
A They were not an investor in Rand PE Fund.
Q I see. But they were an investor in Atlas; isn't that right?
A Yes, but Atlas did not own Beacon Mountain, LLC.
Q And --
A And so it was not an investment in Atlas IDF Fund.
Q So that's your explanation for not letting Crown Global know?
A It's -- Atlas IDF did not -- was not an investor. It did -- Beacon Mountain, LLC was not an investment of Atlas IDF. And when Beacon Mountain was sold, there was no requirement under the fund documents to notify a non-investor. And the only investor in Rand PE Fund was the Atlas IDF Fund.

Q I see. So Rand Advisors, LLC had an investment management agreement relationship with Atlas IDF Fund, LP, too, didn't it?
A Yes.
Q And you controlled Rand Advisors, LLC; isn't that right?
A Yes.
Q And did you draw compensation from your role at Rand Advisors, LLC?
A Personally?
Q Yes, sir.
A No. Just holistically, my compensation's paid that way. The management fees simply go to that -- that entity, and then its ownership.
Q Okay. Who is the ownership of Rand Advisors, LLC?
A I believe it's Charitable DAF Holdco Corporation, Inc.
Q Okay. And you control that company?
A Yes, I do.
Q And does that company pay you?
A Yes.
Q So let's just talk about your -- your compensation from the DAF structure in 2024. What entity would be providing that compensation? I'm not asking (inaudible), but where is it paid out of?
A Yeah. It's -- generally speaking, it's paid out of Charitable DAF Holdco Corporation, Inc.

Q And that is a company that's part of the DAF structure; is that right?
A Yes.
Q Okay. And that's a company that benefits from the Rand Advisor, LLC management; is that right?
A Yes.
Q Okay. And Rand Advisors, LLC charges management fees to entities with which it has an investment management agreement; is that right?
A Yes.
Q And what -- how -- what are those fees running (inaudible)?
A Oh, it's based upon the value of the asset that it manages.
Q So it's like points or something like that?
A I agree.
Q Okay. Now, you started the creation of new entities in the DAF structure around December 2024, didn't you?
A Yes, generally speaking. That is kind of a non-specific question, but yes.
Q One of the first moves you made to reorganize the structure was you created a new general partner of Charitable DAF Fund, LP. Isn't that right?
A Yes.
Q Prior to the winter of 2024, the general partner of

Charitable DAF Fund, LP was Charitable DAF GP, LLC. Isn't that right?

A Yes.

Q And that was a Delaware company; is that right?

A Yes.

Q And you changed that general partner to a company called CDH GP, Ltd. Isn't that right?

A Yes.

Q Let's go back to the previously-admitted Slide 19 with Exhibit 242. So I -- is that the company reflected in green over at the left on Slide 19 in Exhibit 242?

A Yes.

Q And that company was created in the Cayman Islands; isn't that right?

A Yes.

Q Now, in 2024, Mr. Patrick, when you created this new general partner, you told your lawyer to design it in a way that would conceal its creation from any (inaudible). Isn't that right?

A I wouldn't characterize that email like that as far as the context.

Q Okay. And you told your lawyers to do it in a jurisdiction that would make it harder to hold you accountable for any future restructuring moves you might make. Isn't that right?

A No.

MR. LEVY: Objection; assumes facts not in evidence.

THE COURT: Response, if any?

MR. EDNEY: I think I'm establishing the foundation for the evidence that's about to come in, Your Honor.

MR. LEVY: That's backwards. The (inaudible) question is not in evidence. Your Honor (inaudible).

MR. EDNEY: I'm asking him what happened, Your Honor, and --

THE COURT: Yes. I'm going to overrule the objection.

MR. EDNEY: All right. Thank you, Your Honor.

BY MR. EDNEY:

Q Let's go to Movant's Exhibit 169, please. All right. Who's Brandon Schaller, Mr. Patrick?

A He's an attorney with the Shields Legal Group.

Q And Phil Aubry?

A He's an attorney with Walkers, is my understanding.

Q And Shawn Raver?

A He is my chief operating officer and assistant GC for the DAF.

