# EXHIBIT 9

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | | |
|---|---|---|
| IN RE: | . | Case No. 19-34054-SGJ-11 |
| | . | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | . | Chapter 11 |
| | . | |
| Debtor. | . | |
| | . | Monday, May 11, 2026 |
| . . . . . . . . . . . . . . . . . . | . | 9:06 A.M. |

TRANSCRIPT OF HEARING ON
MOTION TO RECONSIDER (RE: DOCUMENT 4297 ORDER ON MOTION TO COMPROMISE CONTROVERSY) AND MOTION TO VACATE FILED BY PARTNER DUGABOY INVESTMENT TRUST (4513)
BEFORE THE HONORABLE BRAD W. ODELL
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor, Highland Capital Management:

Pachulski Stang Ziehl & Jones LLP
BY: JOHN A. MORRIS, ESQUIRE
1700 Broadway, Suite 36th Floor
New York, New York 10019

Pachulski Stang Ziehl & Jones LLP
BY: JEFFREY POMERANTZ, ESQUIRE
10100 Santa Monica Boulevard
13th Floor
Los Angeles, California 90067

APPEARANCES CONTINUED ON THE NEXT PAGE.

Audio Recorder: Nicholas Noble
Earle Cabell Federal Building
501 West 10th Street
Dallas, Texas 75242

Transcription Service: Liberty Transcripts
9107 Topridge Drive
Austin, Texas 78750
(847) 848-4907
DBPATEL1180@GMAIL.COM

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

APPEARANCES (CONTINUED):

For the Debtor, Highland Capital Management:

Willkie Farr & Gallagher LLP
BY: MARK STANCIL, ESQUIRE
1875 K Street, NW
Washington, DC 20006

Willkie Farr & Gallagher LLP
BY: JOSHUA LEVY, ESQUIRE
787 Seventh Avenue
New York, New York 10019

For the Movant, Dugaboy Investment Trust:

Morgan, Lewis & Bockius LLP.
BY: MICHAEL EDNEY, ESQUIRE
1717 Main Street, Suite 3200
Dallas, Texas 75201

Morgan, Lewis & Bockius LLP.
BY: MARTHA B. STOLLEY, ESQUIRE
101 Park Avenue
New York, New York 10178

King & Spalding, LLC
BY: SYDNEY ROSE, ESQUIRE
500 West 2nd Street, Suite 1800
Austin, Texas 78701

For Shields Legal Group, P.C., CLO Holdco, Ltd., Kelly Hart & Pitre ("HMIT Entities"):

Kelly Hart & Pitre
BY: LOUIS M. PHILLIPS, ESQUIRE
301 Main Street, Suite 1600
Baton Rouge, Louisiana 70801

# INDEX


WITNESSES

| | PAGE |
|---|---|
| **FOR THE DEBTOR:** | |
| (None) | |
| **FOR THE MOVANT:** | |
| MARGOT MacINNIS | |
| Direct Examination by Mr. Edney | 69 |
| Cross-Examination by Mr. Morris | 134 |
| Redirect Examination by Mr. Edney | 177 |
| Recross-Examination by Mr. Morris | 194 |
| Examination by the Court | 198 |
| LUCY BANNON | |
| Direct Examination by Ms. Stolley | 204 |
| Cross-Examination by Mr. Morris | 257 |
| Redirect Examination by Ms. Stolley | 269 |

EXHIBITS

| | ID | EVD |
|---|---|---|
| **FOR THE DEBTOR:** | | |
| 1 through 41 | 14 | 16 |
| 46 through 54 | 14 | 16 |
| 59 through 68 | 14 | 16 |
| 72 through 76 | 14 | 16 |
| 78 through 89 | 14 | 16 |
| **FOR THE MOVANT:** | | |
| 1 | 12 | 13 |
| 2 | 12 | 13 |
| 5 through 18 | 12 | 13 |
| 19 | 12 | 21 |
| 20 through 27 | 12 | 13 |
| 35 | 12 | 13 |
| 37 through 46 | 12 | 13 |
| 48 through 51 | 12 | 13 |
| 179 | 110 | 114 |
| 191 | 118 | 119 |
| 204 through 212 | 12 | 13 |
| 215 | 12 | 13 |
| 219 through 221 | 12 | 13 |

Exhibit 8. Ms. MacInnis, I'm showing you what's been previously admitted as Exhibit 8. This is a certificate of incorporation of DFW Charitable Foundation, a nonprofit stock corporation. Do you see that on the first page?