Q Bart Higgins?

A He's an attorney for the Shields Legal Group.

Q And do you use an email addressed called mpatricktax1040@gmail.com?

settlement agreement, did you?

A They are not signatures. That is correct -- they are not signatories. That is correct.

Q Instead, you had the previous ownership structure before the sale of Deacon Mountain, LLC sign the settlement agreement. Is that right?

A Yes.

Q Now, the sale was for -- of Deacon Mountain, LLC for one million dollars. Isn't that right?

A Yes.

Q And that happened on February 12th, correct?

A Yes.

Q And about three months later, on May 19th, you entered into this settlement agreement; is that correct?

A Yes.

Q And under the settlement agreement so far, Hunter Mountain and its current corporate owners have received $18-1/2 million of cash. Is that right?

A I'm sorry. Did you say 16?

Q 18.

A 18?

Q Eighteen and a half. Does that sound right, Mr. Patrick?

A No, that doesn't sound right. But I could be mistaken. Like, I thought we received about $10 million of proceeds, not $18 million.

Q Okay. So you're not sure?
A I'm not sure.
Q Do you know where that cash is today, Mr. Patrick?
A In the -- in the general accounts of the DAF. But not specifically.
Q When you say the general accounts of the DAF, do you mean Charitable DAF Fund, LP?
A Yeah, and its constituent subsidiary entities. It's in there. Like the Prego commercial.
Q In some bank account somewhere in the current DAF structure. Is that right?
A Yes.
Q Okay. Has any of it been spent?
A Money is fungible. So there's legal bills and -- so you could say it's spent. It's -- or it's -- just, money is fungible. So it's in the same pot with all the other assets, is how I kind of would think of it.
Q Ballpark, Mr. Patrick, how much has the DAF entity spent on lawyers in 2026?
A 2026? (Pause.) I don't know precisely. I would -- I'm speculating, but I'll give you an answer, roughly maybe five, six million.
Q Okay. What about in 2025?
A Yeah. Yeah. I don't -- I don't know specifically.
Q Is it more than $10 million?

A It could be.
Q Is it more than $20 million?
A No. I would be very surprised by that.
Q Okay. 2024? Do you have a sense of how much was spent on lawyers then?
A Yes. I think that was around $12 million.
Q Okay. So about how many law firms has the Charitable DAF entity retained?
A I would -- closer to a dozen than half a dozen.

THE COURT: Mr. Edney, I'm sorry to interrupt you, but we're at 11:00 o'clock. We're going to take a 10-minute recess. If you're wanting to catch a plane at 1:00 p.m., you're trying to get through this witness, we're going to need to move things along.

MR. EDNEY: Yes, Your Honor.

THE COURT: So I just want to make sure that the parties are aware of their own time management. But we're going to take a 10-minute recess.

MR. EDNEY: Thank you, Your Honor.

THE CLERK: All rise.

(A recess ensued from 11:01 a.m. until 11:15 a.m.)

THE CLERK: All rise.

THE COURT: You may be seated.

A VOICE: Your Honor, (inaudible) Mr. Edney, but there's also (inaudible). (inaudible) to see what it is

before we --

THE COURT: Okay. That's fine.

A VOICE: He's not here anyway.

THE COURT: Yes. Mr. (inaudible), let me tell you this while I have you here. Just, and this is just so you know, the exhibit Volume 1 that I received does not have Exhibit 1 in it and does not have Exhibit 2, which is behind the tab. So I'm happy to hand this back to you all for you all to get that.

A VOICE: Exhibits 1 and 2?

THE COURT: Yes. And then Mr. Edney, I understand that you all just filed a new exhibit on the docket, and so we're going to take another 10-minute recess so everybody can take a look at what this new exhibit is. So we'll be back in recess.

THE CLERK: All rise.

(A recess ensued from 11:16 a.m. until 11:20 a.m.)

THE CLERK: All rise.

THE COURT: You may be seated.

MR. EDNEY: Your Honor, I just want to apologize for (inaudible).

THE COURT: No worries, Mr. Edney.