A I do.

Q Is this a document that you gathered in the course of your investigation?

A Yes.

Q Do you know what it is?

A Yes. It's -- it incorporates DFW and confirms that, I was correct, it was formed in the State of Delaware.

Q Do you have an understanding of where DFW Charitable Foundation is headquartered?

A I understand it's at Mark Patrick's residence.

Q And do you have an understanding as to Mr. Patrick's role in DFW Charitable Foundation?

A Nothing more than I understand him to be named as the director and holder of the shares of DFW.

Q Let's move on to Movant's Exhibit 43 which is not in evidence. Ms. MacInnis, just in the manner of some preliminary questions, in the course of your investigation, did you gather the business records of Charitable DAF Holdco and use them?

A Yes.

Q And did that include resolutions of the board of directors of Charitable DAF Holdco?

A Yes.

Q And from what sources were you able to gather these records?

A Corporate records generally come from the registered office, although the law firms enacted for the -- for Holdco did have some of those information. So I can't say precisely which entity provided --

Q Charitable DAF Holdco, Ltd. is a Cayman Islands company.

A Yes.

Q Is that right? Does a Cayman Islands company have a duty to maintain its board of directors resolutions and (indiscernible)?

A Yes, it does.

Q Do you have an understanding of what Exhibit 43 is?

A No, not unless I see it.

MR. EDNEY: If we can pull up the first page, please. Oh, here we are.

(Pause)

BY MR. EDNEY:

Q Let us know if you want us to scroll further.

A If you could scroll down.

Q Perhaps I can direct your attention to Section 5?

A Okay. Yes, I understand.

Q What do you recognize this resolution to be?

A This is the resolution that, at least for one purpose,

admitted, or the issuance of shares to DFW which gave DFW a 51 percent interest in the Holdco structure.

Q And with respect to the issuance of shares that DFW Charitable Foundation that you just referenced, what role, if any, did that play in Mr. Patrick's restructuring of the DAF Entities?

A The effect of that was to dilute the other shareholders. And most corporate resolutions require a two-third majority. But the 51 percent of share issuance that diluted the other limited partners.

MR. EDNEY: Your Honor, I move for the admission of Movant's Exhibit 43 as a document held in the regular course of business OF Charitable DAF Holdco and sponsored by (indiscernible).

THE COURT: There's no need to stand up, Mr. Morris. This document has already been admitted as part of the original stipulations or agreements of the party. That's what I show in my records. Do you have anything that disagrees with that?

MR. MORRIS: No, Your Honor.

THE COURT: Okay. So this document has already been admitted, Mr. Edney. You may proceed.

MR. EDNEY: Okay. I had it off my list. Thank you, Your Honor.

BY MR. EDNEY:

Q All right. I'm going to direct your attention to the

first page of the document, the Section 2, and Section 2.5. Did there come a time where the directors of Charitable DAF Holdco set the issuance of shares to another charitable entity or as necessary for certain reasons?

A Yes. I understand that, their reasons for doing that, yes.

Q And what was your understanding of their reasons?

A My understanding is that they perceived a sort of tax threat, challenge to the structure on the basis of Mr. Dondero having sort of undue influence in the structure, and that it threatened the 501(c)(3) status.

Q And did you, in the course of your investigation, come to a conclusion about the genuineness of that classification?

A We took our own tax advice on that matter and did -- don't agree with the perception of a threat and the rationale for that explanation.

Q Why not?

A Essentially, and I'm not a tax expert, but the advice we received indicated that --

MR. PHILLIPS: Objection. This is hearsay. She's testifying that she doesn't have any idea, but she's relying on advice of some third party that's not here and is not on the witness list.

THE COURT: Mr. Edney, do you have a response?

MR. EDNEY: Yes. My question is trying to draw the

conclusion that she reached, and the basis for that conclusion. I'm not calling for hearsay (indiscernible).

THE COURT: So, Ms. MacInnis, to the extent that you can answer the question based on your understanding without stating what you were told, I'll go ahead and allow the question.

THE WITNESS: I reached the conclusion that there was no perceived tax threat.