MR. EDNEY: Second, I (inaudible). That's why I was (inaudible). This morning, I looked and (inaudible). I informed both counsel of that.

the equity owners more quickly in order to obtain the Kirschner personal litigation asset?
A No, I wouldn't characterize that at all. I disagree with that.
Q But you negotiated to obtain the Kirschner litigation asset, didn't you?
A Yes.
Q All right. Now, in 2024, from entities under the DAF structure, you paid yourself more than $14-1/2 million dollars, didn't you?
A No.
Q You heard you heard Ms. McGinnis' testimony. Is it inaccurate?
A Yes.
Q How much did you get paid in 2024?
A About -- the Compensation Committee, pursuant to a Mercer Executive Compensation Benchmark, paid me, for three years of my service starting in 2021, about $10.5 million. So that covered three years. And that was pursuant to Mercer Executive Compensation Benchmarking that took quite some time to accomplish. And then that, that recommendation was presented to the Compensation Committee, and the Compensation Committee made that award.
And as I discussed in my deposition, it was composed of base salary, an annual discretionary bonus. This is set out

by Mercer. And then an LTIP award that's awarded every three years. And so part of that compensation was an LTIP that is based upon the value of the DAF from 2021 through the increase into the 2024 year, is my general recollection.
Q So the answer to my question about how much the DAF entities paid you in 2024 is $10-1/2 million?
A Yes.
Q Okay. And we did talk about your compensation in the deposition on Thursday, didn't we?
A Yes, we did.
Q And I asked you then whether you got paid more than $13 million in 2024, and you said you weren't sure. Isn't that right?
A That is correct.
Q And why are you so certain of the $10-1/2 million number now?
A Because I made an inquiry to confirm exactly what that number was.
Q Did you review documents to do that?
A No.
Q Who did you ask?
A I just called up Mr. Raver, the CFO of the DAF, and I asked him specifically how much was I paid in that year, and that's the number he gave me.
Q Okay. How much did the DAF entities pay you in 2025?

A In the year 2025, I received a bonus for the 2024 work. Paul Murphy awarded me a multiple of three. On a Mercer bench scale of two to four, he awarded me a 3 off of my base of $850,000. And that was paid in roughly February of 2025. And then for the remainder of 2025, I should -- I received my base compensation of $850,000.
Q Okay. I mean, I appreciate the explanation, but can you give me a total number of compensation for 2025, please?
A For 2025, yeah, it would be $850,000 plus $2,550,000, if I'm correct. So add those two numbers together.
Q So about $3.4 million; is that right?
A I'm -- $850,000 plus $2.5 million, yes.
Q Okay. And how about for 2026, Mr. Patrick?
A It's -- it's -- the award for the 2025 work awarded in 2026 was the same multiple and it's the same base.
Q So you expect to make about $3.4 million in 2026?
A Yes.
Q And since its inception, Mr. Patrick, the DFW Charitable Foundation has given away less than a million dollars; is that correct?
A Correct.
Q All right. Do you remember when we earlier talked about the Amended and Restated Partnership Agreement of Charitable DAF Fund, LP?
A Yes.

MR. EDNEY: Let's pull up Highland Exhibit 85, please.

THE COURT: 8-5?

MR. EDNEY: Yes, please.

(Pause.)

BY MR. EDNEY:

Q And just bear with us for a moment, Mr. Patrick. We seem to have technical difficulties here. Do it the old-fashioned way. All right. I've handed you Highland Exhibit 85. This is the Second Amended and Restated Exempted Limited Partnership Agreement of Charitable DAF Fund, LP. Do you see that?

A Yes, I -- yes, I do.

Q And that's the same entity that we were discussing in the previous amended and restated limited partnership agreement; is that right?

A Correct.

Q Okay. And that's dated March 11th, 2024. Correct?

A I see that, yes.

Q And so if the previous exhibit had been amended, it was amended around March of 2024; is that correct?

A Yes, I would assume so.

Q Okay. Let's turn to Page 1 at the bottom of that document page. 1 at the bottom. All right. In Section 1.3 of the document there, you see a reference to Purposes and Powers.