BY MR. EDNEY:

Q Ms. MacInnis, I want to direct your attention to Section 2.1 of the document previously admitted. It reads as follows, "It is noted that the directors have received communications from certain participating shareholders requested information (indiscernible) claims regarding the companies and shareholders' subsidiaries' finances." Do you see that, Section 2.1?

A On the resolution?

Q Yes.

A Yes.

Q Do you have a view of whether the complaints of the charities had a role in the decision of Charitable DAF Holdco to issue shares to this new DFW Charitable Foundation entity?

A I don't know. That was before my appointment.

Q Let's move on to Exhibit 179.

Ms. MacInnis, in the course of your investigation, were

you able to collect certain emails between --

THE COURT: I'm sorry. Did you finish the question, Mr. Edney or?

MR. EDNEY: No.

THE COURT: Okay. Did you want to finish the question --

MR. EDNEY: I will.

THE COURT: -- before he lodges his objection?

MR. EDNEY: I would, Your Honor.

BY MR. EDNEY:

Q In the course of your work as liquidator, were you able to gather electronic communications between Charitable DAF Holdco managers and/or advisors?

A Yes.

Q And how were you able to do that?

A I made requests of the providers for their books and records and information belonging to the company.

Q And for what reason did you do that?

A To carry out my review and investigation of the restructuring.

Q And did that investigation include inquiries into the justification for some of the restructuring rules?

A Yes, it did.

Q And were emails between Charitable DAF Holdco managers and/or advisors maintained in the ordinary course of Charitable

charities?
A They lost their economic interest and right to distributions from the 270 million in the structure. And as I understand it, you know, they, each of them had multi-year grant obligations and charitable works that they were contributing to using the distributions from the structure. And they'd been left in serious straits, not being able to fund those projects.
Q And the Dallas Foundation, was that a charitable organization that was founded in just the last couple years?
A No. As I understand it, it's been around for a century.
Q And do you have similar views with respect to the other four?
A Yes.
Q All right. Ms. MacInnis, in your role as liquidator, you had access to the communications that were going out of the Charitable DAF Holdco structure?
A Yes.
Q And in your role of liquidator, did you see any evidence that these four charities were informed of the redemption and the shift of their interest from 270 million to 1.61 million when it happened?
A No, I did not.
Q Now, in the course of your investigation, did -- have you inquired into what Mr. Patrick had been paid by various DAF

Entities over the course of the last few years?
A Yes, I have.
Q And what did you do to determine the source and amount of this compensation over that period?
A We received information in connection with the disclosures of our injunction that was in place from the end of July to early January. And from the disclosure of various cash outlays from the structure, we were able to determine what amounts had been paid to Mr. Patrick and Mr. Murphy.
Q And did you develop a view, based on your investigation, of how much Mr. Patrick was paid by the entities in the calendar year of 2024?
A Yes.
Q And what was that view?
A I don't have the exact numbers in front of me, but it's set out in our statement of claim. But it was substantial increases in remuneration were paid out to Mr. Murphy and Mr. Patrick from the end of 2024 through 2/2025.
Q And was that amount in excess of $10 million?
A Yes.
Q Was it in excess of $13 million?
A Yes. I believe the total was 18, 18 million and change. But I don't recall the exact figure.
Q And was there a short period of time in September or October of 2024, where these payments were concentrated?

A Yes.

Q And do you recall how much was paid out during those periods?

A I don't recall exactly. I don't recall exactly.

Q Did you also investigate the compensation of Paul Murphy?

A Yes, we did.

Q And can you remind us who Paul Murphy was?

A He was the other co-director of Charitable DAF Holdco.

Q And did you reach a conclusion as to the level of his compensation in 2024, 2025?

A Yes. It increased substantially in terms of what he was paid for salary and also for bonus, and that they were paid in advance of the -- they were paid in a lump sum.

Q And are you able to appear today to give us a sense of the magnitude of that increase in compensation?

A I believe Paul Murphy's initial director services agreement afforded him a salary of 125,000. And then that was subsequently increased to 250, I believe. And then he was also awarded a bonus of 250 at the end of 2024, and I believe in 2025 paid a sum of 500,000, representing his new salary and bonus in advance of the company being put into liquidation.

Q And did your investigation reach any conclusions about who approved Mr. Murphy's increases in compensation?

A I understand. I believe I recall that it was Mr. Patrick approving Mr. Murphy's compensation.